## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| RASER TECHNOLOGIES, INC., *et al.*,[1] | Case No. 11-11315 (KJC) |
| Debtors. | (Joint Administration Requested) |

## MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014, (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING,(II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO FED R. BANKR. P. 4001(b) AND (c)

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by their undersigned counsel, hereby move the Court (the "Motion") for entry of (i)(a) an interim order, the form of which is attached hereto as Exhibit A (the "Interim Order"), authorizing the Debtors to obtain post-petition financing on a secured, super-priority basis pursuant to sections 105, 362, 363, 364 and 507 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and granting certain related relief on an interim basis, (b) scheduling a final hearing on this Motion pursuant to Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (ii) a final order authorizing the Debtors to obtain post-petition secured, priming, super-priority financing and granting certain related relief. In support of this Motion, the Debtors rely on the Declaration of Nicholas Goodman in Support of Chapter 11

---

[1] The Debtors are the following: Raser Technologies, Inc. ("Raser"), Raser Technologies Operating Company, Inc, Raser Power Systems, LLC, RT Patent Company, Inc., Pacific Renewable Power, LLC, Western Renewable Power, LLC, Intermountain Renewable Power, LLC, Los Lobos Renewable Power, LLC, Columbia Renewable Power, LLC, Truckee Geothermal No. 1 SV-01, LLC, Truckee Geothermal No. 2, SV-04, LLC, Trail Canyon Geothermal No. 1 SV 02, LLC, Devil's Canyon Geothermal No. 1 SV-03, LLC, Thermo No. 1 BE-01 ("Thermo"), LLC, Thermo No. 2 BE-02, LLC, Thermo No. 3 BE-03, LLC, Cricket Geothermal No. 1 MI-01, LLC, Harmony Geothermal No. 1 IR-01, LLC, Lightning Dock Geothermal HI-01, LLC, and Klamath Geothermal No. 1 KL-01, LLC. For the purpose of these chapter 11 cases, the service address for all Debtors is: Raser Technologies, Inc., 5152 North Edgewood Drive, Provo, UT 84604.

Petitions and Related Motions (the "Goodman Declaration"). In further support of this Motion, the Debtors respectfully state as follows:

## I. Jurisdiction and Venue

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.    The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Rules, and Rules 4001 and 9014 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## II. Background

3.    On the date hereof (the "Petition Date"), each of the Debtors filed with the Court their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 cases. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have, pursuant to a separate motion, moved this Court for an order authorizing the joint administration of these chapter 11 cases.

4.    No creditors' committee has been appointed in these cases. No trustee or examiner has been appointed.

5.    A full description of the Debtors' business operations, corporate structures, capital structures, the reasons for commencing these cases, and the proposed restructuring set forth in the Plan Support and Restructuring Agreement (the "Plan Support Agreement") between the Debtors and certain of their principal creditor constituencies, is set forth in full in the Goodman

Declaration, which was filed contemporaneously with this Motion and which is incorporated herein by reference. Additional facts in support of the specific relief sought herein are set forth below.

### III. The Proposed DIP Facility

6.    Prior to the Petition Date, the Debtors' management determined that the Debtors likely would have a need for additional working capital after the commencement of these bankruptcy cases. While the Debtors did their best to conserve their available cash prior to the Petition Date, they will need to have access to additional liquidity to ensure their ability to fund their day-to-day operations and to reassure their employees, trade vendors and other constituencies that the Debtors will be in a position to meet their obligations during the pendency of these cases.

7.    Accordingly, following extensive negotiations regarding the Debtors' working capital needs and the means by which the Debtors will seek to reorganize, Linden Capital, LP, Tenor Master Opportunity Fund, Ltd., and Aria Opportunity Fund, Ltd. (collectively, the "Lenders"), have offered to provide to the Debtors a post-petition, secured financing facility (the "DIP Facility") to address the Debtors' anticipated working capital needs during the pendency of these cases. The Lenders hold in the aggregate approximately $25 million of the $55 million face amount of the 8.00% Convertible Senior Unsecured Notes due 2013 (the "Convertible Notes") issued by the Debtors in 2008.

8.    In their capacity as current holders of the Convertible Notes, the Lenders already have a vested interest in seeing the value of the Debtors' businesses preserved and maximized. Further, the Lenders are parties to the Plan Support Agreement and have committed to providing not only the DIP Facility, but also to engage in the other transactions related to the restructuring of the Debtors contemplated by the Plan Support Agreement. Upon information and belief, one

or more of the Lenders solicited the holders of more than 70% in principal amount of the Convertible Notes to participate in the DIP Facility and the transactions contemplated by the Plan Support Agreement. Unfortunately, only the Lenders were willing to commit the significant amounts of additional capital contemplated under the DIP Facility and the Plan Support Agreement.

9. The principal terms of the DIP Facility are set forth on the Summary of DIP Terms, attached hereto as Exhibit B and incorporated herein by reference. For ease of reference, set forth below are the principal terms of the DIP Facility: [2]

| | |
|---|---|
| Borrower: | Debtor Raser Technologies, Inc. |
| Guarantors and Guarantee: | All subsidiaries of the Borrower. All obligations of the Borrower under the DIP Facility will be unconditionally guaranteed by the Guarantors. |
| Administrative Agent: | Wilmington Trust Company will serve as the administrative agent for the Lenders (in such capacity, the "Administrative Agent"). |
| Commitment, Availability, and Purposes: | • Interim commitment of $750,000 (the "Initial DIP Loan") available upon entry of the Interim Order, to be used for general working capital needs of the Debtors; <br><br> • Aggregated commitment of $8.75 million, subject to the terms and conditions of the DIP Facility Term Sheet and entry by the Bankruptcy Court of a final order satisfactory to the Lenders in their sole discretion (i) approving the definitive documentation of the DIP Facility (the "DIP Loan Documentation") (ii) approving the DIP Facility (including, without limitation, the Thermo Lenders Payment), (iii) finding that the liens securing the claims of the Thermo Lenders under the Thermo 1 Financing Documents are valid, enforceable and unavoidable, and (iv) barring any further challenges to the validity, enforceability or unavoidability of such liens (the "Final Order"), which shall be available for the |

---

[2] This summary of the DIP Facility is intended to assist the Court in understanding key aspects of the arrangement and is qualified in its entirety by reference to the Summary of DIP Terms attached as Exhibit B. All capitalized terms not otherwise defined in this description have the meanings given to them in the Summary of DIP Terms.

following purposes:

- $6.0 million to satisfy a portion of the principal obligations owing by Debtor Thermo No. 1 BE-01, LLC (the "Thermo 1 Project Entity") to The Prudential Insurance Company of America, and Zurich American Insurance Company (together, the "Thermo Lenders") under the Thermo 1 Financing Documents (as defined in the Goodman Declaration) in accordance with the Plan Support Agreement plus (ii) an amount sufficient to reimburse the Thermo Lenders and Deutsche Bank Trust Company Americas, as their Administrative Agent and Collateral Agent (the "Thermo Lenders' Agent"), their reasonable, documented out-of-pocket attorneys' fees and expenses in documenting the transactions contemplated by the Plan Support Agreement to the extent such amounts are not covered by the retainer previously provided to them by the Debtors (the "Thermo Lenders Reimbursement Amount") (the aggregate payment under this clause (a) is referred to herein as "Thermo Lenders Payment"); and

- up to $2.75 million (less the Thermo Lenders Reimbursement Amount), including the Initial DIP Loan, (i) to fund day-to-day working capital needs of the Debtors and (ii) the costs, expenses and other payments associated with these cases, the Plan and the other restructuring transactions contemplated by the Plan Support Agreement (other than Expense Payments), in accordance with the Budget (as defined below).

**Collateral and Carve-Out:**

Prior to the entry of the Final Order, all obligations of the Debtors under the DIP Facility shall be secured by (i) first-priority blanket liens and security interests on all assets of the Debtors (other than the collateral securing the Thermo Project Entity's obligations to the Thermo Lenders (the "Existing Collateral")) that are not subject to existing liens, and (ii) junior liens and security interests on all assets of the Debtors that are subject to existing liens or security interests, including the Existing Collateral (the "DIP Facility Junior Liens"). The DIP Facility Junior Liens shall be junior in all respects to the Thermo Lenders' liens on the Existing Collateral prior to the Thermo Lenders Payment.

Following the Thermo Lenders Payment, the DIP Facility obligations shall be secured by (i) a first-priority priming lien and security interest on the assets of the Thermo 1 Project Entity, including the Existing Collateral, (ii) first-priority blanket liens and security interests on all other assets of the Debtors that are not subject to existing liens, (iii)

junior liens and security interests on all assets of the Debtors that are subject to existing liens or security interests except as otherwise described herein, and (iv) super-priority administrative expense claims against the Debtors' bankruptcy estates.

The foregoing liens securing the DIP Facility shall be entitled to the benefits and protections of the appropriate provisions of Section 364 of the Bankruptcy Code.

Without limiting the generality of the foregoing, upon the entry of the Final Order, the foregoing liens shall be subject to (x) all accrued and unpaid fees that arise pursuant to 28 U.S.C. §1930, plus (y) the payment of allowed and unpaid fees of professionals retained in the Cases (other than ordinary course professionals) that are incurred after the delivery of a written notice of the occurrence of one or more Events of Default in an amount not to exceed $100,000, plus (z) any allowed accrued but unpaid fees and expenses owed to professionals retained in the Cases (regardless of when allowed) that were accrued on or before the date of delivery by the Lenders to the Debtors of a written notice of the occurrence of one or more Events of Default to the extent consistent with the Budget ((x), (y) and (z), collectively, the "Carve-Out").

| | |
|---|---|
| Budget: | A 13-week rolling cash budget (with such supporting detail as the Lenders may reasonably request) (as amended from time to time, the "Budget")[3] that reflects on a line-item basis the Debtors' anticipated aggregate cash receipts and aggregate working capital expenses as determined by Debtors in their reasonable judgment as necessary or required for each week covered by the Budget. For each two week period in the Budget, the aggregate disbursements shall not exceed 110% of the aggregate amount of projected disbursements for such two week period ("Permitted Variance"). Upon the prior written request of the Debtors, or upon its own initiative, the Required Lenders in their sole but reasonable discretion may authorize the Debtors in writing to exceed the Permitted Variance. Any unused amounts in the Budget may carry forward to successive weeks on a line-by-line basis, with no carry-over surplus to any other line item. On each bi-weekly anniversary of the Petition Date (or, if such anniversary is not a Business Day, then on the next succeeding Business Day), the Borrower shall provide the Administrative Agent with an updated Budget, including a report of variances on a line-item basis. |
| Term: | Unless otherwise agreed by the Lenders, borrowings shall be repaid in full, and the Commitments shall terminate (the "Termination Date"), on the earliest of (i) May 4, 2011 if the Interim Order has not been entered |

---

[3]     The initial Budget is attached hereto as Exhibit C.

by 11:59 p.m. (Wilmington, Delaware time) on such date, (ii) May 20, 2011 if the Final Order has not been entered by 11:59 p.m. (Wilmington, Delaware time) on such date, (iii) August 11, 2011 if an order confirming the Plan in accordance with the Plan Support Agreement and the Plan Term Sheet is not entered by 11:59 p.m. (Wilmington, Delaware time) on such date, (iv) the "Effective Date" of the Plan, (iv) August 26, 2011 (the "Final Maturity Date") and (v) the acceleration of the loans and the termination of the Commitments in accordance with the terms of the DIP Loan Documentation.

| | |
|---|---|
| Closing Date: | Closing Date for the DIP Facility to occur upon entry of the Interim Order, but no later than May 4, 2011. |
| Compensation: | As a material inducement to the Lenders to make the Commitments, the Borrower agrees to compensate the Lenders, from and after the Interim Order, as set forth below. |
| Interest Rate: | The Debtors' obligations under the DIP Facility shall accrue interest at the rate of 15% per annum on the outstanding principal amount of the DIP Loan, compounded monthly (the "Interest Rate"). Interest shall be payable at maturity of the DIP Facility (whether at stated maturity, by acceleration or otherwise). At all times that an Event of Default exists, the Interest Rate applicable to the DIP Facility (and all amounts outstanding thereunder) shall equal 17% per annum. Interest after maturity shall be payable upon demand. |
| Commitment Fees: | A fee equal to 10% of the Initial DIP Loans earned upon entry of the Initial Order, and a fee equal to 10% of the Commitment Amount (less the amount of the Initial DIP Loans) earned upon entry of the Final Order. Once earned, all Commitment Fees will accrue interest at the Interest Rate. All Commitment Fees (together with accrued interest) will be payable upon maturity of the DIP Facility (whether at stated maturity, by acceleration or otherwise). |
| Credit of Interest and Commitment Fees: | If (a) no Event of Default has occurred and is continuing under the DIP Loan Documentation or the Plan Support Agreement, (b) the DIP Facility obligations are satisfied or waived in accordance with the terms of the Plan Support Agreement and the Plan, and (c) the Plan (as defined below) is confirmed and goes effective, then (i) all of the accrued interest on the DIP Loans and the Commitment Fees, and (ii) 100% of the accrued Commitment Fees, will be credited in accordance with the Plan Support Agreement and the Plan Term Sheet attached thereto as Exhibit A (the "Plan Term Sheet"). |
| Optional Prepayments: | No early repayment or prepayment of any obligations under the DIP Facility. |

| | |
|---|---|
| <u>Conditions of Each</u><br><u>DIP Loan:</u> | The obligation to provide each DIP Loan (including the Initial DIP Loans) shall be subject to the satisfaction of the Initial Conditions and each of the following conditions: |

        (a)     If after giving effect to a request for extension of credit, usage of the Commitments would not exceed $8.75 million;

        (b)     In connection with the Initial DIP Loan, the Interim Order shall have been entered and the Interim Order shall be in full force and effect, and shall not have been amended, vacated, reversed, modified or rescinded or subject to a presently effective stay pending appeal;

        (c)     For any subsequent loan, (i) the DIP Loan Documentation shall have been executed and (ii) the Final Order and Auction Procedures Order (as defined in the Plan Term Sheet) shall have been entered, shall be in full force and effect, and shall not have been amended, vacated, reversed, modified or rescinded or subject to a presently effective stay pending appeal;

        (d)     No Event of Default and no condition which would constitute an Event of Default with the giving of notice or lapse of time or both shall exist;

        (e)     Representations and warranties shall be true and correct in all material respects on and as of the date of each extension of credit, except to the extent such representations and warranties specifically relate to an earlier date;

        (f)     Receipt of a notice of borrowing from the Borrower in form and substance reasonably satisfactory to the Lenders;

        (g)     The Plan Support Agreement has not been terminated in accordance with its terms and no party thereto has issued a notice of termination that will, by the terms of the Plan Support Agreement, become effective upon the passage of time without any further action by, or notice to or from, any other party; and

        (h)     Such other customary conditions as are reasonably required by the Administrative Agent of the Lenders.

| | |
|---|---|
| <u>Representations and</u><br><u>Warranties:</u> | The DIP Loan Documentation shall contain representations and warranties customary for debtor-in-possession financings and other terms reasonably deemed appropriate by the Lenders. |
| <u>Affirmative and</u><br><u>Negative Covenants:</u> | The DIP Loan Documentation shall contain certain affirmative and negative covenants customary for debtor-in-possession financings and other terms (including customary exceptions) reasonably deemed |

appropriate by the Lenders (subject to the Plan Support Agreement).

Events of Default:    The following shall constitute Events of Default under the DIP Facility:

(a)    Failure by the Borrower to pay principal, interest or fees when due;

(b)    Breach by any Debtor of any of the negative covenants described above;

(c)    Breach by any Debtor of any other covenant or agreement contained in the DIP Loan Documentation after written notice thereof from Required Lenders (subject, in the case of certain affirmative covenants, to a 10 day grace period; provided, that grace periods shall not apply to any notice or Budget reporting provisions);

(d)    Failure of the Debtors to obtain the Interim Order by 11:59 p.m. (Wilmington, Delaware time) on May 4, 2011;

(e)    Failure of the parties to execute the DIP Financing Documentation on or prior to May 20, 2011;

(f)    Failure of the Debtors to obtain the Final Order by 11:59 p.m. (Wilmington, Delaware time) on May 20, 2011;

(g)    Failure of the Debtors to obtain confirmation of a Chapter 11 plan of reorganization in conformance with the Plan Support Agreement (the "Plan") before 11:59 p.m. (Wilmington, Delaware time) on August 11, 2011;

(h)    Failure of the Debtors to have the Plan become effective before 11:59 p.m. (Wilmington, Delaware time) on August 26, 2011;

(i)    Any representation or warranty made by any Debtor shall prove to have been incorrect in any material respect when made;

(j)    Any of the Cases shall be dismissed or converted to a Chapter 7 Case; a Chapter 11 Trustee, a responsible officer or an examiner with enlarged powers relating to the operation of the business of the Borrower (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Cases; or any other superpriority Claim (other than the Carve-Out upon entry of the Final Order) or lien which is pari passu with or senior to the claims or liens of the Administrative Agent and the Lenders shall be granted in any of the Cases;

(k)      Other than (a) payments authorized by the Bankruptcy Court (i) in respect of accrued payroll and related expenses as of the commencement of the Cases or (ii) in respect of certain creditors, in each case to the extent authorized by one or more "first day" orders reasonably satisfactory to the Lenders), (b) payments authorized by the Bankruptcy Court with respect to any settlement or other stipulation with any creditor of any Borrower, other than the Lenders, as adequate protection or otherwise individually or in the aggregate not in excess of $100,000 for any and all such creditors unless approved in writing by the Lenders; and (c) the making of the Thermo Lenders Payment on the terms and conditions set forth above, or (d) as otherwise contemplated by the Budget, any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or payables of a Debtor;

(l)      The Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Borrower or any Guarantor which have an aggregate value in excess of $350,000;

(m)      A Change of Control (to be defined in a manner mutually agreeable to the Lenders and Debtors) shall occur;

(n)      Any material provision of the DIP Loan Documentation, the Interim Order or the Final Order shall cease to be valid and binding on any Debtor, or any Debtor shall so assert in any pleading filed in any court;

(o)      An order (i) shall be entered reversing, staying for a period in excess of fifteen (15) days, vacating or rescinding the Interim Order or the Final Order or (ii) shall be entered amending, modifying or supplementing the Interim Order or the Final Order without the prior written consent of the Lenders;

(p)      The Plan Support Agreement is terminated; or

(q)      Such other reasonable and customary Events of Default as are reasonably required by the Lenders.

Upon the occurrence and continuance of any of these Events of Default beyond the applicable grace period (if any) set forth below, the Administrative Agent may take all or any of the following actions without further order of or application to the Bankruptcy Court, <u>provided</u> that with respect to items (iii) and (iv) below, the Administrative Agent shall provide the Borrower, any official committee appointed in these cases and the United States Trustee for the District of Delaware with five

(5) Business Days' prior written notice and provided, further, that upon receipt of the notice referred to in the immediately preceding clause, the Borrower may continue to make ordinary course disbursements from such accounts referred to in (iii) below to the extent and at the times set forth in the Budget, but may not withdraw or disburse any other amounts from such account (in any hearing after the giving effect of the aforementioned notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, an Event of Default has occurred and is continuing):

> (ii)     declare the principal of and accrued interest on the outstanding borrowings to be immediately due and payable;

> (iii)     terminate the Commitments;

> (iv)     set-off any amounts held for the account of the Debtors as cash collateral or in any accounts maintained with the Administrative Agent, any other Lenders or their respective affiliates; and

> (v)     take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the Administrative Agent and the Lenders) permitted under the DIP Loan Documentation, or by applicable law.

Credit Bidding:

The Administrative Agent and the Lenders shall have the right to credit bid in any sale of Collateral and shall have standing with respect to any such sale or hearing related thereto.

Yield Protection and Increased Costs; Taxes:

Standard yield protection and indemnification including capital adequacy requirements will be incorporated that will satisfactorily compensate the Lenders in the event that any changes in law, requirement, guideline or request of relevant governmental authorities shall increase costs, reduce payments or earnings, or increase capital requirements. All payments to be made by the Borrower or the Guarantors under the DIP Facility shall be made free and clear of any deduction, withholding or set off by reason of any taxes or other amounts, except as required by applicable law. If any taxes or other amounts are required by applicable law to be deducted or withheld from any payments made by the Borrower or the Guarantors under the DIP Facility to the original Lenders (or any assignee of such Lender that is an affiliate of such Lender) (a "Sponsor Lender"), then the amount payable by the Borrower or the applicable Guarantor(s) shall be increased as necessary so that, net of any such withholding or deduction, such Sponsor Lender receives the amount it would have received had no such withholding or deduction been made; provided that income or franchise taxes imposed on (or measured by) overall net income and imposed by the United States or the jurisdiction under the laws of which

11

the Lender is organized, has its principal place or business or has its applicable lending office, or any branch profits taxes imposed by the United States, shall be "excluded taxes" and shall not be eligible for the gross-up payable by the Borrower and/or the Guarantors pursuant to this section. Each foreign Lender shall furnish to the Borrower and the Administrative Agent appropriate certificates or tax forms as will permit such payments to be made without being subject to U.S. federal tax withholding to the extent such Lender is legally able to do so.

Costs and Expenses;
Indemnification:

All reasonable and documented out-of-pocket costs and expenses of the Administrative Agent and the Lenders (including, without limitation, reasonable fees and disbursements of counsel) incurred in connection with the transactions contemplated hereby shall be payable by the Borrower and the Guarantors on demand whether or not the transactions contemplated hereby are consummated. The Borrower shall also pay all reasonable and documented out-of-pocket costs and expenses of the Administrative Agent and the Lenders (including, without limitation, reasonable fees and disbursements of counsel) in connection with (i) the negotiation, preparation and execution of all documentation executed on or before the Closing Date in connection with the transactions contemplated hereunder, whether or not consummated, and (ii) the enforcement of any rights and remedies under the DIP Loan Documentation. All costs and expenses required to be paid by the Borrower and Guarantors hereunder are collectively referred to as the "Expense Payments". All Expense Payments that become due and owing under the DIP Loan Documents shall be automatically added to the principal amount of the DIP Loan on the third Business Day following the Borrower's receipt of a reasonably detailed invoice therefor from the Administrative Agent.

The Borrower and the Guarantor shall indemnify the Administrative Agent and each Lender against any liability arising in connection with the transactions contemplated hereby (other than in the case of the gross negligence, bad faith or willful misconduct of any indemnified person).

Assignments and
Participations:

Usual and customary assignment and participation provisions reasonably satisfactory to the Administrative Agent and the Lenders, subject to the Borrower's prior written consent, not to be unreasonably withheld or delayed, except that no such consent shall be required if an Event of Default has occurred and is continuing or in the case of any such assignment or participation to an affiliate of any Lenders.

The Debtors believe that the terms and conditions of the proposed DIP Facility are fair and reasonable under the circumstances and that entering into and performing under the DIP Facility Term Sheet is in the best interests of their estates and creditors.

10.     Prior to the Petition Date, the Debtors, at times with the assistance of their professionals, worked diligently to identify other sources of working capital financing to determine if they could obtain post-petition financing on terms or conditions more favorable than those contained in the proposed DIP Facility. None of those proposed lenders, however, were able to provide an offer for financing on terms that were as or more favorable than those contained in the DIP Facility. Accordingly, the Debtors believe that the proposed DIP Facility represents the best alternative available to address their post-petition working capital needs.

## IV.  Relief Requested

11.     By this Motion, the Debtors respectfully request entry of interim and final orders, pursuant to sections 105, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 (i) approving the DIP Facility Term Sheet, (ii) authorizing the Debtors to obtain post-petition financing on a secured, super-priority basis (and on a priming basis, subject to entry of the Final Order) on the terms and conditions set forth in the DIP Facility Term Sheet and the DIP Financing Documentation, once it is executed, (iii) authorizing the Debtors to grant liens and security interests on their assets as contemplated by the DIP Facility Term Sheet, (iv) authorizing the Debtors to make certain payments to the Lenders in accordance with the terms of the DIP Facility Term Sheet, and (v) authorizing the Debtors to grant adequate protection to the Pre-Petition Lien Holders (as defined below), and (vi) granting certain related relief.

## V.  Argument

**A.     The Debtors' Need for Post-Petition Financing**

12.     The Debtors believe that it is essential that they obtain post-petition financing. The relief requested herein will enable the Debtors to continue their ordinary course, day-to-day operations, to preserve the value of their estates, and to facilitate the Debtors' ability to successfully execute the transactions contemplated by the Plan Support Agreement, including the confirmation of the Plan.  Access to credit under the DIP Facility is necessary to provide working capital during the pendency of these cases to deal with the liquidity constraints described in the Goodman Declaration and to provide the Debtors' employees, vendors and other key constituencies with confidence that the Debtors have sufficient resources available to maintain their operations in the ordinary course.  Absent this new liquidity, not only would the Debtors' ability to maximize the value of their estates and successfully reorganize be jeopardized, but the Debtors almost certainly would be forced to cease their business operations, and lose the going-concern value of their businesses to the direct detriment of all parties in interest.

13.     Section 364 of the Bankruptcy Code "provides bankruptcy courts with the power to authorize post-petition financing for a Chapter 11 debtor-in-possession," *See In re Defender Drug Stores, Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991).  "Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to extend post-petition credit'" *Id.*  In particular, section 364(c) of the Bankruptcy Code establishes the conditions under which a debtor may obtain certain types of secured credit and provides, in pertinent part, as follows:

> (c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
>
> > (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

14.    Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

(a)    the debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above factors and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); *In re Ames Dep't Stores*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990).


### i.    *Credit Was Not Obtainable on Better Terms*

15.    To show that the credit required is not obtainable on an unsecured basis or on better terms, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such

credit is unavailable." *Id.* at 1088; *see also Ames*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

16.    As discussed above, to obtain post-petition financing, the Debtors and their advisors approached several sophisticated, commercial entities, including potential strategic buyers and principal creditors of the Debtors, about providing debtor-in-possession financing in conjunction with a sale or other restructuring transaction. None of those potential lenders were willing to make a post-petition loan on an unsecured basis in an amount necessary for the Debtors' business operations and other financing needs. As such, when considering all of the factors, the Debtors concluded that the DIP Facility was their best financing alternative. The Debtors' efforts to seek necessary post-petition financing satisfies the statutory requirements of section 364 of the Bankruptcy Code. *See, e.g., In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (debtor seeking financing under section 364(c) of the Bankruptcy Code made acceptable attempt to obtain less onerous financing by speaking to several lenders that denied the loan request); *Ames*, 115 B.R. at 40.

### ii.    The DIP Facility is Necessary to Preserve Assets of the Estates

17.    It is essential that the Debtors obtain the financing required to continue, among other things, the orderly operation of the Debtors' businesses and to make certain capital expenditures and satisfy certain working capital requirements of the Debtors' businesses. The

DIP Facility also is essential to provide the Debtors' various stakeholders, including employees, vendors, service providers and other key constituencies, with confidence in the Debtors' ability to reorganize.

18.     The success of these cases depends, among other things, on (a) the Debtors' ability to meet their day-to-day working capital requirements without interruption or delay and (b) the confidence of the Debtors' stakeholders. If the proposed DIP Facility is denied, the Debtors almost certainly will experience business disruptions in the short term and the Debtors' ability to reorganize will be damaged irreparably. In addition to ensuring that the Debtors can fund their operations, the requested availability under the DIP Facility will help provide assurances to the Debtors' vendors and employees that they will be paid for post-petition services. Approval of the requested borrowing under the DIP Facility thus is crucial to maximizing the value of the Debtors' estates.

### iii.     The Terms of the DIP Facility Are Fair, Reasonable and Appropriate

19.     As discussed above, the terms and conditions of the proposed DIP Facility are fair and reasonable under the circumstances and are superior to the terms of any alternative financing available to the Debtors. The interest rates and other covenants negotiated with the Lenders are reasonable, and the terms of the DIP Facility were highly negotiated in the context of the overall restructuring transactions contemplated by the Plan Support Agreement. Moreover, the other terms and conditions of the proposed DIP Facility are similar, or more favorable to the Debtors, than any other alternative financing available to the Debtors.

### iv.     Application of the Business Judgment Standard

20.     As described above, after appropriate investigation and analysis, the Debtors' management has concluded that the DIP Facility provides the best alternative available in the circumstances of these cases. Bankruptcy courts routinely defer to a debtor's business judgment

on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); *cf. Group of Inst. Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding the rejection or assumption of a lease is left to the business judgment of the debtor). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

21.     The Debtors have exercised sound business judgment in determining that a post-petition credit facility is both necessary and appropriate and have satisfied the legal prerequisites to incur debt under the DIP Facility. The terms of the DIP Facility are fair and reasonable, and are in the best interests of the Debtors' estates. The Debtors have reason to believe that the funds made available through the DIP Facility will be adequate to pay all administrative expenses due and payable during the post-petition periods. Accordingly, the Court should grant the Debtors authority to enter into the DIP Facility and obtain funds from the Lenders on the secured and administrative "superpriority" basis described above, pursuant to section 364(c) of the Bankruptcy Code.

**B.     Approval of Priming Liens**

22.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain post-petition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing

lien holders, if the debtor cannot otherwise obtain such credit and the interests of existing lien

holders are adequately protected. *See* 11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) of

the Bankruptcy Code provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by
> a senior or equal lien on property of the estate that is subject to a
> lien only if --
>
> (A)    the [debtor] is unable to obtain such credit otherwise; and
>
> (B)    there is adequate protection of the interest holder of the lien
> on the property of the estate on which such senior or equal
> lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

23.    As explained above, the Debtors have explored financial alternatives and are

aware of the lack of financing available to them given their highly leveraged capital structure. In

light of that, and given the state of the credit markets, the Debtors have concluded that financing

comparable to that provided by the Lenders in the DIP Facility is currently unobtainable without

the priming of the prepetition liens of the Pre-Petition Lien Holders (as defined below). *See*

*Shaw Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.)*, 300 B.R. 861, 863, 865

(Bankr. W.D. Pa. 2003) (where debtor made efforts by "contacting numerous lenders" and was

unable to obtain credit without a priming lien, it had met its burden under section 364(d)); *In re*

*Dunes Casino Hotel*, 69 B.R. 784, 796 (Bankr. D. N.J. 1986) (holding that the debtor had made

required efforts under section 364(d)(1) of the Bankruptcy Code based on evidence that the

debtor had attempted unsuccessfully to borrow funds on an unsecured basis or secured by junior

liens, but that at least three such lenders were willing to advance funds secured by a superpriority

lien). Thus, the Debtors are otherwise unable to obtain financing other than financing secured by

first priority priming liens.

24.     Additionally, the interests of the Pre-Petition Lien Holders whose liens will be primed will be "adequately protected" under section 364(d) of the Bankruptcy Code.  What constitutes adequate protection is decided on a case-by-case basis and it can come in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"; *see also In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of the adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted); *In re Continental Airlines Inc.*, 154 B.R. 176, 180-81 (Bankr. D. Del. 1993).

25.     In this case, access to the DIP Facility and the Cash Collateral are critical to the Debtors' ability to continue operations.  The Debtors intend to provide adequate protection to the Pre-Petition Lien Holders in the form of the Thermo Lenders Payment to be paid to the Thermo Lenders and Replacement Liens and Superpriority Claims (as each such term is defined below) and understand that, upon the receipt of the Thermo Lenders Payment, the Thermo Lenders will consent to having their liens on the Existing Collateral primed in favor of the Administrative Agent and DIP Lenders, and that upon the grant of the Replacement Liens and Superpriority Claims to the Pre-Petition Bridge Lenders (as defined below), the Pre-Petition Bridge Lenders will consent to having their pre-petition liens primed in favor of the Administrative Agent and DIP Lenders.

26.     Accordingly, the adequate protection to be provided to the Pre-Petition Lien Holders is fair and reasonable, and is sufficient to satisfy the standards of sections 363(c) and 364(d) of the Bankruptcy Code.

## C.     Cash Collateral and Adequate Protection

27.     The Thermo Lenders and the Pre-Petition Bridge Lenders (as defined in the Interim Order) (collectively, the "Pre-Petition Lien Holders") are entitled, under sections 363(e) and 364(d)(1)(B) of the Bankruptcy Code, to adequate protection of their interest in their respective  Pre-Petition Collateral (as defined in the Interim Order), including the Cash Collateral, for the aggregate diminution in the value of the Pre-Petition Lenders' interest in the Pre-Petition Collateral, including the Cash Collateral, by reason of, among other things, (i) the imposition of the automatic stay under section 362 of the Bankruptcy Code, (ii) the use of the Pre-Petition Lien Holders' Cash Collateral; and (iii) the use, sale or lease of Pre-Petition Collateral pursuant to section 363(a) of the Bankruptcy Code.  Accordingly, the Debtors have agreed, subject to the Court's approval, to grant to the Pre-Petition Lien Holders the following adequate protection for any diminution in the value of their respective interests in the Pre-Petition Collateral from the Petition Date:

(A)     Replacement Liens:  The Pre-Petition Lien Holders shall be granted the Replacement Liens (as defined below) subject to the priorities set forth in the Interim Order, Final Order (once entered) and  the Subordination Agreement (as defined in the Interim Order).  "Replacement Lien" shall mean that, subject to the terms and conditions set forth in the Interim Order, the Final Order (once entered) and  the Subordination Agreement, the Pre-Petition Lien Holders shall have (effective upon the date of the Interim Order and Final Order (once entered) and without the necessity of the Debtors or the Pre-Petition Lien Holders to execute mortgages, deeds of trust, security agreements,

pledge agreements, control agreements, financing statements or otherwise) valid and perfected, security interests in, and liens upon all Collateral, in the same priority and to the same extent, priority, enforceability, unavoidability and validity applicable to the Thermo Lenders' security interests and liens in the pre-petition Collateral and the Pre-Petition Bridge Lenders' security interests and liens in the pre-petition Collateral; provided, however, the Replacement Liens shall be subject in all respects to the Subordination Agreement and the Replacement Liens granted to the Pre-Petition Bridge Lenders shall be junior in all respects to the DIP Liens.

(B)    Superpriority Claims:  The Pre-Petition Lien Holders shall be granted allowed administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and with priority over all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (collectively, the "Superpriority Claims"); provided, however, that the Superpriority Claims granted to the Pre-Petition Bridge Lenders shall be junior in all respects to the Superpriority Claims granted to the DIP Lenders and the Thermo Lenders, and following the entry of the Final Order, the Superpriority Claims granted to the Thermo Lenders shall be junior to the Superpriority Claims granted to the DIP Lenders pursuant thereto.  No cost or expense of administration under Bankruptcy Code §§ 105, 503(b) and 507(b) shall be senior to, or *pari passu* with, any Superpriority Claims.

**D.    Highlighted Provisions Under Local Rule 4001-2**

28.    Local Rule 4001-2(a) states in pertinent part that:

(i) All Financing Motions must (a) recite whether the proposed form of order and/or underling cash collateral stipulation or loan agreement contains any provision of the type indicated below, (b)

identify the location of any such provision in the proposed form of order, cash collateral stipulation and/or loan agreement and (c) justify the inclusion of such provision:

(A) Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law);

(B) Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters;

(C) Provisions that seek to waive, without notice, whatever rights the estate may have under 11 U.S.C. § 506(c);

(D) Provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549;

(E) Provisions that deem prepetition secured debt to be postpetition debt or that use prepetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);

(F) Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out; and

(G) Provisions that prime any secured lien without the consent of that lienor.

Del Bankr. Local Rule 4001-2(a)(i).

29.     As discussed above, the DIP Facility contemplates two interrelated provisions that implicate Local Rule 4001-2(a)(i). Specifically, the DIP Facility requires (i) that the Final Order include a finding that the liens and security interests of the Thermo Lenders are valid and

properly perfected, first-priority liens against the assets of the Thermo 1 Project Entity (*see* Summary of DIP Terms, at B-2), and (ii) upon entry of the Final Order, the Debtors must utilize proceeds of the DIP Facility to make the Thermo Lenders Payment, thereby repaying $6.0 million of the approximately $10.3 million obligation owed to the Thermo Lenders by the Thermo 1 Project Entity (*see id.*). The Debtors believe that, in the context of these cases and the expedited restructuring transactions contemplated by the Plan Support Agreement, each of the foregoing provisions are appropriate and reasonable.

30.    In conjunction with the Debtors' significant prepetition efforts to market their assets for sale or negotiate the restructuring of their business with their principal creditors, the Debtors undertook an extensive review of the validity and priority of the liens of the Thermo Lenders and concluded that the liens and security interests granted to the Thermo Lenders are both valid and properly perfected. To the extent an official committee or other party in interest desires to analyze those liens, a significant amount of the due diligence related to such a review has already been completed and can easily be provided by the Debtors. Accordingly, the Debtors believe that the shortened review period contemplated by the DIP Facility is appropriate and reasonable under the circumstances of these cases.

31.    Further and related to the expedited review period is the payment of the Thermo Lender Payment. The repayment of a portion of the prepetition obligations owed to the Thermo Lenders is necessary because it is a condition to the Thermo Lenders' consent to the priming of their liens by the liens being granted to the Lenders under the DIP Facility. Unless the Thermo Lender Payment is made and the Thermo Lenders consent to the priming of their liens, the Lenders will not extend additional financing beyond the Initial DIP Loan and the Debtors ability

to consummate the restructuring contemplated by the Plan Support Agreement and successfully reorganize their business will disappear.

32.     In addition to the provisions related to the shortened challenge period with respect to the liens on the Existing Collateral and the Thermo Lenders Payment, the DIP Facility also contemplates the waiver of the Debtors' right to seek to surcharge the Lenders' or Pre-Petition Lien Holders' collateral under Section 506(c) of the Bankruptcy Code upon entry of the final order approving. *See* Interim Order, ¶ 13. Under the facts of these cases, the Lenders' request for a waiver of surcharge rights is reasonable and appropriate.

33.     Accordingly, the facts and circumstances of these cases justify the inclusion of the above terms that require disclosure under Local Rule 4001-2, and these terms of the DIP Facility should be approved.

**E.      Additional Relief to be Sought at Final Hearing**

34.     The Debtors also intend to seek the following relief in connection with the DIP Facility to be approved at the Final Hearing and pursuant to the Final Order:

(A)     The Lenders and Pre-Petition Lien Holders shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine;

(B)     None of the Summary of DIP Terms, DIP Loan Documentation, nor any other documents related to the transactions contemplated or reference therein, shall in any way be construed or interpreted to impose or allow the imposition upon the Lenders or Pre-Petition Lien Holders any liability for any claims arising from the pre-petition or post-petition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts; and

(C)     The Lenders shall be granted a full lien on and security interest in the proceeds or property recovered from, the Debtors' claims and causes of action under

sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code.

The Debtors submit that the foregoing requested relief is customary for debtor-in-possession financings of this nature and should be granted on a final basis pursuant to the Final Order.

**F.      Approval of the DIP Facility on an Interim Basis Is Necessary to Prevent Immediate and Irreparable Harm**

35.      Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. Proc. 4001(c)(2).

36.      In examining requests for interim relief under the immediate and irreparable harm standard, court apply the same business judgment standard applicable to other business decisions. *See, e.g., Ames Dep't Stores*, 115 B.R. at 36; *Simasko*, 47 B.R. at 449. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. *Ames Dep't Stores*, 115 B.R. at 36.

37.      Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis. As described in detail herein and the Goodman Declaration, the Debtors have an immediate need to obtain access to liquidity to, among other things, continue to operate their businesses, maintain key business relationships, make payroll and satisfy other working capital and operational needs. Funding each of these expenditures is necessary to preserve and maintain the value of the Debtors' estates for the benefit of all parties in interest.

38.     The crucial importance of a debtor's ability to secure postpetition financing repeatedly has been recognized in this district. *See, e.g., In re U.S. Concrete, Inc.*, Case No. 10-11407 (Bankr. D. Del. Apr. 30, 2010); *In re Taylor-Wharton Int'l LLC*, Case No. 09-14089 (Bankr. D. Del. Nov. 20, 2009); *In re Lazy Days' R.V. Center Inc.*, Case No. 09-13911 (Bankr. D. Del. Nov. 6, 2009); *In re Source Interlink Cos.*, Case No. 09-11296 (Bankr. D. Del. May 28, 2009); *In re AbitibiBowater Inc.*, Case No. 09-11296 (Bankr. D. Del. Apr. 20, 2009); *In re EZ Lube, LLC*, Case No. 08-13256 (Bankr. D. Del. Jan. 14, 2009).

39.     Accordingly, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing on the Petition Date or as soon thereafter as is practical to consider the Debtors' request for authorization to obtain interim financing under the DIP Facility.

**G.      Good Faith**

40.     The terms and conditions of the DIP Facility are fair and reasonable and were negotiated by the parties in good faith and at arms' length. Therefore, the DIP Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Facility, or any order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

**H.      Modification of the Automatic Stay Is Warranted**

41.     The Interim Order provides that the automatic stay provisions under section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Lenders to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Facility Term Sheet, and to take various actions without further order of or application to the Court. The Interim Order also proposes that the Lenders must provide the Debtors, any committee and the U.S. Trustee with five (5) business days' written notice prior to exercising any enforcement rights or remedies in the Event of Default.

42.     Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.   Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Facility Term Sheet and the proposed DIP Orders.

## I.     Request for Final Hearing

43.     Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2(c), the Debtors request that the Court set a date for the final hearing that is as soon as practicable, but in no event later than, 20 days following the Petition Date, and fix the time and date prior to the final hearing for parties to file objections to this Motion.

## J.     Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order

44.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a), the twenty-one-day stay provided for by Bankruptcy Rule 6003(b), and the fourteen-day stay provided for by Bankruptcy Rule 6004(h).

## VI. Notice

45.     Notice of this Motion has been provided to:  (a) the U.S. Trustee; (b) the creditors holding the thirty (30) largest unsecured claims against the Debtors' estates on a consolidated basis; and (c) known holders of prepetition liens against the Debtors' property.  The Debtors submit that no other or further notice need be provided.

## VII. No Prior Request

46.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Interim Order, substantially in the form annexed hereto as Exhibit A; and (b) grant to the Debtors such other and further relief as the Court may deem proper.

Dated: April 29, 2011                BAYARD, P.A.
       Wilmington, Delaware

                       By:   */s/ Neil B. Glassman*
                           Neil B. Glassman (No. 2087)
                           Jamie L. Edmonson (No. 4247)
                           GianClaudio Finizio (No. 4253)
                           222 Delaware Avenue, Suite 900
                           Wilmington, DE 19801
                           Phone: (302) 655-5000
                           Fax: (302) 658-6395
                           nglassman@bayardlaw.com
                           jedmonson@bayardlaw.com
                           gfinizio@bayardlaw.com

                           -and-

                           Peter S. Partee, Sr. (N.Y. Bar No. 4484234)
                           Richard P. Norton (N.Y. Bar No. 3975737)
                           HUNTON & WILLIAMS LLP
                           200 Park Avenue, 53rd Floor
                           New York, New York 10166-0136
                           Telephone: (212) 309-1000
                           Telecopier: (212) 309-1100

                           -and-

                           Michael G. Wilson (VSB No. 48927, DE No. 4022)
                           Henry P. (Toby) Long, III (VSB No. 75134)
                           HUNTON & WILLIAMS LLP
                           Riverfront Plaza, East Tower
                           951 East Byrd Street
                           Richmond, Virginia 23219-4074
                           Telephone: (804) 788-8200
                           Telecopier: (804) 788-8218

                           *Proposed Attorneys for Debtors*
                           *and Debtors-in-Possession*