# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>RASER TECHNOLOGIES, INC., *et al*.,<br><br>Debtors. | Chapter 11<br>Case No. 11-11315 (KJC)<br>(Jointly Administered)<br><br>Re: Docket Nos. 9, 34 and 41 |

**OBJECTION TO DEBTORS' MOTION FOR ENTRY OF FINAL ORDER, PURSUANT TO 11 U.S.C.§§ 105, 361, 362, 363, 364 AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014, (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES, AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)**

Kraig Higginson, a shareholder of Raser Technologies, Inc., and a party-in-interest ("**Higginson**") in the above-captioned bankruptcy cases (the "**Cases**")[1] by his undersigned counsel, submits this objection (this "**Objection**") to Debtors' Motion for Entry of Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014, (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Granting Liens and Super-Priority Claims, (III) Granting Adequate Protection to Pre-Petition Secured Parties, and (IV) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001 (b) and (c) (the "**Motion**").[2]

---

[1] Higginson will be joined in the alternative debtor in possession financing proposal contained herein by other investors who are currently obtaining documentation to substantiate the financing proposed by the Alternate Financing Proposal (collectively, with Higginson, the "**Alternative Lenders**").

[2] The Motion was originally stylized as a motion requesting entry of an interim and final order. This Court granted the Interim Order (as defined herein) on May 3, 2011, and scheduled a final hearing on May 19, 2011.

**PRELIMINARY STATEMENT**

1. Preliminarily, it is important to note that the determination of the Debtors with regard to the DIP Financing Agreement are not entitled to deference or protection under the business judgment rule. It is apparent that the Debtors have improperly and prematurely acquiesced to an overreaching debtor-in-possession financing facility which also contains provisions designed to shield the Lenders and the Thermo Lenders from liability for their pre-petition conduct. The Lenders propose to provide $8.75 million in debtor-in-possession financing to the Debtors that inappropriately and contrary to applicable law, seeks to, among other things, (i) limits the ability of parties in interest to investigate and prosecute causes of action against the Lenders and the Thermo Lenders, (ii) ensures payment in full of the senior obligations under the pre-petition Bridge Facility of $750,000 from Linden Capital, L.P. ("**Linden**"), (iii) imposes financing terms that are demonstrably not the best available to the Debtors in these Cases, (iv) expedites the sale of all equity in the reorganized Debtors while leaving nothing for unsecured creditors and shareholders, and (v) pays $6 million to the Thermo Lenders without adequate consideration or fair value for the release that would be obtained. The Plan Support Agreement (the "**PSA**") insulates the Lenders and Thermo Lenders from investigation and prosecution of potential causes of action against them. The DIP Financing Agreement and PSA are self-dealing, non-arms'-length transactions which are detrimental to the Debtors' estates, creditors and shareholders. The Lenders and Thermo Lenders have opportunistically crafted a DIP Financing Agreement and a PSA, which together attempt to shield the Lenders from a full investigation and challenge to their pre-petition conduct while at the same time imposing overreaching and inappropriate financing terms. Further, the Motion misrepresents the Debtors' ability to obtain other financing arrangements.

2. As discussed in detail below, the Alternative Lenders propose to

provide financing to the Debtors (the "**Alternate Financing Proposal**")[3] on terms that are significantly better for the Debtors and their estates and creditors, without weakening the estates' ability to investigate and prosecute claims against the Lenders and the Thermo Lenders.[4] This proposal is not inconsistent with that provided to Raser shortly before the Filing Date. A summary comparison of the Alternate Financing Proposal to the DIP Financing Agreement is set forth in **Exhibit A** annexed hereto.

3. In light of the Alternate Financing proposal, and because the DIP Financing Agreement and PSA trample upon the fundamental dictates of the Bankruptcy Code, applicable law and bankruptcy policy, the Alternate Lenders respectfully submit that this Court should (i) deny the Debtors' request for orders approving the DIP Financing Agreement and PSA, or, in the alternative, (ii) make such modifications as are necessary to the DIP Financing Agreement and the PSA to address the objections set forth herein and to make them consistent with the requirements of the Bankruptcy Code, applicable law and bankruptcy policy.

**RELEVANT BACKGROUND**

**A.   In General.**

4. On April 29, 2011 (the "**Filing Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

---

[3] The Alternate Lenders also understand that other arms'-length lenders have offered to provide alternative financing (both pre and post-petition) and/or requested to join in the DIP Financing Agreement, but that the Debtors have not pursued such financing.

[4] In connection with the Alternate Financing Proposal, the Alternate Lenders intend to file a Motion to Terminate Exclusivity, which shall include complete drafts of the Alternate Lenders' proposed disclosure statement and plan of reorganization, which currently contemplates an investment of approximately $105 million. Furthermore, the Motion to Approve Auction Procedures filed by the Debtors is unreasonable and is designed to chill bidding. The Alternate Lenders will be requesting, in the Motion to Terminate Exclusivity, that the Court allow their disclosure statement and plan to follow a parallel track to that of the Debtors, or any other entity which may submit a competing plan.

"**Bankruptcy Code**").

5. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. As of the filing of this Objection, no trustee or examiner has been requested or appointed in these chapter 11 cases. An Official Committee of Unsecured Creditors (the "**Committee**") was formed by the United States Trustee on May 13, 2011.

7. On May 3, 2011, the Court entered an order directing that the Debtors' chapter 11 cases be jointly administered for procedural purposes only pursuant to section 105(a) of the Bankruptcy Code and Rule 1015(b) of the Bankruptcy Rules. *See* Docket No. 30.

8. On May 3, 2011, the Court entered an interim order (the "**Interim Order**") granting the Motion on an interim basis. *See* Docket No. 34. The Interim Order authorizes the Debtors to borrow up to $750,000 in debtor-in-possession financing.

**B.    Relevant Pre-Petition Events.**

9. Debtor Raser Technologies, Inc. ("**Raser**") became a public company in October 2003, and until recently traded on the New York Stock Exchange (the "**NYSE**").

10. In March 2008, Raser issued $55 million in aggregate principal amount of its 8.00% Convertible Senior Unsecured Notes due 2003 (the "**Convertible Notes**"). The Lenders hold in the aggregate approximately $25 million of the Convertible Notes.

11. In November 2010, Raser was delisted by the NYSE and it is now quoted on the Over-the-Counter Bulletin Board. Also in November 2010, Raser sold all of the assets comprising the Transportation and Industrial business segment to a company

now called VIA Motors ("**VIA**"), owned by a private investor group.[5]

12. Higginson owns approximately 7% of Raser Technologies, Inc. and was elected as Chairman of the Board of Raser Technologies, Inc. in October of 2003. Higginson remained in this position until February 2011 when he resigned because of his required commitment to VIA, and at the request of the Raser Board of Directors.

## OBJECTION

A. **The Debtors Did Not Exercise Sound And Reasonable Business Judgment By Entering Into The PSA And DIP Financing Agreement.**

13. Before the Court approves the DIP Financing Agreement, the Debtors must show "first, that the proposed financing is an exercise of sound and reasonable business judgment; second, that no alternative financing is available on any other basis; third, that the financing is in the best interest of the estate and its creditors; and, as a corollary to the first three points, that no better offers, bids or timely proposals are before the Court." *In re Phase-1 Molecular Toxicology, Inc.*, 285 B.R. 494, 496 - 96 (Bankr. D.Md. 2002)(quoting *In re W Pac Airlines, Inc.*, 223 B.R. 567, 572 (Bankr. D. Colo. 1997)). Accordingly, a determination that the financing satisfies the business judgment rule is just the starting point.

14. Similarly, when considering the propriety of debtor in possession financing, courts will consider not just whether the proposed financing is in the best interests of the estate and its creditors, but also whether it is an exercise of sound and reasonable business judgment. *See Mid-State Raceway*, 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005); *see also In re Tenney Village Co. Inc.,* 104 B.R. 562, 569 (Bankr. D.N.H. 1989) (rejecting DIP financing proposal when, among other things, "the execution of the Financing Agreement violates the Debtors' fiduciary obligations to the

---

[5] In consideration for this sale, Raser ultimately received $2.5 million in cash, VIA's assumption of segment related liabilities and thirty-one (31%) percent of VIA's equity.

estate").

15. For the reasons discussed below, the Debtors' agreement to the DIP Financing Agreement (and the PSA), prejudicial to many of their stakeholders, was not an exercise of sound and reasonable business judgment. Accordingly, the Motion must be denied.

**B.     The DIP Agreement Is An Impermissible *Sub Rosa* Plan, The Approval Of Which Will Dictate The Terms Of The Debtors' Joint Plan Of Reorganization.**

16. Chapter 11 debtors cannot tailor DIP financings to satisfy exclusively the needs, concerns, and desires of a single creditor or creditor constituency. Courts recognize that "in connection with post-petition financing, lenders often extract favorable terms that may or may not have the effect of causing harm to the estate and creditors." *In re Tenney Village Co., Inc.,* 104 B.R. 562, 569 (Bankr. D.N.H. 1989). As such, "bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender." *In re Mid-State Raceway, Inc.*, 323 B.R. at 59.

17. More specifically, a lender cannot extend DIP financing to "seize control of the reins of organization." *In re Tenney Village Co., Inc.*, 104 B.R. at 568 (denying approval of DIP financing extended by pre-petition lender "under the guise of financing a reorganization," when in reality the lender would have "the ultimate say over the very goal of [the] Chapter 11 case, a confirmed plan of reorganization.") This is especially true considering a debtor in possession's fiduciary duty runs to all creditors. *See, e.g. In re Penick Pharmaceutical, Inc.*, 227 B.R. 229, 232-33 (Bankr. S.D.N.Y. 1998)("[I]n the case of an inanimate debtor in possession of such a corporation, the fiduciary duties borne by a trustee for a debtor out of possession fall on the debtor's directors, officers and managing employees ... who have a duty to maximize the value of

the estate ... and who are burdened to ensure that the resources that flow through the debtor in possession's hands are used to benefit the unsecured creditors and other parties in interest.") (citations omitted).

18. To that end, courts examining proposed DIP financings must consider whether "the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets so as to unduly prejudice the rights of other parties in interest." *In re Mid-State Raceway, Inc.,* 323 B.R. at 58.

19. DIP financings cannot dictate the terms of a chapter 11 plan. Indeed, "[t]he bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements." *Id*. at 59 (citing *In re Defender Drug Stores, Inc.,* 145 B.R. 312, 317 (9th Cir. BAP 1992)); *see also In re Braniff,* 700 F.2d at 940 (explaining that the danger of *sub rosa* plans is that a debtor in possession may enter into a transaction that will, in effect, "short circuit the requirements of chapter 11 for confirmation of a reorganization plan").

20. Here, the DIP Financing Agreement is inextricably linked with the PSA, an agreement which constitutes a *sub rosa* plan on its own accord. The PSA is not simply an agreement pursuant to which the Debtors will pursue, and the PSA Parties will support, a common goal of emerging from chapter 11 and a general restructuring plan. Instead, the PSA is a device through which the Debtors have locked themselves into a *particular restructuring*, with onerous consequences attached to the failure to implement that restructuring – all without the protections and procedures of chapter 11 of the Bankruptcy Code. Thus, the PSA is an impermissible *sub rosa* plan.

21. It is axiomatic that "[t]he debtor and the bankruptcy court should not be able to short circuit the requirements of Chapter 11 for confirmation of a

reorganization plan by establishing the terms of the plan *sub rosa*." *In re Braniff*, 700 F.2d 935, 940 (5th Cir. 1983). Thus, an agreement that dictates the terms of the Debtors' plan of reorganization prior to the confirmation process cannot be approved. *See In re Tower Automotive Inc.,* 241 F.R.D. 162, 168 - 69 (S.D.N.Y. 2006); *see also In re Crowthers McCall Pattern, Inc.,* 114 B.R. 877, 887 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted.")

22. While *sub rosa* plan objections commonly are filed in connection with assets sales pursuant to section 363(b) of the Bankruptcy Code, the underlying basis for such an objection is equally applicable in the context of a plan support agreement. In both contexts there exists the "fear that one class of creditors may strong-arm the debtor-in-possession and bypass the requirements of Chapter 11 to cash out quickly at the expense of other stakeholders, in a proceeding that amounts to a reorganization in all but name, achieved by stealth and momentum." *In re Chrysler LLC,* 576 F.3d 108, 116 (2d. Cir. 2009), *rev'd on other grounds* in *Indian State Police Pension Trust v. Chrysler, LLC*, 130 S.Ct. 1015 (2009). All of the above elements justifying prohibitions against *sub rosa* plans are present here.

23. First, the Lenders, led by Linden – the holder of approximately $25 million of the Convertible Notes and the lender of the $750,000 pre-petition Bridge Facility – are dictating and controlling the chapter 11 process by strong-arming the Debtors. Pursuant to the PSA, it is a "Termination Event" if, *inter alia*, the Debtors propose and/or seek confirmation of the plan other than the proposed plan that would "materially and adversely affect the treatment of the Claims as contemplated by the Term Sheet without the Creditors' consent"; the effective date is not on or before August 26, 2011 (four months post-petition); "[o]n or before August 1, 2011, the Bankruptcy Court has not entered an order on its docket approving the DIP Facility on a final basis confirming the validity and priority of the Thermo Lenders' liens on and security interests in the collateral for the Thermo 1 Note and approving the Thermo Lenders

payments; or ... [o]n or before August 3, 2011, the Thermo Lenders Payment [of $6M] has not been made." *See* PSA at ¶ 10. The Debtors hands are effectively tied, preventing them from exploring options beneficial to all stakeholders and requiring them to pursue a course of action that benefits only the Lenders and the Thermo Lenders.

24. The Debtors' failure to meet the milestones contained in the PSA, which appear to be mirrored in the DIP Financing Agreement, constitutes an Event of Default under the DIP Financing Agreement. Accordingly, the Debtors have tied themselves to a plan *sub rosa* by agreeing to condition the DIP Financing Agreement on their filing (and confirmation of) the PSA Party Plan.

25. <u>Second</u>, the PSA Parties have demanded – and the Debtors have acquiesced – that each of the major milestones in these Cases be completed at lightning speed, with the Effective Date of the PSA Parties' Plan on or before August 26, 2011 and an auction of 100% of the equity in the reorganized Debtors to be held on July 25, 2011. *See Motion of the Debtors for Entry of an Order Establishing Auction Procedures Related to the Sale of the Reorganized Raser Equity* (Docket No. 47) at ¶ 15(ii). Thus, instead of using the bankruptcy process to reorganize for the benefit of the Debtors' estates and creditors, the Lenders, with the assistance of the other PSA Parties, have compelled the Debtors to use the bankruptcy process to accomplish a strategic asset acquisition in the shortest amount of time possible, while threatening the Court with defaults if it does not accede to the Lenders' timetable.

26. Triggering any of the Events of Default contained in the DIP Facility allows the administrative agent to, among other things, declare the principal of and accrued interest on the outstanding borrowings to be immediately due and payable and to terminate the commitments. By tying their post-petition financing to the milestones contained in the PSA, the Debtors have given the Lenders and the Thermo Lenders, as well as the other PSA Parties "the ultimate say over the very goal of this Chapter 11 case, a confirmed plan of reorganization." *In re Tenney Village Co., Inc.,* 104

B.R. at 568.

27. Approval of the DIP Financing Agreement, as proposed by Debtors and Lenders, will help the PSA Parties in their efforts to ignore the fundamental requirements and protections of chapter 11 and should be rejected. *See In re Washington-St. Tammany Elec. Co-op., Inc.,* 87 B.R. 852, 856 (E.D. La. 1989) (reversing Bankruptcy Court's extension of exclusivity that would have "effectively determin[ed] the terms of an acceptable reorganization plan") (citing *Braniff*, 700 F.2d at 940 (5th Cir. 1983); *see also In re Cloverleaf Enterprises, Inc.*, 2010 WL 1445487 at *3 (Bankr.D.Md. April 2, 2010) ("When a proposed transaction specifies terms or coerces one result from adopting a reorganization plan, the parties and the district court must scale the hurdles erected in Chapter 11.").

28. The mere fact that these Cases were prearranged with certain constituencies does not make the DIP Agreement any less of a *sub rosa* plan. If this Court approves the Motion on a final basis, it will have the effect of binding the Debtors and all creditors to the PSA Party Plan prior to a ruling on whether the Disclosure Statement provided adequate information or whether the PSA Party Plan properly complied with the confirmation requirements set forth in 11 U.S.C. § 1129.

**C.** **The Complete Roll-Up Of The Pre-Petition Obligations Is Overreaching And Inappropriate.**

    **(i)** *"Roll-Ups" Violate Numerous Principles Underlying the Bankruptcy Code.*

29. The proposed DIP Financing Agreement attempts to impose the disfavored practice of cross-collateralization of pre- and post-petition debt. *See, e.g., In re Saybrook Manufacturing Co.,*, 963 F.2d 1490 (11th Cir. 1992) (holding that cross-collateralization is an impermissible means of post-petition financing). It is this proposed "roll-up" transaction that allows the Thermo Lenders to convert pre-petition obligations to post-petition financing. A "roll-up" of this kind contravenes a basic principle of section

364. It is well established that "[s]ection 364 does not … authorize the debtor pay the lender's prepetition ... claim as a condition precedent to the postpetition financing" because such action benefits the lender at the expense of the other creditors. *Sun Runner Marine, Inc. v. Transamerica Commercial Finance Corp. (In re Sun Runner Marine)*, 116 B.R. 712, 717-18 (B.A.P. 9th Cir. 1990), vacated on other grounds 945 F.2d 1089 (9th Cir. 1991); *see also In re Timberhouse Post and Beam, Ltd.*, 196 B.R. 547, 550 - 551 (D. Mont. 1996) ("The scheme of the ... [Bankruptcy] Code does not allow this Court to change the classifications of claims set by Congress in the Code."); *In re Willingham Investments, Inc.,* 203 B.R. 75, 78 - 79 (M.D. Tenn. 1996); *In re FCX, Inc.*, 60 B.R. 405, 409 (E.D.N.C. 1986)(holding that a bankruptcy court has the ability to deviate from the rules of priority and distribution in the interests of justice and equity, but the court cannot use this flexibility to establish a ranking of priorities within priorities).

30. In addition, "roll-up" provisions are an attempted "end run" around section 362(a)(6) of the Bankruptcy Code, which prohibits "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case ...." 11 U.S.C. §362(a)(6). Prepetition lenders, even if entirely secured, are not entitled to payment of their prepetition claims prior to other similarly situated creditors. A secured creditor is entitled only to protection under section 361 of the Bankruptcy Code, which requires that a secured creditor receive "adequate protection" for any diminution in the value of such creditor's interest in property of the estate. However, by no means does "adequate protection" entitle a secured creditor to payment of any portion of its claim during the case.

31. Finally, section 549 of the Bankruptcy Code generally prohibits the payment of a prepetition claim after commencement of a case. This section is consistent with the overall policy of chapter 11 of the Bankruptcy Code, which is that prepetition claims should only be paid under a plan of reorganization, so as to promote the Bankruptcy Code's goal of fair and equal distribution of estate assets to creditors, in line

with the priorities established by Congress. *See generally*, 1 William L. Norton, Jr., Bankruptcy Law and Practice 2d § 3:9 (1994); Alan N. Resnick, Bankruptcy Law Manual §§ 3:34; 5:19 5th ed. 2002).

32. It is therefore clear that not only are "roll-ups" wholly inconsistent with specific provisions of the Bankruptcy Code, but they fly in the face of clearly established tenets underlying the Bankruptcy Code which are essential to the chapter 11 reorganization process.

(**ii**) *The Explicit "Roll-Up" In The DIP Financing Agreement.*

33. The DIP Financing Agreement requires that the Thermo Lenders be paid $6.0 million to satisfy a portion of the principal obligations owing by Debtor Thermo No. 1 BE-01, LLC, a prepetition debt, effectively entitling this prepetition secured claim the status of an administrative claim, different from other similar prepetition claims under the plan of reorganization.

34. This provision of the DIP Financing Agreement is a blatant "roll-up" of the payments owing to the Thermo Lenders. This "roll-up" converts prepetition claims allegedly secured by liens on prepetition collateral, whose validity has yet to be determined (and which, if the Lenders and Thermo Lenders have their way, never will be investigated), into claims currently payable with the priority ordinary accorded to secured post-petition obligations.

35. The Debtors, Lenders and Thermo Lenders may argue that this payment is "adequate protection" or "standard and acceptable under the circumstances." Regardless, however, of the terms they use to couch their argument, it is a plain and simple "roll up" of prepetition debt that is inappropriate. The Court should not permit such blatant derogation of one of the fundamental principles of the Bankruptcy Code to the detriment of all other creditor constituencies.

*(iii)* *The Implicit "Roll-Up" In The DIP Financing Agreement And Plan Support Agreement.*

36. While the explicit "roll-up" of the payment owing to the Thermo Lenders is inappropriate, it is the implicit "roll-up" of the Bridge Facility contemplated by the DIP Financing Agreement and PSA that gives the Lenders an upper hand over the Debtors' reorganization efforts. One of the most inappropriate aspects of a "roll-up" is that it converts a prepetition claim into an administrative expense which must be paid in cash on the effective date of a plan, or sooner. The DIP Financing Agreement, by making it an Event of Default if the PSA is terminated, provides Linden's Bridge Facility claim with administrative priority by requiring that any plan of reorganization pay this amount in full in cash.

37. The express and implicit "roll-up" provisions of the DIP Financing Agreement violate the Bankruptcy Code, applicable law and policy, and should not be approved.

**D. The Milestones Established In The PSA And DIP Agreements Preclude The Debtors From Exploring Other Potential Reorganization Plans.**

38. The Debtors are required under the PSA and the DIP Financing Agreement to meet certain accelerated milestones, which include: (i) the entry of the Interim Order by May 4, 2011; (ii) entry of final order on DIP Financing Agreement by May 20, 2011; (iii) confirmation of Chapter 11 plan of reorganization in conformance with the PSA and Plan Term Sheet by August 11, 2011; and (iv) ensuring an effective plan date by August 26, 2011. DIP Facility B-11 (d), (e), (f), (g) and (h). Failure to meet even one of these deadlines constitutes an Event of Default under the DIP Financing Agreement, and therefore, threatens the termination and acceleration of the Debtors' post-petition financing.

39. These milestones force the PSA Party Plan through this bankruptcy proceeding at an overly-hastened pace, foreclosing any possibility that the Debtors will be able to consider or pursue other restructuring options.

40. The imposition of these restraints as a condition of post-petition financing ensures that the Debtors will pursue the PSA Party Plan exclusively, to the detriment of their estates and creditors constituencies, for the sole benefit of the Lenders, Thermo Lenders and the PSA Parties. By entering into the PSA and DIP Financing Agreement, the Debtors have bargained away their ability to fulfill their fiduciary duty to their estates and creditors. By conditioning the DIP Financing Agreement on satisfying the indefensibly accelerated milestones contained in the PSA, the Lenders and Thermo Lenders have overreached well beyond what the Bankruptcy Code permits.

E. **The PSA And DIP Financing Agreement Are Products Of The Debtors' Breach Of Their Fiduciary Duties To Their Estates And Creditors, And Its Approval Would Result In A Further Breach.**

41. Debtors in possession owe a fiduciary duty to their estates and creditors. *See Cenargo International, PLC,* 294 571, 599 n.32 (Bankr. S.D.N.Y. 2003); *see also In re Mondie Forge, Inc.,* 148 B.R. 499, 502 (Bankr. N.D. Ohio 1992) ("the [t]rustee has a duty to realize the maximum return for the estate for further distribution to the [d]ebtor's creditors").

42. The fiduciary duty owed by trustees and debtors in possession is owed to each creditor of the estate. *In re Ngan Gung Rest.,* 254 B.R. 566, 570 (Bankr. S.D.N.Y. 2000) ("A trustee also owes a fiduciary duty to each creditor of the estate. As such, he has a duty to treat all creditors fairly ...." (internal quotations omitted); *In re Centennial Textiles, Inc.,* 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998) ("As fiduciaries, the debtor in possession and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate, and protect and conserve the debtor's property.") (internal quotations omitted).

43. It is well established that an agreement to breach a fiduciary duty is illegal and unenforceable on the grounds of public policy. *See* Restatement (Second) of Contracts § 193 (2010) ("A promise by a fiduciary to violate his fiduciary duty or a

promise that tends to induce such a violation is unenforceable on grounds of public policy."). Courts therefore refuse to approve or enforce agreements that would result in the breach of a debtor in possession's fiduciary duty to its estate or creditors. *See, e.g., In re Tenney Village Co., Inc.*, 104 B.R. at 569 (refusing to approve DIP financing because "the execution of the Financing Agreement violates the Debtor's fiduciary obligations to the estate"); *In re U.S. Lines, Inc.,* 103 B.R. 427, 431 n.1 (Bankr. S.D.N.Y. 1989) (refusing to enforce an agreement by debtor in possession to abstain from objection to fee applications because "[a] promise by a fiduciary tending to violate his fiduciary duty is unenforceable on grounds of public policy").

44. Here, the Debtors have breached their fiduciary duties to all of their creditors by agreeing to consummate the transactions proposed in the PSA and the DIP Financing Agreement. By agreeing to those terms, the Debtors effectively are precluded from pursuing any reorganization plan other than the PSA Party Plan, even if such alternative plan – the Alternate Lenders' plan for instance – would better serve their estates' and creditors' interests.

**E.    Debtors Have Not Demonstrated That They Are Unable To Obtain Financing On More Favorable Terms.**

45. In the Motion, the Debtors fail to meet their burden to demonstrate that alternative financing on more favorable terms was and is unavailable. This glaring lack of evidence troubled the Court at the hearing on May 3, 2011. *See* Hrg. Tr. at 15:3-9.[6] To compensate, the Debtors attempt to misdirect the Court's attention by focusing on their duty to "seek" financing and their opinion as to whether "lenders are *likely* to be able and willing to extend the necessary credit." *See DIP Motion*, *paragraph 15, pages 15 - 16.*

46. In these Cases, the Debtors did not have to "seek" financing as financing options were being delivered to them pre- and post-petition. In fact, the

---

[6]    A copy of the May 3, 2011 hearing transcript is annexed hereto as **Exhibit B**.

Debtors were presented with a proposal approximately three (3) months prior to the Filing Date that would have avoided this bankruptcy filing and preserved the Debtors' assets for the benefit of all creditors. The Debtors chose to disregard that offer. Instead, the Debtors present to this Court a DIP Financing Agreement and PSA that is an impermissible *sub rosa* plan that seeks to only benefit the Lenders and Thermo Lenders, with no payment to other creditors.

47. In the face of the Alternate Financing Proposal, the terms of which are far superior to the Debtors and their estates and creditors that the DIP Financing Agreement, the Debtors cannot credibly maintain their façade that other financing is unavailable to them.

**F. The Alternate Financing Proposal Contains Significantly Better Terms And Conditions For The Debtors And Their Creditors Than The DIP Financing Agreement Proposed By Lenders.**

48. As discussed above, the Alternate Lenders propose to provide the Alternate Financing Proposal to the Debtors on the terms set forth in Exhibit A. It is beyond cavil that the Alternate Financing Proposal is far superior to the DIP Financing Agreement because its terms are more reasonable, it does not violate any provision of the Bankruptcy Code, it does not hand cuff the Debtors to a particular plan of reorganization that benefits only the Lenders and the Thermo Lenders, and it is in the best interests of the estates and all creditors.

**(i)** *The Standard For Choosing Debtor-In-Possession Financing.*

49. Section 364(c) of the Bankruptcy Code provides that the Bankruptcy Court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt as an administrative expense if the debtor in possession is unable to obtain unsecured credit under section 503(b)(1) of the Bankruptcy Code. Pursuant to this provision, the threshold issue is whether credit on better terms is available to the Debtors. *In re Ames Dep't Stores*, 115 B.R. at 40 ("Although a debtor is not requires to seek credit

from every possible source, a debtor must show that it has made a reasonable effort to seek other sources of credit available under sections 364(a) & (b)".) After making this determination, the Court must focus on the terms of the proposed financing to determine whether they are "reasonable". *Id.* at 37.

50. In determining whether a debtor has made a reasonable effort to obtain other sources of credit, courts must be wary of the fact that often times, a debtor will find it easier to obtain credit from a pre-petition lender, at the expense of causing detriment to its creditors. As one court has noted, "The debtor in possession is hardly neutral. Its interest is in its own survival, even at the expense of equal treatment of creditors, and close relations with a lending institution tend to prevent the exploration of other available courses in which a more objective receiver or trustee would engage." *Otte v. Manufacturers Hanover Comm. Corp. (In re Texlon Corp.),* 596 F.2d 1092, 1098 (2nd Cir. 1979). While balancing the needs of the debtor and affording deference to the debtor's business judgment, a court must refuse to approve financing where the purpose of the financing is to benefit one creditor rather than the estate. *In re Aqua Assocs.*, 123 B.R. at 196 ("credit should not be approve when it is sought for the primary benefit of a party other than the debtor").

51. In these Cases, the DIP Financing Agreement proposed by the Lenders contains numerous provisions which, as discussed above, are designed solely and inappropriately to benefit the Lenders (specifically, Linden) and the Thermo Lenders.

**(ii)** *The Advantages Of The Shareholders DIP Financing Proposal.*

52. Alternative financing was offered by Evergreen Energy and others on significantly better terms than those offered by Lenders approximately three (3) months prior to the Filing Date (the "**Evergreen Energy Proposal**"). The Debtors did not pursue these proposals even though Evergreen proposed a plan which could have avoided this bankruptcy filing and would have paid all creditors in full, over time, while

preserving the Debtors' significant and valuable assets.

53. As is evident from the comparison of the Alternate Financing Proposal and the DIP Financing Agreement set forth in Exhibit A hereto, the Alternate Financing Proposal contains numerous terms which are substantially more advantageous to the Debtors, their estates and creditors than the burdensome and overreaching provisions of the DIP Financing Agreement proposed by Lenders. Most importantly, it should be noted that:

> Limitations on Ability to Attach Pre-Petition Senior Lenders' Claims: As noted throughout this Objection, the DIP Financing Agreement puts severe constraints on the ability of any party-in-interest to investigate and litigate causes of action against the Pre-Petition Senior Lenders and Lenders with regard to their pre-petition claims. The Alternate Financing Proposal contains no such restrictions.
>
> Collateral: The DIP Financing Agreement requires first-priority blanket liens and security interests on all assets of the Debtors that are not subject to existing liens. According to the terms of the Alternate Financing Proposal, upon entry of the Final Order and payment of the Bridge Facility and Interim DIP financing, all obligations of the Debtors under the Alternate Financing Proposal shall be secured by first-priority blanket liens and security interests previously held by the Lenders and Bridge Facility lender.
>
> The Alternate Lenders will take a junior position to the Thermo Lenders as to the Existing Collateral.
>
> Interest Rate: The Alternate Financing Proposal provides for an interest rate that is five percent (5%) lower than the DIP Financing Agreement, with a lower default rate as well.
>
> Commitment Fees: The Alternate Financing Proposal does not require a Commitment Fee.

54. The Debtors have chosen a financing proposal which is more onerous and more costly to them, and that unduly prejudices all creditors other than the Lenders and the Thermo Lenders. The Debtors' decision to choose such a financing arrangement when a clearly better, cheaper alternative is available to them should not be

given deference. This Court should consider the tremendous benefits of the Alternate Financing Proposal, authorize the Debtors to enter into a financing agreement with the Alternate Lenders, and deny the Motion.

## **CONCLUSION**

55. For all of the above stated reasons, the Alternate Lenders respectfully request that this Court (i) deny the Motion, (ii) enter an order authorizing the Debtors to obtain DIP financing from the Alternate Lenders; and (iii) grant to the Alternate Lenders such other and further relief as the Court may deem proper.

**[SIGNATURES APPEAR ON NEXT PAGE]**

Dated: May 13, 2011
Wilmington, DE

Respectfully Submitted,

**BIFFERATO GENTILOTTI LLC**

By: /s/ Garvan F. McDaniel
Garvan F. McDaniel (Bar No. 4167)
800 North King Street, Plaza Level
Wilmington, Delaware 19801
Telephone: (302) 429-1900
Facsimile: (302) 429-8600

-and-

**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq.
S. Jason Teele, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400

-and-

**CHRISTIAN, SMITH & JEWELL, LLP**
James Wesley Christian, Esq.
Laura Gee, Esq.
2302 Fannin, Suite 500
Houston, Texas 77002
Telephone: (713) 659-7617
Facsimile: (713) 659-7641
*Counsel for The Alternate Lenders*