## Exhibit B

```
              UNITED STATES BANKRUPTCY COURT
                 DISTRICT OF DELAWARE
                            .
                            .
IN RE:                      .        Chapter 11
                            .
Raser Technologies, Inc.,   .
et al.,                     .
                            .
     Debtors.               .        Bankruptcy #11-11315 (KJC)
.......................................................
```

Wilmington, DE
May 3, 2011
10:27 a.m.

TRANSCRIPT OF FIRST DAY MOTIONS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For The Debtors:                Neil Glassman, Esq.
                                Bayard, P.A.
                                222 Delaware Ave.-Ste. 900
                                Wilmington, DE 19801

                                Jamie Edmonson, Esq.
                                Bayard, P.A.
                                222 Delaware Ave.-Ste. 900
                                Wilmington, DE 19801

                                Peter Partee, Esq.
                                Hunton & Williams, LLP
                                200 Park Ave., 53rd Fl.
                                New York, NY 10166

                                Michael Wilson, Esq.
                                Hunton & Williams, LLP
                                Riverfront Plaza, East Tower
                                951 East Byrd St.
                                Richmond, VA

```
For BNYM Trust Co., NA:        Aaron Cahn, Esq.
                               Carter Ledyard & Millburn, LLC
                               2 Wall St.
                               New York, NY 10005

For Tenor & Linden:            Christopher Donoho, Esq.
                               Hogan Lovells US, LLP
                               875 Third Ave.
                               New York, NY 10022

                               Joseph Barry, Esq.
                               Young Conaway Stargatt
                               & Taylor, LLP
                               The Brandywine Bldg.
                               1000 West St., 17th Fl.
                               Wilmington, DE 19801

For Global Geothermal,:        Gregory Werkheiser, Esq.
et al.                         Morris Nichols Arsht
                               & Tunnell, LLP
                               1201 North Market St., 18th Fl.
                               Wilmington, DE 19899

For Prudential Insurance:      Brett D. Fallon, Esq.
& Zurich American Insurance     Morris James, LLP
                               500 Delaware Ave.-Ste. 1500
                               Wilmington, DE 19801

For The United States:         David Klauder, Esq.
Trustee                        Office of the U.S. Trustee
                               844 King St.-Ste. 2207
                               Wilmington, DE 19801

(Via Telephone)

For Tenor, et al:              Christopher Bryant, Esq.
                               Hogan Lovells US, LLP
                               875 Third Ave.
                               New York, NY 10022

For Prudential Insurance:      Judith Ross, Esq.
& Zurich American Insurance     Baker Botts, LLP
                               2001 Ross Ave.
                               Dallas, TX 75201

Audio Operator:                Al Lugano
```

Transcribing Firm:          Writer's Cramp, Inc.
                              6 Norton Rd.
                              Monmouth Jct., NJ 08852
                              732-329-0191

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1              THE CLERK:  All rise.

2              THE COURT:  Good morning everyone.

3              ALL:  Good morning, Your Honor.

4              MR. GLASSMAN:  Good morning, Your Honor.  May I

5    proceed?

6              THE COURT:  You may.

7              MR. GLASSMAN:  Neil Glassman on behalf of the

8    Debtors that are identified in the agenda for this morning.

9    Thank you, Your Honor.  Raser Technologies, Inc. is the lead

10   Debtor.  If Your Honor would like, I will read all the names,

11   but I don't think it's really necessary.  In the interest of

12   time, I'll just turn the podium over to my co-counsel, Peter

13   Partee of Hunton & Williams, and we'll start.

14             THE COURT:  Very well.

15             MR. GLASSMAN:  Thank you, Your Honor.

16             MR. PARTEE:  May it please the Court, Your Honor,

17   I'm Peter Partee from Hunton & Williams, LLP, along with Mike

18   Wilson to my right.  W are proposed counsel for the Debtors

19   and Debtors-In-Possessions in these Chapter 11 cases.  With me

20   today from the company is Mr. Nick Goodman, the Chief

21   Executive Officer, and Mr. John Perry, who is also the Chief

22   Financial Officer of all of the Debtors.

23             THE COURT:  Good morning.

24             MR. PARTEE:  Your Honor, there's a relatively short

25   agenda.  I believe we have four matters, plus a Debtor-In-

1    Possession Financing Motion.  With the Court's permission, I

2    would propose to give the Court a little bit of background on

3    the company and how it got to where we are, amplifying on the

4    First Day Declaration, and then proceed with the DIP Motion,

5    and then I'll turn the podium over to Mr. Wilson to handle the

6    remaining matters.

7            THE COURT:  All right.

8            MR. PARTEE:  Thank you, Your Honor.  Your Honor,

9    Raser Technologies is a publicly traded geothermal energy

10   company.  It -- I like to say it tries to make power out of

11   Old Faithful, or in similar geothermal geysers, and is one of

12   the very few companies who actually has an up and running

13   geothermal plant -- it's known as it's Thermo 1 Plant; you'll

14   hear a fair amount about that in this case.  The company

15   originally had two separate lines of business, the geothermal

16   energy business, and then a business where it designed,

17   manufactured and dealt with high mile per gallon energy

18   efficient engines.  That was known as its Via Motors line of

19   business.  It has divested itself back in the fall of all but

20   a 39% interest in Via Motors, and so now the only operating

21   line of business within the company is its core business,

22   which is the geothermal energy business.

23        The company essentially has -- its corporate structure is

24   relatively simple.  It has a parent company which is publicly

25   traded.  The public company is what owns the remaining 31%

1    interest in Via Motors.  It has two principle geothermal

2    plants; one the operating geothermal plant, Thermo 1, the

3    other is the Lightning Dock Plant, which is still in the

4    development stage.  The other assets owned by the company are

5    just a very large portfolio of undeveloped geothermal leases.

6        Your Honor, the company's capital structure, again, as

7    explained in the First Day Declaration, amplified on a little

8    here, is we have about $55 million of bond -- convertible

9    unsecured bonds at the parent company level.  The company also

10   owns -- owes approximately $21 million on an unsecured basis

11   to Merrill Lynch at the parent company level and at some of

12   the intermediate holding company levels.  In addition to that,

13   the company has project level, secured debt at each of the

14   Lightning Dock and the Thermo plants.

15       The company got to its current position through --

16   essentially in June of 2010, it flunked a -- the plant at

17   Thermo 1 failed a production test.  That triggered a default

18   under the company's project level debt at the Thermal 1 Plant

19   and put the company in the mode of believing that it needed to

20   sell the Thermo 1 Plant in order to monetize it.  The theory

21   was if we could monetize it to an extent that we could pay off

22   the Thermo 1 project debt, have enough left over to resolve

23   the company's other debts, or a lot of them, make them

24   manageable, and then also continue to develop the company's

25   remaining assets.

1    The company then employed an investment banker, Canaccord

2    Genuity, which likely we will ask to be employed as our

3    investment banker in the case, to engage in the sale process

4    for the Thermo 1 Plant.  It contacted a very large number of

5    parties over a six-month period, and unfortunately, that

6    process was singularly unsuccessful, Judge.  We ultimately

7    found only one truly closeable offer for the Thermo 1 Plant of

8    approximately $12 million, and that was subject to and

9    conditioned upon selling the plant and related materials

10   through a 363 Sale, which we predicted that the net proceeds

11   would be about $9 million from that.  This is after having

12   invested between 150 and $200 million to get that plant up and

13   running.  That was a singularly unacceptable result for the

14   company and so it shifted gears.

15       During this process, it had engaged in numerous

16   forbearance agreements and negotiations with the Thermo 1

17   secured lenders to give them the opportunity to try and sell

18   the Thermo 1 Plant.  When that resulted in what I've

19   described, a singularly unsuccessful result, the company

20   shifted gears and brokered for more time to reach a global

21   restructuring, and one that would allow it to retain the

22   Thermo 1 Plant that is kind of its crown jewel and resolve its

23   other liabilities in a way that would allow the company to go

24   forward; basically to restructure the balance sheet.

25       When we recanvassed all of the parties that were involved

1   in the Thermo 1 sale process, as well as all of our existing

2   stakeholders, only the two parties that you have before us as

3   our proposed DIP lenders, Tenor Capital and Linden Capital,

4   were willing to step forward and put new money into this

5   company. And that brings us up to date where we are today.

6   It resulted in the negotiations over a plan support agreement,

7   which is attached to Mr. Goodman's First Day Declaration,

8   explaining where we intend to go in this case with I think a

9   great degree of specificity, but also explaining the terms of

10  the proposed DIP. And so with that background, Your Honor,

11  I'll proceed into the Debtor-In-Possession Financing Motion.

12          THE COURT: Go ahead.

13          MR. PARTEE: Thank you, Your Honor. The DIP Motion,

14  Your Honor, is divided -- we've explained, obviously, what we

15  expect to seek in the way of final relief in the case, and

16  I'll get to the justification for that in a minute, but on an

17  interim basis, what we're requesting, Your Honor, is really

18  two forms of very simple relief. We're asking for the use of

19  cash collateral, kicked off primarily by the use of the Thermo

20  1 Plant, and to provide replacement liens with the same

21  priority as the liens that are -- and secured claims that are

22  being protected by those replacement liens, and then also to

23  borrow on an interim basis and with junior priority to any

24  properly perfected pre-petition secured claims up to $750,000

25  for the first 20 days of the case.

1    And as evidence in support of that, Your Honor, we do

2    proffer the Declaration of Mr. Goodman, the CEO.  He is in the

3    Courtroom and if called to testify, would testify to the

4    matters set forth in his Declaration.  In addition, we have

5    Mr. John Perry, the CFO of the company, who, if called, would

6    testify as to a 20-day cash-in/cash-out budget, a copy of

7    which I have and can tender to the Court.  May I approach,

8    Your Honor?

9        THE COURT:  Yes.

10    (The Court receives document)

11        THE COURT:  Thank you.

12        MR. PARTEE:  Your Honor, this is a very

13    straightforward 20-day, cash-in/cash-out budget to support the

14    request for interim relief.  If called, Mr. Perry would

15    testify that he personally prepared this budget and that these

16    expenses are necessary and appropriate during the 20-day

17    period.  You will see one item of note that I want to draw the

18    Court's attention to, and that is the premium for directors

19    and officers insurance; that is $287,000.  I have -- Mr.

20    Perry, if called, would testify that there is no grace period

21    available for the payment of that amount, and therefore, it

22    does have to be paid during this 20-day period.  And that is,

23    obviously, a very large component of the $750,000 budget for

24    the first 20 days of the case.  Again, Mr. Perry is in the

25    Courtroom and available for cross examination if anybody

1    should choose to do so or if the Court has any questions about

2    the budget, and so, too, is Mr. Goodman for any questions

3    regarding his First Day Declaration.

4              THE COURT:  All right, let me ask for the record

5    whether anyone objects to the admission of the Goodman

6    Declaration?

7              ALL:  (No verbal response).

8              THE COURT:  I hear no response, I'll take it into

9    evidence without objection.  That's Docket #5.  Does anyone

10   wish to examine either Mr. Goodman or Mr. Perry?

11             ALL:  (No verbal response).

12             THE COURT:  I hear no response.  Does anyone else

13   care to be heard in connection with the financing motion?

14             MR. KLAUDER:  Good morning, Your Honor, David

15   Klauder for the United States Trustee.  Your Honor, we had a

16   few comments, and I'm sure Mr. Partee will go over that when

17   he tenders a blackline order to you.  I just want to highlight

18   one issue that I don't think is necessarily an issue or is not

19   an issue for today, but will certainly be an issue come the

20   final hearing, and that is the period that will be available

21   for Creditors and/or a Committee to investigate and/or

22   challenge the pre-petition liens.  And this is kind of an

23   unusual and, quite frankly, an extraordinary aspect of at

24   least the DIP financing on a final basis because that period

25   will be shortened considerably from what the normal period we

1  see, in this District anyway, of the 60 to 75 days from the

2  petition date.  I think it's set out pretty -- fairly clearly

3  in the interim order that the Debtors will be seeking at a

4  final hearing that those liens be indicated as valid and

5  binding and that any challenges are barred; that is set out,

6  and nothing is being done today with regard to that issue.

7  but I think it's one that certainly needed to be highlighted

8  on the record today, and I wanted to just address that with

9  the Court that that might be a dispute come the final hearing.

10      THE COURT:  Well, it's a component of the overall

11  proposed resolution of the Debtors' circumstances, and I

12  understand why it's been asked for, but I also did read the

13  submissions and note that that was, as you say, not relief for

14  today.  Mr. Klauder, let me ask this.  Is there a date for a

15  formation meeting?

16      MR. KLAUDER:  There is, May 12th at 10 a.m.  That

17  notice will go out today.

18      THE COURT:  All right.  Thank you.

19      MR. KLAUDER:  Thank you.

20      THE COURT:  Does anyone else wish to be heard in

21  connection with the financing motion?

22      ALL:  (No verbal response).

23      THE COURT:  I hear no further response.

24      MR. PARTEE:  Your Honor, just to follow up on Mr.

25  Klauder's comments, he is absolutely right that at the final

1    hearing, as the Court noted, we are going to be seeking some

2    relief that is somewhat extraordinary, and it is essentially

3    how we have devised to -- what we've come up with to avoid a

4    priming fight that, in all candor, the Debtor does not believe

5    it could win.  Essentially, the only way we can access the

6    balance of our DIP facility on a final basis, Your Honor, and

7    continue in business is if we make essentially a $6 million

8    indefeasible paydown of our pre-petition existing project

9    debt.  That's only 60% roughly -- a little less than that --

10   of what they're owed, but they want to know that they can keep

11   it, and they want to know that their liens are valid, and

12   they're going to get the benefit of their bargain, which the

13   Debtor does not believe is an unreasonable position for them

14   to take and is actually better than -- substantially better

15   than what we had achieved through pre-petition forbearance

16   negotiations with the same parties.

17        So again, it is not relief that is being requested today.

18   What we are asking, Your Honor, is that as part of the interim

19   order -- and I'll go through the blackline changes here in

20   just a minute, they are not significant -- is to set a final

21   hearing.  And we are asking that -- you know, we intend to

22   send out a notice that tells everybody exactly what relief we

23   intend to be seeking at the final hearing, including the

24   confirmation of the validity and priority of the Thermo

25   lenders project secured lenders debt and liens.  And, you

1    know, that -- the setting of that hearing will effectively

2    establish if the Court accepts the relief that we're

3    requesting -- grants the relief that we're requesting

4    effectively set a challenge period.  And so, you know, setting

5    that final hearing is something that is being done under the

6    interim order, and I wanted to point out the consequence of

7    that potentially for the relief that we will be requesting at

8    the final hearing.  So with that, Your Honor, if we can tender

9    the blackline of the revised interim order?

10            THE COURT:  Yes.

11       (The Court receives document)

12            THE COURT:  Thank you.

13            MR. PARTEE:  Your Honor, going through the

14   blackline, the main change is that although the lenders in

15   this -- the proposed DIP lenders in this case are willing to

16   work off a term sheet.  Shockingly enough, Wilmington Trust,

17   as the administrative agent, was not.  And therefore, they

18   have asked that there be an administrative agent agreement

19   assigned.  That has been negotiated, and essentially, the

20   revised interim DIP Order grants the Debtor authority to enter

21   into that agreement.  It's entirely customary in form with

22   exculpations and indemnities and what-have-you for the

23   administrative agent, but basically requires that the

24   administrative agent have unanimous consent from the DIP

25   lenders before being directed.  And that is now included as a

1  blackline change to the proposed interim order.  In addition,

2  Your Honor, we have made -- we have taken out -- or made

3  subject, rather, to entry of a final order the credit bidding

4  rights that are set forth on -- in paragraph 20 -- 42, excuse

5  me.  Yes, we have simply added to, as a preface to the -- to

6  paragraph 42 that the right to credit bid is subject to the

7  entry of a final order.  That was based on some considerations

8  raised by the U.S. Trustee.

9         THE COURT:  Well, I'd like to keep my record in tact

10 of not approving that on the first day.

11        MR. PARTEE:  Understood, Your Honor.  In light of

12 recent legal developments in that regard and on that topic,

13 it's certainly understandable.  Your Honor, the other changes

14 I believe were largely typographical in nature.  They are

15 shown by the blackline.  If the Court has any questions -- oh,

16 we have also made it clear that the superpriority claims being

17 granted as adequate protection here are subject to a carveout

18 for U.S. Trustee fees.  That is in paragraph 23(b) and, again,

19 at Mr. Klauder's request.

20        THE COURT:  All right, let me just finish going

21 through the order.

22        MR. PARTEE:  Certainly, Your Honor.

23        THE COURT:  Let's see if I have any questions about

24 the other blackline.  I did have a couple other things I did

25 want to discuss with you on this, but bear with me for one

1    moment.

2              MR. PARTEE:  Certainly, Your Honor.

3              THE COURT:  Okay.  As I read the First Day

4    Declaration, I would say it's maybe a little bit light --

5              MR. PARTEE:  Yes.

6              THE COURT:  -- on factual underpinning for -- to

7    show that credit could not be obtained from anyone else on a

8    better basis, and I think that just a brief proffer to that

9    end is necessary.

10             MR. PARTEE:  Certainly, Your Honor.  Each of Mr.

11   Goodman and Mr. Perry who -- would testify if called that they

12   personally participated in the pre-petition sale process for

13   Thermo 1, as well as the subsequent follow-on solicitation of

14   global restructuring offers.  As part of that process, the

15   company actively sought out DIP lenders, as well as pre-

16   petition secured debt, and the only party who was willing to

17   provide any form of pre-petition financing to the Debtors,

18   much less Debtor-In-Possession financing, was the one -- was

19   Wasabi, which was the party who made the offer for $12 million

20   for the Thermo 1 project.  And again that was -- they made an

21   offer of providing $3 million of DIP financing as part of a

22   363 Sale process of the Thermo 1 Plant, which was not the

23   Debtor's chosen path and not a path that the Debtors believe

24   would maximize the recovery to Creditors in this case.  No one

25   else has offered any form of financing or new money in this

1    case, Your Honor, on anything close to the terms that have

2    been proposed.  And again, Mr. Goodman and Mr. Perry are both

3    in the Courtroom, and if the Court would like to question them

4    directly on that point for them to give you some firsthand

5    color, they're happy to do so.

6           THE COURT:  I'll accept the proffer, but I will ask

7    for the record does anyone wish to examine either witness?

8           ALL:  (No verbal response).

9           THE COURT:  I hear no response.  Okay.

10          MR. PARTEE:  And I would note also for the record

11   that, Your Honor, the -- kind of the shorthand way we tried to

12   structure the First Day Declaration was just to verify or

13   corroborate each of the factual assertions set forth in the

14   First Day Motions, and that included the Debtor-In-Possession

15   Financing Motion, which I think contains a lot of assertions

16   along the lines of the Court's inquiry.

17          THE COURT:  Well, it contains information from which

18   I could draw inferences, I guess.

19          MR. PARTEE:  Indeed, Your Honor, that's probably a

20   better way to put it.

21          THE COURT:  Bear with me for just one more minute.

22          MR. PARTEE:  Certainly.

23      (Pause in proceedings)

24          THE COURT:  Okay.  I was a little bit confused.  In

25   the motion, in the financing motion, events of default under

1    the DIP facility include the failure of the Debtors to obtain

2    the final order by May 20th.

3          MR. PARTEE:  Yes, Your Honor.

4          THE COURT:  In paragraph 21 of the proposed order,

5    it allows the DIP lenders to exercise rights if the final

6    order is not entered by August 1st, and I just -- I didn't

7    catch the reason for that distinction.

8          MR. PARTEE:  That's on outside deadline, Your Honor.

9    Under any set of circumstances, it's -- essentially, under the

10   Plan Support Agreement, that's when we lose our deal with the

11   Thermo 1 secured lenders is if they don't get paid by August

12   1st and the final order's not entered by August 1st.  The

13   hitch is, of course, that the Debtor can't live on the interim

14   advance until that point.  Otherwise, we wouldn't have an

15   issue with the challenge period.  And so, you know, again,

16   there is a default right now under the DIP Order if the final

17   order is not entered by May 20th, but again, we recognize that

18   we're requesting extraordinary relief, and that needs to be

19   taken into account when setting the final hearing.

20         THE COURT:  Okay.

21         MR. DONOHO:  Pardon me, Your Honor, this might be

22   some helpful color -- it's Christopher Donoho from Hogan

23   Lovells US, LLP, I'm representing the two DIP lenders here

24   that are sponsors of the Plan.  That provision, the August 1st

25   date, I understand it's confusing and it looks like it comes

1   out of thin air, and it sort of does.  The reason for the
2   August 1st date is the Thermo 1 lenders wanted to make sure
3   that they weren't going to be sort of held in suspension
4   permanently without knowing whether they're going to receive
5   the $6 million paydown that they've negotiated for.  The flip
6   side is the ability to have that paydown and the deal and the
7   rights that went along with that for the estate and for the
8   sponsors are paramount to this going through smoothly, and so
9   the one thing we did not want to lose was the ability to
10  implement this transaction.  And so the August 1st date is
11  simply a compromise of a date by which they need to have their
12  money certainly.  That said, that is not the date by which the
13  DIP lenders are prepared to extend out the interim DIP;  I
14  don't want there to be any confusion about it.  But that
15  August date isn't -- is an absolute worst case scenario
16  deadline that we just agreed upon because we figured it was
17  far enough out that we could solve problems by then if they
18  arose.
19          THE COURT:  All right, thank you.
20          MR. DONOHO:  Thank you.
21          MR. PARTEE:  That's an excellent description, Your
22  Honor, it is an outside deadline.  It is, again, not the
23  deadline that the Debtor can live with on the interim advance.
24          THE COURT:  Okay.  Anything further in support of
25  the financing motion?

1          MR. PARTEE:  Your Honor, that's all I have.

2          THE COURT:  All right.  Based upon this record, I'm

3     prepared to grant the interim relief that's been requested.

4     And if you have a clean Form of Order --

5          MR. PARTEE:  I believe we do, Your Honor.

6          THE COURT:  -- I'd be willing to consider it.

7          MR. PARTEE:  And Your Honor, obviously it does have

8     a date to be filled in for the final hearing.  I didn't know

9     if the Court wanted to engage in that dialogue now.  I mean, I

10    will say in that connection, Your Honor, and this is just a

11    little bit of theater that everybody in this case has asked me

12    to do, the --

13         THE COURT:  Well, then it must be the right thing.

14         MR. PARTEE:  It must be the right thing.

15      (Laughter)

16         MR. PARTEE:  I'm going to do it to placate

17    everybody, and that is that these are the documents that any

18    third party, such as a Committee, will have to review to

19    determine whether the pre-petition secured Thermo lenders are

20    properly perfected and have a valid secured claim.  It's a

21    comparatively slender volume, Your Honor, and this contains

22    the lien search, as well as the title report.  This is

23    something that a relatively competent bankruptcy attorney can

24    digest in a couple of hours, and we don't believe that we're

25    going to be prejudicing anybody with the kind of timelines

1   that we have proposed in this case.

2              THE COURT:  I tell you, optimism drives the world.

3              MR. PARTEE:  It does indeed, Your Honor.  Glass half

4   full.

5              THE COURT:  Okay.  How is May 19th at 2 o'clock in

6   the afternoon for a final hearing?

7              MR. PARTEE:  I'm hearing no objections, Your Honor,

8   and I have none to weigh in with.  As a result, May 19th it

9   is.

10             THE COURT:  Okay.

11             MR. PARTEE:  I'm sorry, you said at what time, Your

12  Honor?

13             THE COURT:  2 o'clock in the afternoon.  I've

14  written that in in paragraph 13 on page 13 of the proposed

15  order.  Now, there is a blank to be filled in for notice to be

16  mailed of the order.

17             MR. PARTEE:  Yes, Your Honor.

18             THE COURT:  Do you have a date to suggest?

19             MR. PARTEE:  We could do it within -- we can get it

20  out tomorrow, Your Honor.

21             THE COURT:  Okay.  I'll put in May 4th.  And on the

22  following page, there is a date to be filled in for

23  objections.  Normally I'd say -- bear with me for a moment.

24             MR. PARTEE:  Certainly.

25             THE COURT:  Nancy, I see that we've blocked out six

1    hours, but I don't know why.  I'm being reminded that I have a
2    hearing in the morning that we've blocked out the day for on
3    May 19th, but when I look at the calendar I couldn't remember
4    why.

5              MR. PARTEE:  That happens.

6              THE COURT:  Yes, and I don't think it's going to be
7    necessary.  If that should change, we'll let you know.  Let me
8    go back to the calendar.  Normally, if it goes out tomorrow,
9    I'd say a week before for everybody but a Committee.  And
10   frankly, given the formation date of the 12th, you know, I'd
11   let the Committee file an objection up until, say, noon the
12   day before.

13             MR. PARTEE:  I think that's fair, Your Honor.

14             THE COURT:  Okay.  And I'll fill in May 12th, and
15   then add a notation that except for any Official Committee,
16   which may file any response by noon Eastern time on May 18th,
17   2011.  Okay, are those the only blanks in the order?

18             MR. PARTEE:  Those are the only ones I know of, Your
19   Honor.  If there are any others, it's an error.

20             THE COURT:  Okay, with that, I've signed the order.

21             MR. PARTEE:  Thank you very much, Your Honor, and
22   with that, I'll turn the podium over to Mr. Wilson.

23             THE COURT:  All right.

24             MR. PARTEE:  Mr. Donoho's correctly pointing out
25   that in recital paragraph (h), Your Honor, there is a blank

1   for the date on which we're holding this hearing.

2           THE COURT:  That was filled in.

3           MR. PARTEE:  Oh, it has been filled in.

4           THE COURT:  On my copy.

5           MR. PARTEE:  Well, then Mr. Donoho's incorrect.

6       (Laugher)

7           THE COURT:  Let me just double check that.  I

8   thought I saw that it had been filled in.  Yes, it was filled

9   in.

10          MR. PARTEE:  Thank you very much.  And then with

11  that, I'll finally turn the podium over to Mr. Wilson.

12          THE COURT:  All right.

13          MR. WILSON:  Good morning, Your Honor, may it please

14  the Court, Mike Wilson, Hunton & Williams, on behalf of the

15  Debtors.  Your Honor, I am going to handle the other four more

16  routine motions.  There were a few comments received on a

17  couple of them from the United States Trustee's Office.  We've

18  made changes that I believe are acceptable, and with the

19  Court's indulgence, I'll just walk through quickly.  Your

20  Honor, the first motion on the agenda is the Joint

21  Administration Motion.  Raser Technologies is a parent; the 19

22  other Debtors are all direct or indirect subsidiaries.  We

23  believe joint administration of this case is appropriate and

24  have received no comments on the proposed Form of Order.

25          THE COURT:  Does anyone else wish to be heard in

1    connection with joint administration?

2              ALL:  (NO verbal response).

3              THE COURT:  I hear no response.  I don't have any

4    questions.

5              MR. WILSON:  May I approach?

6              THE COURT:  You may.

7         (The Court receives document)

8              THE COURT:  Thank you.  That order has been signed.

9              MR. WILSON:  Thank you, Your Honor.  The next motion

10   on the agenda is the Debtors' Motion to Retain American Legal

11   Claim Services as its claims and noticing agent.  Your Honor,

12   the U.S. Trustee did request a couple of additions to the

13   order.  There was a request to add notice to the Committee and

14   the Office of the United States Trustee for invoices from

15   American Legal Claims, and a short period to review those.

16   There was a request to modify one of the paragraphs that said

17   that American Legal Claims, if it was not paid, could quit,

18   and we've modified that to say effectively it has to get the

19   Court's authority to be released from its duties.  And then

20   finally, we've added the {quote, unquote} "Planet Hollywood"

21   indemnification language to the end of the order.  I do have a

22   clean and blackline for the Court.

23             THE COURT:  You can bring them up.

24             MR. WILSON:  May I approach, thanks.

25        (The Court receives documents)

1          THE COURT:  All right, does anyone else wish to be

2    heard in connection with the claims agent motion?

3          ALL:  (No verbal response).

4          THE COURT:  I hear no response.  That order has been

5    signed.

6          MR. WILSON:  Thank you, Your Honor.  The next item

7    on the agenda, Your Honor, is our Employee Wage and Benefits

8    Motion.  Your Honor, the Debtors employ approximately 20 full

9    time employees at the parent company level, as well as at the

10   two project company levels.  They generally pay their

11   employees twice a month in arrears, Your Honor.  Due to some

12   fortuitous timing, they were able to actually complete the

13   payroll that was due to be paid yesterday on -- they funded

14   that on Friday just prior to the filing.  So there actually

15   are no outstanding wage claims, Your Honor.  There are some

16   reimbursable corporate expenses, as well as the benefits, et

17   cetera, that we're requesting authority to continue in this.

18   We believe the total of that is going to be approximately

19   $30,000.  It does include two payments up to the cap amount

20   under 507(a)(4) and (a)(5); one to Mr. Goodman and one to Mr.

21   Perry.  Those are related to moving expenses that were

22   incurred and that are compensable under their employment

23   agreements within the -- and they were -- became compensable

24   within the 180 day period.  So we believe that they would be

25   priority -- covered by the priority scheme of 507(a)(4) and

1    (a)(5).  Otherwise, they are just literally day-to-day,

2    reimbursable expenses of the employees, Your Honor.  The U.S.

3    Trustee did request that there be a couple of changes;

4    actually one change, he wanted to add language to make it

5    clear that the Debtors would not pay anything over the cap

6    amount.  We have added that language, and I have a clean and

7    blackline for the Court.

8              THE COURT:  Thank you.

9              MR. WILSON:  May I approach?

10             THE COURT:  Yes.

11        (The Court receives document)

12             THE COURT:  Unless I missed it, I didn't see an

13   overall cap in the original proposed Form of Order.  Is one in

14   the revised Form of Order?  I don't see one.

15             MR. WILSON:  There was not an overall cap, Your

16   Honor.  The Debtors' monthly payroll is approximately $240,000

17   a month, 120,000 per period.  As I indicated, they have --

18   they were able to pay that and fund that to their payroll

19   service on Friday, so there is really very little outstanding.

20   The aggregate amount that they estimated was going to be the

21   $30,000.

22             THE COURT:  I understand.  Okay.  Well, I expect if

23   that amount is to be exceeded that you'll come back to me.

24             MR. WILSON:  Yes, Your Honor.

25             THE COURT:  All right, does anyone else wish to be

1    heard in connection with the wage motion?

2            ALL:  (No verbal response).

3            THE COURT:  I hear no response.  That order has been

4    signed.

5            MR. WILSON:  Thank you, Your Honor.  The final

6    motion on the agenda is a Motion for Authority to Continue

7    the Debtors' Cash Management System and Maintain Bank

8    Accounts.  Your Honor, the Debtors' current cash management

9    system includes 16 accounts, all but six of -- only six of

10   which are really utilized in the ordinary course.  There are

11   two at Raser Operating Company, which is sort of the entity

12   that handles payroll and funding some of the different things,

13   the G&A for the parent company.  There are three accounts at

14   the Thermo 1 project level, only one of which is really a --

15   utilized in the ordinary course, that is a control account

16   controlled by the Thermo lenders subject to their security and

17   control agreement; that is the cash collateral account that

18   Mr. Partee referred to in conjunction with the DIP Motion.

19   And then there was one account at the Lightning Dock project

20   entity level that is only funded through contributions from or

21   through advances from the lender at that project level.  We

22   are not anticipating that that would be utilized, however

23   there may come a time.  The Debtors request authority to

24   maintain all of those accounts, as well as maintain their cash

25   management system.

1      Your Honor, the U.S. Trustee did request a few changes to

2   our proposed Form or Order.  There was a request for a waiver

3   of the 345(b) investing limitations.  The U.S. Trustee

4   requested that we limit that to a 45-day period, subject to

5   the Debtors' right to come back in and request an extension of

6   that.  The Debtor -- the U.S. Trustee requested that prior to

7   utilizing the authority in the order to open or close bank

8   accounts that we provide notice to the Office of the United

9   States Trustee, which the Debtor did agree to.  And finally,

10  the Debtors' committed to seek uniform disbursement agreements

11  from their banks, to the extent that their banks are not

12  already subject to those agreements with the United States

13  Trustee's Office.  Otherwise, there were no other requests for

14  changes, and I do have a clean and blackline of the proposed

15  order.

16          THE COURT:  All right.

17      (The Court receives document)

18          THE COURT:  Thank you.  All right, does anyone wish

19  to be heard in connection with the Cash Management Motion?

20          ALL:  (No verbal response).

21          THE COURT:  I hear no response.  Okay, I see we have

22  some dates to fill in.

23          MR. WILSON:  Yes, it is contemplated that that would

24  be an interim order, Your Honor, subject to final hearing.

25          THE COURT:  All right, final hearing on the same

1  date as financing?

2          MR. WILSON:  Okay, that works, Your Honor.

3          THE COURT:  The 19th at 2 o'clock.  Objection date -

4  -

5          MR. WILSON:  For the DIP it was set at May 18th at

6  noon, Your Honor.

7          THE COURT:  Well, that was for the Committee --

8          MR. WILSON:  Oh, I apologize.

9          THE COURT:  Well, that would be the only -- not to

10 foreclose anybody, but the only likely objector, so why don't

11 we just put that date in.  That would be -- the designation

12 says Eastern Standard time, but I think we're on daylight time

13 now.  So with those changes, that order has been signed.

14         MR. WILSON:  And I believe that completes the agenda

15 for the day, Your Honor.

16         THE COURT:  All right.

17         MR. WERKHEISER:  Your Honor?

18         THE COURT:  Yes.

19         MR. WERKHEISER:  Thank you, Your Honor.  For the

20 record, it's Gregory Werkheiser, Morris, Nichols, Arsht &

21 Tunnell, LLP.  Your Honor, I'm rising on behalf of Wasabi

22 entity, the entity that you heard mentioned as having had

23 discussions with Raser earlier on in proceedings.  And

24 frankly, Your Honor, I didn't expect to be speaking today, so

25 I didn't sign in on behalf of that entity, and I was taken

1   aback a bit that our confidential discussions were discussed

2   in open court, but be that as it may, they have been.  I

3   simply just wanted to note for the Court that you heard one

4   opinion on the adequacy of the proposals that were made today;

5   they were deemed unacceptable by the Debtor.  It's not an

6   issue for today, but it could be an issue further on in this

7   case as to why they were and whether a proposed restructure

8   under a 363 Sale versus a plan affects all Creditors in the

9   same way.  This is a Debtor with a capital stack and Creditors

10  that are structurally and contractually subordinated with it

11  and something that we would submit to the extent that its

12  relevant in the case ought to be considered.  So Your Honor,

13  I'm happy to entertain the Court has, but I did want to just

14  simply note that for the record.

15          THE COURT:  That would just further prolong that

16  debate.

17          MR. WERKHEISER:  Thank you, Your Honor.

18          THE COURT:  Does anyone else wish to be heard?  All

19  right.  Thank you all very much, that concludes this hearing.

20  Court will stand in recess.

21          ALL:  Thank you, Your Honor.

22

23

24

25

CERTIFICATION

1
2   I certify that the foregoing is a correct transcript from the
3   electronic sound recording of the proceedings in the above-
4   entitled matter.
5
6   *Lewis Parham*                              5/9/11
7   _____        _____
8   Signature of Transcriber                Date