## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| RASER TECHNOLOGIES, INC., *et al.*,[1] | ) | Case No. 11-11315 (KJC) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

**OBJECTION TO MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014, (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)**

Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") files this Objection (the "Objection") to the *Motion for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014, (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Granting Liens and Super-Priority Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, and (IV) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c)* (the "Financing Motion")[2] and respectfully states as follows:

### PRELIMINARY STATEMENT[3]

1. Through the Financing Motion, the Debtors seek relief far beyond that which is necessary to secure funding to continue operating and to protect the estates from losing value.

---

[1] The Debtors are the following: Raser Technologies, Inc., Raser Technologies Operating Company, Inc., Raser Power Systems, LLC, RT Patent Company, Inc., Pacific Renewable Power, LLC, Western Renewable Power, LLC, Intermountain Renewable Power, LLC, Los Lobos Renewable Power, LLC, Columbia Renewable Power, LLC, Truckee Geothermal No. 1 SV-01, LLC, Truckee Geothermal No. 2 SV-04, LLC, Trail Canyon Geothermal No. 1 SV-02, LLC, Devil's Canyon Geothermal No. 1 SV-03, LLC, Thermo No. 1 BE-01, LLC, Thermo No. 2 BE-02, LLC, Thermo No. 3 BE-03, LLC, Cricket Geothermal No. 1 MI-01, LLC, Harmony Geothermal No. 1 IR-01, LLC, Lightning Dock Geothermal HI-01, LLC, and Klamath Geothermal No. 1 KL-01, LLC. For the purpose of these chapter 11 cases, the service address for all Debtors is: Raser Technologies, Inc., 5152 North Edgewood Drive, Provo, UT 84604.

[2] Docket No. 9.

[3] Capitalized terms used, but not defined, in the Preliminary Statement shall have the meaning given to them below.

Rather, the Debtors seek relief that will determine the specific course and outcome of the above-captioned cases (the "Cases") while tying the hands of the Court and all of the other parties in interest. In addition to the Debtors borrowing far more than is necessary on unfavorable terms, any deviation from the sale procedures or plan of reorganization envisioned by the DIP Lenders could result in a breach of a condition or an event of default under the DIP Facility that would result in automatic relief to the DIP Lenders that would likely cripple the Debtors going forward and end any hope of a successful resolution to these Cases.

2. Because (1) the relief requested simply goes too far toward handing control of the Cases over to the DIP Lenders, (2) the evidence presented that the financing terms in the DIP Facility were the best available to the Debtors is insufficient, (3) the DIP Facility provides for an inappropriate payment to a prepetition lender, (4) the DIP Facility is inextricably tied to auction procedures and a plan of reorganization that contain objectionable provisions, and (5) the Financing Motion requests various other inappropriate relief, the requirements of 11 U.S.C. § 364 have not been met and Merrill asks that the Court deny the relief requested in the Financing Motion.

**BACKGROUND**

3. On April 29, 2011 (the "Petition Date"), the above-captioned debtors (the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. On the Petition Date, the Debtors filed the Financing Motion requesting that the Court approve certain financing (the "DIP Facility") to be provided by certain of the prepetition

lenders (the "DIP Lenders").[4]  In support of the Financing Motion and the other first day motions filed by the Debtors, the Debtors filed the *Declaration of Nicholas Goodman in Support of Chapter 11 Petitions and Related Motions* (the "Goodman Declaration").[5]  Attached as Exhibit B to the Goodman Declaration, the Debtors disclosed a Plan Support and Restructuring Agreement (the "Plan Support Agreement"), which purports to commit the Debtors, the DIP Lenders, and certain of the secured lenders (the "Thermo Lenders")[6] to proceeding with the DIP Facility and a plan term sheet (the "PSA Plan").

5. A hearing on the Financing Motion is currently scheduled for May 19, 2011.  On the Petition Date, the Debtors also filed the *Motion to Approve Entry of an Order Establishing Auction Procedures Related to the Sale of the Reorganized Raser Equity* (the "Sale Motion"),[7] which will also be heard at the hearing on May 19, 2011.

## **OBJECTION**

6. The relief requested in the Financing Motion is problematic for a number of reasons, including deficiencies with the DIP Facility itself as well as deficiencies with the Sale Motion and the PSA Plan.  Perhaps most troubling, however, is the manner in which the relief sought in the Financing Motion attempts to preordain a path and ultimate outcome for the Cases less than a month into the proceedings.  Such relief is simply inappropriate at this stage in the Cases.

> **A. The terms of the DIP Facility unreasonably tie the hands of the Court and the other parties in the Cases.**

7. The DIP Facility is highly contingent on the rest of the Cases going exactly as the DIP Lenders have planned.  Pursuant to the DIP Facility, any deviation from this planned course

---

[4] The DIP Lenders are Linden Capital, L.P. and Tenor Capital Management Company L.P.
[5] Docket No. 5.
[6] The Thermo Lenders include the Prudential Insurance Company of America and Zurich American Insurance Company.
[7] Docket No. 47.

will have drastic consequences for the estates and would likely cripple any future attempt at reorganization.

8. The Financing Motion identifies certain events of default to include, among others (1) failure to confirm a plan of reorganization in conformance with the Plan Support Agreement by a date certain, (2) the Court granting relief from the automatic stay with respect to assets exceeding $350,000 in value, (3) the termination of the Plan Support Agreement, or (4) "other reasonable and customary Events of Default as are reasonably required by the Lenders." Thus, the Financing Motion seeks to set trip wires throughout the Cases precluding other parties from seeking relief and requiring that the particular plan of reorganization agreed to by the Debtors, the DIP Lenders, and the Thermo Lenders will be confirmed. While the DIP Lenders obviously can not force the Court to do anything later in the Cases, they will have incredible leverage by virtue of being able to declare an event of default if certain events do not take place *when* the DIP Lenders would like and *how* the DIP Lenders would like.

9. The consequences of an event of default are draconian. While it would be reasonable to expect that upon an uncured event of default under the DIP Facility, the principal and interest due under the DIP Facility would become immediately due and further commitments would be terminated, the DIP Lenders require relief far beyond that. If the Financing Motion is approved on a final basis, the DIP Facility will be secured by first-priority liens on crucial assets of the Debtors and junior liens on almost everything else. The Financing Motion requests that the Court modify the automatic stay so that the DIP Lenders may, upon the occurrence of any event of default under the DIP Facility, take any action or exercise any right or remedy with respect to the liens. Thus, if the Court approves this relief now and any party in the Cases mounts a successful challenge to the course charted in the Plan Support Agreement, the assets of

the estates may be foreclosed upon and there may be nothing left for the estates to structure a reorganization around.

10.     In addition to events of default, the Financing Motion also proposes to make the obligation to provide each individual loan under the DIP Facility subject to a number of conditions, including that, for any subsequent loan, the Auction Procedures Order (as defined in the Plan Support Agreement) shall have been entered.  Thus, the DIP Lenders are able to control the steps along the way to their desired plan of reorganization.

11.     In short, the Financing Motion attempts to hand incredible leverage over the future of the Cases to the DIP Lenders less than a month into the Cases.  In addition to the blanket liens and events of default that will allow the DIP Lenders to dictate the timeline and outcome of the Cases, the Financing Motion further proposes to provide financing terms that are far too generous to the DIP Lenders.

> **B.     The terms of the DIP Facility are unreasonable, and the evidence provided that the Debtors could not obtain financing on better terms is insufficient.**

12.     The terms on which the Debtors have managed to obtain a commitment from the DIP Lenders to fund the DIP Facility are hardly favorable to the estate.  Not only will the DIP Facility accrue interest at a rate of at least 15%, the DIP Lenders will be entitled to a 10% commitment fee in addition to the interest.  To make matters even worse, because $6 million of the up to $8.75 million DIP Facility will be paid immediately to a prepetition creditor that is still subject to the automatic stay, the Debtors are proposing to pay interest and the commitment fee based on an amount that is over three times the amount necessary to fund the Debtors' operations.

13.     Given the very high costs of obtaining the financing provided by the DIP Facility, one would expect it to be accompanied by compelling evidence to demonstrate that these were the best financing terms available to the Debtors, but in documents filed with Court, the Debtors

provide none. While the Debtors assert in the Financing Motion that this is the best that they can do, the topic is notably absent from the Goodman Declaration. The Debtors addressed this dearth of evidence in a proffer at the hearing on May 3, 2011, but the only testimony provided was that one party offered $3 million of debtor-in-possession financing as part of a sale process in bankruptcy, which "was not the Debtor's chosen path . . . " and no other party "has offered any form of financing or new money . . . on anything close to the terms that have been proposed."[8] Particularly in light of the alternative financing described in the objection to the Financing Motion filed by Kraig Higginson (the "Higginson Objection"),[9] the evidence presented by the Debtors regarding the Financing Motion will have to be greatly supplemented.

14. At the very least, the Court should not grant the Financing Motion without more substantial evidence to support these assertions that the financing obtained was on the best possible terms and that the Debtors conducted an adequate search for other sources of financing. The Debtors must also provide evidence regarding how the cost associated with granting the DIP Lenders so much control in the Cases was factored in to the cost of financing and why, despite the fact that the Debtors state in the Financing Motion that relief was justified under section 364(d), it was necessary to request a DIP Facility that so vastly exceeds what is necessary for continuing the Debtors' operations in order to obtain the consent of a secured creditor to priming liens.

    **C.    The six million dollar payment to the Thermo Lenders is inappropriate.**

15. Not only will the $6 million payment to the Thermo Lenders (the "Thermo Payment") funded by the DIP Facility be extremely costly for the estates, the Debtors imply in the Financing Motion that the payment is not even necessary. The cost to the estates for the commitment fee under the DIP Facility is increased by $600,000 to fund the Thermo Payment,

---

[8] Transcript of Hearing Held May 3, 2011 at 15:14 – 16:2.
[9] Docket No. 53.

and given the interest rate proposed by the Financing Motion, the interest just for the money borrowed to fund the Thermo Payment would come to approximately $75,000 per month. Given the dollar amounts involved in theses Cases, the cost of borrowing to fund the Thermo Payment is simply unjustified.

16. The situation is further aggravated by the fact that in order to make this payment, the Debtors ask for additional extraordinary relief—to recognize the liens and security interests of the Thermo Lenders as valid and properly perfected. Such relief is clearly premature as the official committee of unsecured creditors (the "Official Committee") was not formed until roughly eight days prior to the hearing on the Financing Motion. Given the suggested proportion of the Debtors' assets encumbered by liens held by the Thermo Lenders, the inspection of those liens will be an important part of the Official Committee's duties, and the Official Committee should not be unduly rushed.

17. Interestingly, the Debtors justify the Thermo Payment by stating: "The repayment of a portion of the prepetition obligations owed to the Thermo Lenders is necessary because it is a condition to the Thermo Lenders' consent to the priming of their liens by the liens being granted to the Lenders under the DIP Facility."[10] However, the Debtors also state in the Financing Motion that "the Debtors are otherwise unable to obtain financing other than financing secured by first priority priming liens."[11] Presumably the Debtors would be able to provide adequate protection to the Thermo Lenders and thus obtain priming liens without being required to pay down roughly 60%[12] of the obligations owed to the Thermo Lenders. Taking this course of action could significantly lower the amount of the DIP Facility and the related financing costs.

---

[10] Financing Motion at ¶ 31.
[11] Financing Motion at ¶ 23.
[12] Given the stated willingness of the Thermo Lenders to waive the remainder of their claim if the DIP Lenders are the successful bidder at an auction to be held later in the Cases, this is actually much closer to a 100% paydown of their prepetition claims.

**D.  The auction procedures and other relief contained in the Plan Support Agreement that will be tied to the DIP Facility is unreasonable.**

18. While the Sale Motion and the PSA Plan are not being considered as part of the Financing Motion, their deficiencies are still relevant to the relief that the Debtors request in the Financing Motion. Given the conditions and events of default built in to the DIP Facility, the Financing Motion simply can not be approved without at least some examination of both the Sale Motion and the PSA Plan.

19. The Sale Motion proposes auction procedures (the "Auction Procedures") in accordance with those attached to the Plan Support Agreement. While Merrill, the Official Committee, and the other parties in interest in these Cases have likely not had time to fully evaluate the Auction Procedures prior to the response deadline for the Financing Motion, there are glaring deficiencies on its face including (1) an unreasonably high break-up fee of five percent of the purchase price, (2) an unreasonably high initial overbid requirement of $500,000 *plus* the break-up fee (which results in, roughly, a 7.5% overbid requirement), and (3) a stalking horse bid of $19,768,180.59 that manages to include only $2.5 million in new cash.

20. To say that the Auction Procedures will likely chill bidding is an understatement. The Auction Procedures clearly favor the DIP Lenders/stalking horse bidder, and any other entity wishing to actually bid pursuant to the Auction Procedures would begin at a serious disadvantage. If any party opposes these terms after the Court grants the Financing Motion on a final basis though, it runs the risk of either losing and having to accept Auction Procedures designed to chill bidding or "winning" and facing the recourse that the Debtors request for the DIP Lenders to have.

21. The only details regarding the PSA Plan that have been disclosed are attached to the Goodman Declaration, but already problems appear. Pursuant to the PSA Plan, the Thermo Lenders are guaranteed either a full release of liability if the DIP Lenders are the successful

bidder or full payment of their claims in cash if the DIP Lenders are not the successful bidder. It is difficult to judge whether this is fair treatment for the Thermo Lenders this early in the Cases, but if the Financing Motion is approved, questioning the treatment may be futile. Any attempt to modify this treatment runs the risk of being considered an event of default under the DIP Facility and entitling the DIP Lenders to foreclose on all of the assets of the estates.

> **E.  The Financing Motion attempts to give a security interest in Chapter 5 causes of action to the DIP Lenders.**

22. Given the expansive collateral granted to the DIP Lenders to secure repayment of obligations under the DIP Facility, the one category of assets that should not be encumbered at this early stage of the Cases are the causes of action provided under Chapter 5 of the Bankruptcy Code. These claims may ultimately serve as one of the only sources of recovery for unsecured creditors in the Cases, and while the Debtors have not proposed to specifically encumber the Chapter 5 causes of action themselves, they are nevertheless giving a blanket lien on all assets, which would include any cash recoveries from such actions. These actions, including those potentially available against the Thermo Lenders, should be preserved and unencumbered.

## CONCLUSION

23. For all of the foregoing reasons, Merrill respectfully requests that the Court deny the relief requested in the Financing Motion.

Dated: May 16, 2011
REED SMITH LLP

By: /s/ Kurt F. Gwynne, Esq.
Kurt F. Gwynne (No. 3951)
1201 Market Street, Suite 1500
Wilmington, DE 19801
Telephone: 302.778.7500
Facsimile: 302.778.7575
E-mail: kgwynne@reedsmith.com

and

**HAYNES AND BOONE, LLP**
Mark X. Mullin
Texas Bar No. 14653520
Stephen J. Manz
Texas Bar No. 24070211
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone:  214.651.5000
Facsimile:   214.651.5940
Email: mark.mullin@haynesboone.com
Email: stephen.manz@haynesboone.com

ATTORNEYS FOR MERRILL LYNCH,
PIERCE, FENNER & SMITH
INCORPORATED