# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> RASER TECHNOLOGIES, INC., *et al.*, <br><br> Debtors. | Chapter 11 <br><br> Case No. 11-11315 (KJC) <br> (Jointly Administered) <br><br> Re: Docket No. 47 |

## OBJECTION OF KRAIG HIGGINSON TO MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER ESTABLISHING AUCTION PROCEDURES RELATED TO THE SALE OF THE REORGANIZED RASER EQUITY

Kraig Higginson ("**Higginson**"), a shareholder in the above-captioned chapter 11 cases (the "**Cases**"), by its undersigned counsel, submits this objection (this "**Objection**") to Motion of the Debtors for Entry of an Order Establishing Auction Procedures Related to the Sale of the Reorganized Raser Equity (the "**Sale Motion**").[1]

## PRELIMINARY STATEMENT

1. Through the Motion, the Debtors and Sponsors are attempting to hinder the Debtors' and creditors' ability to obtain a fair value for the Debtors' assets by placing extraordinary constraints on any bidders (as discussed below), other than the Sponsors who have agreed to act as the Stalking Horse Bidder. The terms of the Motion are incorporated in to the Plan Support Agreement (the "**PSA**"), which, on its own, insulates the Sponsors and Thermo Lenders from investigation and prosecution of potential causes of action against them. The DIP Financing Agreement, PSA and the Sale Motion are self-dealing, non-arms'-length transactions which are detrimental to the Debtors' estates and their arms'-length unsecured creditors. Further, these pleadings are a

---

[1] Unless otherwise defined herein, capitalized terms shall have the meaning ascribed to them in the Motion, as appropriate.

*sub rosa plan* designed to circumvent the requirements of section 1129 of the Bankruptcy Code for proper disclosure prior to confirmation of a plan of reorganization. The terms of the auction procedures contained in the Sale Motion are unreasonable and devised to prevent other potential purchases or plan proponents from offering to the Debtors a plan which will truly benefit the Debtors' estates and creditors, not simply the Sponsors and Thermo Lenders.

## RELEVANT BACKGROUND

**A. In General.**

2. On April 29, 2011 (the "**Filing Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

3. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. As of the filing of this Objection, no trustee, examiner or official committee has been requested or appointed in these chapter 11 cases. An Official Committee of Unsecured Creditors (the "**Committee**") was formed by the United States Trustee on May 12, 2011.

5. On the Filing Date, Debtors filed their Motion for Entry of Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014, (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Granting Liens and Super-Priority Claims, (III) Granting Adequate Protection to Pre-Petition Secured Parties, and (IV) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001 (b) and (c) (the "**DIP Motion**").

6. On May 3, 2011, the Court entered an order directing that the Debtors' chapter 11 cases be jointly administered for procedural purposes only pursuant to section 105(a) of the Bankruptcy Code and Rule 1015(b) of the Bankruptcy Rules. *See* Docket No. 30.

7. Also on May 3, 2011, the Court entered an interim order (the "**Interim Order**") granting the DIP Motion on an interim basis. *See* Docket No. 34. The Interim Order authorizes the Debtors to borrow up to $750,000 in debtor-in-possession financing.

8. On May 9, 2011, Debtors filed the Sale Motion. By this Sale Motion, the Debtors are seeking to sell substantially all of their assets via an auction to be held on July 25, 2011, which is less than 90 days from the Filing Date. As discussed more fully below, other than boilerplate language indicating a need to move quickly or their DIP financing, which is opposed by multiple parties, will be in default, the Sale Motion fails to set forth any specific reasons why the sale must be rushed.

9. On May 13, 2011, Higginson filed an Objection to Debtors' Motion for Entry of Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014, (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Granting Liens and Super-Priority Claims, (III) Granting Adequate Protection to Pre-Petition Secured Parties, and (IV) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001 (b) and (c) (the "**DIP Objection**") *See* Docket No. 53. In that DIP Objection, Higginson presented a competing debtor-in-possession financing plan on terms that are significantly better for the Debtors and their estates and creditors, without weakening the estates' ability to investigate and prosecute claims against the

Lenders and the Thermo Lenders. Higginson's proposal is not inconsistent with that provided to Raser shortly before the Filing Date.

**B.    Relevant Pre-Petition Events.**

10.    Raser Technologies, Inc. ("**Raser**") became a public company in October 2003, and until recently traded on the New York Stock Exchange (the "**NYSE**").

11.    In March 2008, Raser issued $55 million in aggregate principal amount of its 8.00% Convertible Senior Unsecured Notes due 2003 (the "**Convertible Notes**").  The Lenders hold in the aggregate approximately $25 million of the Convertible Notes.

12.    In November 2010, Raser was delisted by the NYSE and it is now quoted on the Over-the-Counter Bulletin Board.  Also in November 2010, Raser sold all of the assets comprising the Transportation and Industrial business segment to a company now called VIA Motors ("**VIA**"), owned by a private investor group.[3]

## OBJECTIONS

**A.    The Auction Procedures Are Not Fair or Appropriate.**

13.    The sale terms, as set forth in the Sale Motion, are unduly prejudicial to the Debtors and all parties in interest. Potential bidders will be afforded a condensed time in which to conduct due diligence, obtain funding and prepare an Initial Bid.  An Initial Bid, to be deemed a Qualified Bid, must be in an amount equal the Purchase Price <u>plus</u> five percent (5%) of the Purchase Price <u>plus</u> an additional Five Hundred Thousand Dollars ($500,000). Furthermore, any bid must be for 100% of the Reorganized Raser Equity.

---

[3]    In consideration for this sale, Raser ultimately received $2.5 million in cash, VIA's assumption of segment related liabilities and thirty-one (31%) percent of VIA's equity.

-4-

14. The Debtors are asking this Court to approve procedures which only allow potential bidders until July 20, 2011, less than 60 days following the Filing Date, to submit an Initial Bid. Further, any Successful Bidder must be able to close and consummate the sale on or before August 11, 2011.

15. The PSA requires that the Debtors must propose and file a plan and disclosure statement no later than May 27, 2011. Debtors will be unable to comply with the requirements of section 1129 of the Bankruptcy Code by a date prior than the date of the auction. Further, Debtors cannot possibly propose a plan contingent on an auction which has yet to occur.

16. To date, none of the Debtors have filed schedules, statements of financial affairs or even a monthly operating report. Absent these key documents, it is impossible for creditors to determine if the sale makes sense or will generate sufficient proceeds to pay their claims. Even with these documents, it would be extremely difficult for creditors to figure out what they might achieve out of the sale without approval of a Chapter 11 disclosure statement. Without knowing the auction results, Debtors cannot draft an adequate disclosure statement to submit to creditors and parties in interest.

B. **The Break-Up Fee Is Not Necessary or Appropriate.**

17. "A break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser." *In re Integrated Resources,* 147 B.R. 650, 662 (S.D.N.Y. 1992). "A court should consider the prospective buyer's investment of both time and money when determining whether a break-up fee is reasonable. In general, a break-up fee is permissible if reasonably related to the bidder's efforts and the

transaction's magnitude." *Id.* at 662 – 663 (citations omitted). If Lenders need to be reimbursed, at a minimum, $1 million for their investment of both time and money preparing the Stalking Horse Bid, then potential purchasers who received notice of the Sale Motion only nine (9) days before an objection was due to be filed surely will need more than the time allotted by the Sale Motion to adequately evaluate the Debtors' assets.

18. The Stalking Horse Purchase Price is currently $19.7 million, which includes credits to the Lenders for the outstanding balance of the DIP Facility, credit to Linden for the outstanding balance of the Bridge Facility, waiver by the Thermo Lenders, cash in the amount of $2.5 million and the Exit Facility of $3.0 million. Accordingly, the Initial Overbid must be at least $21.2 million to be considered by the Debtors. This minimum Initial Overbid amount includes a Break-Up Fee to Lenders in the amount of almost $1 million. Such Break-Up Fee is excessive to say the least and does nothing more than prohibit other potential bidders.

19. Debtors argue that "the Break-Up Fee appropriately compensates the [Lenders] for the significant risks they have undertaken in committing to act as lenders under the DIP Facility and to provide the additional capital necessary to confirm the Plan and ensure its feasibility as contemplated in the Stalking Horse Offer." *See* Motion at ¶ 23. This statement is another example of how the Lenders have hand cuffed the Debtors with the DIP Financing, PSA and Sale Motion. The Break-Up Fee in the auction procedures should not be an inducement to fund the debtor-in-possession financing. Moreover, any Successful Bidder, other than the Lenders, should not be required to compensate the Lenders for committing to a DIP Financing Agreement that is not in the best interests of the Debtors' estates.

## CONCLUSION

20. For all of the above reasons, Higginson respectfully requests that this Court (i) deny the Sale Motion or, in the alternative, adjourn the hearing on the Motion until after the DIP Objection (which proposed alternate financing) is adjudicated, and (ii) grant to Higginson such other and further relief as the Court may deem proper.

Dated: May 18, 2011
       Wilmington, DE

Respectfully Submitted,

**BIFFERATO GENTILOTTI LLC**

By: /s/ Mary E. Augustine
Garvan F. McDaniel (Bar No. 4167)
Mary E. Augustine (Bar No. 4477)
800 North King Street, Plaza Level
Wilmington, Delaware 19801
Telephone: (302) 429-1900
Facsimile: (302) 429-8600

-and-

**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq.
S. Jason Teele, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400

-and-

**CHRISTIAN, SMITH & JEWELL, LLP**
James Wesley Christian, Esq.
Laura Gee, Esq.
2302 Fannin, Suite 500
Houston, Texas 77002
Telephone: (713) 659-7617
Facsimile: (713) 659-7641

*Counsel for Kraig Higginson*