## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RASER TECHNOLOGIES, INC., *et al.*,[1] | Case No. 11-11315 (KJC) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:** 5/25/2011 at 11:00 a.m.<br>**Objection Deadline:** 5/24/2011 at 12:00 p.m., as to the Creditors' Committee and the United States Trustee |
| | **Re: Docket No. 9** |

### OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364: AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014, (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES AND (IV) SCHEDULING FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)

The Official Committee of Unsecured Creditors (the "Committee") of Raser

Technologies, Inc., and its debtor affiliates (collectively, the "Debtors"), by and through its

undersigned proposed counsel, Foley & Lardner LLP and Womble Carlyle Sandridge & Rice,

PLLC, hereby files its objection (the "Objection") to the Debtors' *Motion for Entry of Final*

*Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 and Fed. R. Bankr. P. 2002,*

*4001 and 9014, (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Granting Liens*

*and Super-Priority Claims, (III) Granting Adequate Protection to Pre-Petition Secured Parties,*

---

[1] The Debtors are the following: Raser Technologies, Inc., Raser Technologies Operating Company, Inc., Raser Power Systems, LLC, RT Patent Company, Inc., Pacific Renewable Power, LLC, Western Renewable Power, LLC, Intermountain Renewable Power, LLC, Los Lobos Renewable Power, LLC, Columbia Renewable Power, LLC, Truckee Geothermal No. 1 SV-01, LLC, Truckee Geothermal No. 2 SV-04, LLC, Trail Canyon Geothermal No. 1SV-02, LLC, Devil's Canyon Geothermal No. 1 SV-03, LLC, Thermo No. 1 BE-01, LLC, Thermo No. 2 BE-

*and (IV) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001 (b) and (c)* (the "DIP Financing Motion") [Dkt. No. 9]. In support of its Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.     For reasons that are not yet clear to the Committee, the Debtors have struck a deal with Linden Capital, L.P., Tenor Capital Master Opportunity Fund, Ltd. and Aria Opportunity Fund, Ltd. (collectively, the "DIP Lenders") and Prudential Insurance Company of America and Zurich American Insurance Company (the "Thermo Lenders") to engage in a rapid fire restructuring that does not seem to provide much benefit to anyone other than the DIP Lenders and Thermo Lenders. By the DIP Financing Motion, the Debtors, in exchange for minimal postpetition financing, cede complete control of these cases, within one month of the filing, to the DIP Lenders for a proposed plan that requires unsecured creditors to negotiate their plan treatment after the plan structure is approved and prohibits meaningful marketing by limiting it solely for the equity of the reorganized Debtors.

2.     The Debtors' process to secure DIP financing should be open, competitive and transparent in order to ensure that Debtors have an opportunity to (i) solicit and consider alternative financing proposals and (ii) select the financing proposal that offers the best terms and provides the most flexibility for marketing an exit and value for creditors. Unfortunately, the Debtors have not engaged in such a process, and accordingly, the DIP facility proposed by the DIP Financing Motion is not in the best interests of the estates and their creditors. The proposed financing (i) is subject to high fees and interest rates (10% commitment fees; 15% interest rate); (ii) borrows nearly three times as much money as is necessary to pay off secured lenders at

---

02, LLC, Thermo No. 3 BE-03, LLC, Cricket Geothermal No. 1 MI-01, LLC, Harmony Geothermal No. 1 IR-01,

higher interest rates than the current default rates; (iii) is inextricably tied to an incomplete outline of a  plan of reorganization, prohibiting any other outcome and allowing the DIP Lenders to effectively confirm such a plan within a month of the Petition Date (without proper process, safeguards and approvals required by the Bankruptcy Code); (iii) provides nothing for unsecured creditors and grants leverage to DIP Lenders; and (iv) includes unreasonable, fast-tracked milestones which are tied to draconian events of default that effectively preclude Debtors from securing any other financing or alternative exit transaction.   In addition, the so-called prearranged plan in effect, turns over potentially valuable third party claims and improperly affects releases of other claims, all to the detriment of general unsecured creditors.

3.     The Committee is not the only constituency that is suspect of the DIP Financing Motion and related PSA (as defined below).  To date, four objections to the DIP Financing Motion have been filed.  The objections filed by (i) Kraig Higginson on May 13, 2011 [Dkt. No. 53] (the "Higginson Objection") and (ii) Merrill Lynch on May 16, 2011 [Dkt. No. 59] (the "Merrill Objection") cover the bases for the majority of the Committee's concerns with the DIP Financing Motion.  For efficiency purposes only, where the Committee agrees with the Higginson Objection and the Merrill Objection it will incorporate such arguments by reference below.

4.     For the reasons more thoroughly set forth below, the Committee objects to the DIP Financing Motion and requests that the Court deny the DIP Financing Motion and slow down the process to allow Debtors time to find financing on better terms and with flexibility so as to maximize the value to creditors.

LLC, Lightning Dock Geothermal HI-01, LLC, and Klamath Geothermal No. 1 KL-01, LLC.

## BACKGROUND

5.     On April 29, 2011 (the "Petition Date") the Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     On the Petition Date, the Debtors filed the DIP Financing Motion requesting that the Court approve certain financing (the "DIP Facility") to be provided by the DIP Lenders. In support of the DIP Financing Motion and the other first day motions filed by the Debtors, the Debtors filed the Declaration of Nicholas Goodman in Support of Chapter 11 Petitions and Related Motions (the "Goodman Declaration") [Dkt. No. 5]. Attached as Exhibit B to the Goodman Declaration, the Debtors disclosed a Plan Support and Restructuring Agreement (the "PSA"), dated April 28, 2011, by and among Debtors, DIP Lenders and Thermo Lenders. The PSA sets forth the terms of (i) a plan of reorganization (the "PSA Plan"), evidenced by a plan term sheet (the "Plan Term Sheet"), (ii) the DIP Facility, evidenced by a DIP term sheet (the "DIP Term Sheet"),[2] (iii) the sale and auction of the equity of the reorganized debtor (the "Auction") and related bid procedures (the "Bid Procedures") and (iv) a settlement with the Thermo Lenders (the "Thermo Settlement").

7.     On May 3, 2011, the Court entered an interim order (the "Interim Order") granting the DIP Financing Motion on an interim basis. [Dkt. No. 34]. The Interim Order

---

[2] The Committee notes that there were no separate executed DIP financing agreements attached to or filed in connection with the DIP Financing Motion; the DIP Term Sheet was attached as Exhibit B to the PSA.

authorizes the Debtors to borrow up to $750,000 in initial debtor-in-possession financing from the DIP Lenders.

8.    On May 5, 2011, the Debtors filed the *Motion to Approve Entry of an Order Establishing Auction Procedures Related to the Sale of the Reorganized Raser Equity* (the "Sale Motion") [Dkt. No. 47], by which Debtors seek, among other things, approval of the Auction and Bid Procedures. Under the Sale Motion, and in connection with the PSA, the DIP Lenders will serve as the stalking horse bidder at the Auction.

9.    On, May 12, 2011, the United States Trustee for the District of Delaware held a formation meeting and appointed the Committee.

10.    A hearing on the DIP Financing Motion and Sale Motion is currently scheduled for May 25, 2011 at 11:00 am.

## OBJECTIONS

### A.    The Court Should Adjourn The DIP Hearing.

11.    The Committee objects to the DIP Financing Motion for a number of reasons, but first and foremost because the Debtors and DIP Lenders are, through the PSA and DIP Term Sheet, attempting to preordain a path and ultimate outcome for the Debtors' chapter 11 cases less than a month into the proceedings. Such relief is simply inappropriate at this stage in the cases.

12.    The DIP Financing Motion was filed on the April 29, 2011 (the Petition Date) and the Interim Order was entered on May 3, 2011. The Committee was formed on May 12, 2011 and retained a financial advisor on May 13, 2011. Accordingly, the Committee has been provided just twelve days to attempt to obtain necessary information concerning the Debtors and third parties, evaluate the extent of tangible and intangible assets, litigation claims, insider transactions, and perfection issues, all of which will be, significantly, if not irreparably

impacted by the DIP Financing Motion and PSA Plan. In this regard, the Committee sent its first letter request for documents and information relating to, among other things, the Debtors' process for securing DIP financing to the Debtors on May 18, 2011 (the "Document Request"). On May 22, 2011, the Debtors provided the Committee with their initial responsive documents; however, the vast majority of the requested information concerning valuation of assets, causes of action, prior discussions and negotiations regarding the marketing of assets and soliciting of financing and related transactions have not yet or very recently been produced.

13.     The Committee is the statutorily-appointed body with a mandate to represent the interests of all unsecured creditors. The PSA, through the DIP Financing Motion, contemplates a reorganization which would serve only the interests of the DIP Lenders and Thermo Lenders and does not discuss what little, if anything, it would leave for unsecured creditors. The Committee needs time to become sufficiently familiar with the Debtors' operations, restructuring plans, debt structure, prepetition loan transactions, potential third party litigation claims and related matters. Twelve days is an insufficient amount of time to analyze the impact of a motion where the relief sought will control the entire reorganization process. The impact of the relief requested by the DIP Financing Motion is such that the Committee should be afforded additional time to negotiate the plan treatment for unsecured creditors if the Debtors and DIP Lenders refuse to deviate from their proposed process, or, at minimum, time to review the Debtors' responses to the Document Request with the benefit of its financial advisor.[3]

14.     In addition, the Debtors, in concert with the Committee, also need more time to conduct an open and competitive process for new financing at better terms and develop a

---

[3] Debtors and the Committee are still in the process of negotiating a confidentiality agreement, so all documents received from Debtors to date have been designated as "for attorneys eyes only" and are not able to be shared with the Committee members or financial advisor.

plan that creditors can support. Debtors have not given sufficient reason as to why the DIP

Facility in the amounts requested is immediately necessary. By the DIP Financing Motion, the

Debtors state that the DIP Facility, which is approximately $2.75 million (after $6 million

payment to Thermo Lenders) over 13 weeks, will be used to "continue their ordinary course,

day-to-day operations, to preserve the value of the estates, and to facilitate the Debtors' ability to

successfully execute the transactions contemplated by the [PSA], including confirmation of the

Plan." DIP Financing Motion, p. 14. There is no description of any immediate liquidity crisis.

Furthermore, Debtors received approximately $1.5 million over the last month between the

Bridge Loan[4] and the initial DIP payment. The Committee has requested information relating to

the distribution and use of those funds, but has not received relevant responsive documents from

Debtors to date. The Debtors should be required to provide an accounting of such funds and

demonstrate a real, immediate need for funding to justify the approval of the DIP Financing

Motion given its less than favorable terms, sale chilling impact and accelerated pace.

      15.    For this and other reasons discussed below, the Committee respectfully

requests that the final hearing on the DIP Financing Motion be postponed.

**B.    The PSA And DIP Financing Motion Constrain the Debtors' Performance Of Their Fiduciary Duty To Creditors.**

      16.    Debtors-in-possession owe a fiduciary duty to their estates and creditors.

See Cenargo International, PLC, 294 B.R. 571, 599 n.32 (Bankr. S.D.N.Y. 2003); see also In re

Mondie Forge, Inc., 148 B.R. 499, 502 (Bankr. N.D. Ohio 1992) ("the [t]rustee has a duty to

realize the maximum return for the estate for further distribution to the [d]ebtor's creditors").

---

[4] The Bridge Loan was a $750,000 loan provided to the Debtors on April 15, 2011. Linden Capital L.P. ("Bridge Lender") took assignment of the Bridge Loan from David S. Handsman in April 2011. The Committee has not been provided with a copy of the assignment of the Note or Security Agreement.

17. The fiduciary duty owed by trustees and debtors-in-possession is owed to each creditor of the estate. <u>In re Ngan Gung Rest.</u>, 254 B.R. 566, 570 (Bankr. S.D.N.Y. 2000) ("A trustee also owes a fiduciary duty to each creditor of the estate. As such, he has a duty to treat all creditors fairly ....") (internal quotations omitted); <u>In re Centennial Textiles, Inc.</u>, 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998) ("As fiduciaries, the debtor in possession and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate, and protect and conserve the debtor's property.") (internal quotations omitted).

18. For the reasons below, the Debtors have compromised their fiduciary duties owed to all creditors by agreeing to consummate the transactions proposed in the PSA, including the DIP Financing Motion. By agreeing to those terms, the Debtors effectively are precluded from pursuing any reorganization or liquidation plan other than the PSA Plan, even if an alternative plan would better serve the interest of their estates and creditors. This is particularly troubling where the Debtors are in effect, relinquishing rights to potentially valuable third party causes of action, without fair value.

## C. Debtors Have Not Demonstrated That They Are Unable To Obtain Financing On More Favorable Terms.

19. The Debtors fail to meet their burden to demonstrate that alternative financing on more favorable terms was and is not available. As stated in the Merrill Objection, the terms on which the Debtors have managed to obtain a commitment from the DIP Lenders are hardly favorable to the estate. Not only will the DIP Facility accrue interest at a rate of at least 15%, the DIP Lenders will be entitled to a 10% commitment fee in addition to the interest. To make matters worse, because $6 million of the up to $8.75 million DIP Facility will be paid immediately to the Thermo Lenders (the "<u>Thermo Payment</u>"), the Debtors are proposing to pay interest and the commitment fee based on an amount that is *over three times* the amount

necessary to fund the Debtors' operations and to increase their cost of borrowing in excess of the Thermo Lenders' default interest rate.

20.      The Debtors bear the burden of proving that the proposed DIP Facility's terms are fair and reasonable under the circumstances, that no alternative financing is available, and that the financing is in the best interests of the Debtors' estates and their creditors.  See, e.g., In re Phase-I Molecular Toxicology, 285 B.R. 494, 495 (Bankr. D. N.M. 2002) (citing In re Western Pacific Airlines, Inc., 223 B.R. 567, 572 (Bankr. D. Colo. 1997)); In re Crouse Group. Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (stating that the debtor bears the burden of proving that the terms of financing under section 364 of the Bankruptcy Code are "fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.").

21.      Neither the DIP Financing Motion nor the Goodman Declaration provide adequate information regarding the Debtors' efforts to secure financing to justify the unfavorable terms of the DIP Facility.   Indeed, while the Goodman Declaration describes the Debtors' attempts to market the Thermo 1 assets, it only briefly mentions the fact that Debtors reached out to their existing creditor constituencies regarding potential financing.  In light of the Alternate Financing Proposal by Higginson, and the less than favorable terms of the DIP Facility, the Debtors have not met their burden of demonstrating that no alternative financing is available.

**D.      The PSA And Auction Motion Are Inextricably Tied To The DIP Financing Motion.**

22.      The PSA and Sale Motion, while not before the Court on the DIP Financing Motion, are tied to the DIP and contain unreasonable terms that are chilling to an open and competitive process to maximize value to the estates.  As stated in the Merrill Objection, the relief requested in the DIP Financing Motion is problematic for a number of reasons, including

deficiencies with the DIP Facility itself as well as deficiencies with the *inextricably connected* PSA and Sale Motion.

           i.     **The PSA Constitutes A *Sub Rosa* Plan.**

        23.      The Debtors have tied themselves to a plan *sub rosa* by agreeing to condition the DIP Financing Agreement on their filing and confirmation of the PSA Plan. The PSA -- which sets the terms of the DIP Facility and the Auction and Bid Procedures -- is a *sub rosa* plan, and allows the DIP Lenders to subvert the bankruptcy process and effectively confirm a plan of reorganization without the protections afforded by chapter 11 of the Bankruptcy Code. The Committee agrees with and hereby adopts herein by reference the *sub rosa* objections included in the Higginson Objection, pp. 6-10.

        24.      By the PSA, the Debtors and DIP Lenders are attempting to close off all avenues to a successful restructuring except the one which solely benefits the DIP Lenders. The PSA improperly dictates the terms of the reorganization through unreasonable, fast-tracked milestones which are tied to draconian events of default under the DIP Term Sheet. The DIP Financing Motion identifies certain events of default to include, among others: (a) the entry of the Interim Order by May 4, 2011; (b) entry of final order on DIP Financing Agreement by May 20, 2011; (c) confirmation of Chapter 11 plan of reorganization in conformance with the PSA and Plan Term Sheet by August 11, 2011; and (d) ensuring an effective plan date by August 26, 2011. Failure to meet any of these deadlines constitutes an Event of Default under the DIP Facility, and threatens the termination and acceleration of the Debtors' postpetition financing and foreclosure of all of the Debtors' assets by the DIP Lenders.

        25.      These provisions, and others like them, effectively seek a reorganization by motion, without the protections that unsecured creditors would otherwise receive under section 1129 of the Bankruptcy Code. This approach constitutes a *sub rosa* plan, and should be

rejected.  See, e.g., In re Braniff Airways, Inc., 700 F.2d 935, 940 (5th Cir. 1983) (the debtor "should not be able to short circuit the requirements of chapter 11 for confirmation of a plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets").

26.     At the very least, these provisions of the PSA will, if approved through the DIP Financing Motion, afford the DIP Lenders unwarranted control over these cases, to the detriment of the Debtors, their estates and creditors.  These provisions should be rejected.  See In re Tenney Village, 104 B.R. 562 (Bankr. D. N.H. 1989) (denying proposed financing facility that afforded procedural and substantive advantages to the Debtors' prepetition lenders).  As stated by the court in Tenney Village:

> Under the guise of financing a reorganization, the bank would disarm the debtor of all weapons usable against it for the bankruptcy estate's benefit, place the debtor in bondage working for the bank, seize control of the reins of reorganization, and steal a march on other creditors in numerous ways.  The Financing Agreement would pervert the reorganization process from one designed to accommodate all classes of creditors and equity interests to one specifically crafted for the benefit of the bank and the debtor's principals who guaranteed its debt.  It runs roughshod over numerous sections of the Bankruptcy Code.

Tenney Village, 104 B.R. at 568.

27.     These provisions put the DIP Lenders in the "driver's seat," granting them freedom to veto actions that may be preferred by the Debtors and their creditors, in pursuit of a maximized recovery for the DIP Lenders.  They undermine the fundamental principle that a debtor operating in chapter 11 owes a fiduciary duty to all if its creditors, not merely to its lenders who may exert undue leverage against the debtor.  See e.g., id. at 569 (a debtor's "pervading obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries.").

ii.    **The Bid Procedures Are Inextricably Tied to the DIP Facility And PSA.**

28.    The Bid Procedures as proposed under the Sale Motion and PSA do not operate to encourage a fair and competitive bidding process and are likely to discourage interested third parties from participating in the Auction. Specifically, the proposed Bid Procedures are intertwined with the Debtors' proposed DIP Facility in ways that virtually guaranty that no party will be able to bid against the DIP Lenders. The proposed Bid Procedures (i) inappropriately require interested bidders to bid on 100% of the Reorganized Raser Equity, and prohibit bids for only a portion or blocks of the Debtors' assets and/or equity; (ii) do not allow for the flexible marketing of the Debtors' assets and/or equity in a manner designed to provide optimum exposure of the Debtors' estates to the market; (iii) contain numerous bid protections that will chill bidding, including a break-up fee for insider DIP Lenders, minimum initial overbid, and subsequent bid increment that are unreasonable and excessive and based on an illusory, over-inflated sales price; and (iv) give the Debtors unbridled discretion to make critical decisions without consulting the Committee or any other party, including the unilateral right to determine what is a qualifying bid, determine what bid offers the highest and best price, and to reject bids.

**E.    The DIP Facility Is Insufficient To Support A Reorganization Process**

29.    Under the current DIP Facility, only approximately $2.75 million will actually be going to the Debtors. The Committee has serious doubts that the amount of funds provided by the DIP will be sufficient to carry Debtors through the reorganization process successfully. The milestones set by Debtors and DIP Lenders under the DIP Financing Motion and PSA are extremely onerous, and do not take into account proviso for delays in the process. The current budget attached to the DIP Financing Motion runs through the end of July 2011 and is unclear as to whether there are sufficient funds to satisfy all of the milestones. Confirming a

plan of reorganization in less than four months is an incredible feat without opposition; given the number of objections that have already been filed opposing the PSA Plan, the Debtors are no doubt going to have a fight on their hands, which can only delay things further and increase expenses. The Committee believes that DIP financing of approximately $4-5 million will be necessary to fully support the Debtors' in a successful reorganization. The current financing of $2.75 is insufficient and, as discussed above, the Committee will not support a plan where failure to meet unrealistic milestone results in financial penalties to the Debtors.

**F.      The DIP Budget Prevents A Meaningful Investigation By The Committee.**

30.      Under the budget attached to the DIP Financing Motion, the total amount of funds apportioned to the Committee is only $100,000 -- for ALL Committee professionals (the Committee has already retained a financial advisor) -- for investigation and prosecution of claims and defenses, assessment of valuation and the sale/auction process. In comparison, the Debtors have five categories of professionals receiving $781,000 collectively: (i) counsel - $400,000, (ii) SRFF (general outside counsel) - $25,000, (iii) Financial Advisor - $66,000, (iv) claims agent - $75,000 and (v) local counsel/other - $215,000.

31.      The disparity in the budget amounts allocated to Debtors' professionals versus the Committee is striking and appears designed to chill the ability for the Committee to properly carry out its duties and responsibilities to independently investigate the conduct, assets, and liabilities of the Debtors. The cap on Committee professional fees for purposes of representing the interests of creditors and conducting an investigation regarding possible claims and defenses against lenders should be increased to provide an appropriate fund to permit the Committee to carry out its statutory duties. The amounts set forth in the budget must be increased to give the Debtors' unsecured creditors the leverage they need to ensure they are treated fairly. The level of disparate treatment shown in the current budget serves to highlight

the uneven playing field the Committee will be compelled to navigate if significant changes to the budget are not made.

**G.** **The Six Million Dollar Payment And Releases To Thermo Lenders Are Inappropriate And Violates The Bankruptcy Code.**

      **i.** **Thermo Payment is Unnecessary and Costly.**

32.     The Thermo Payment, an unnecessary payment to prepetition creditors that are still subject to the automatic stay, will be extremely costly for the estates. To fund the Thermo Payment, the cost to the estates for the commitment fee under the DIP Facility is increased by $600,000. Under the interest rate proposed by the DIP Financing Motion, the interest, just for the money borrowed to fund the Thermo Payment, would come to approximately $75,000 per month. Given the dollar amounts involved in theses cases, the cost of borrowing to fund the Thermo Payment is simply unjustified. Furthermore, as stated in the Merrill Objection, the Debtors imply in the DIP Financing Motion that the payment is not even necessary. Even the PSA provides August 3, 2011 as the outside date upon which the Debtors must make the Thermo Payments to maintain the PSA Plan structure.

33.     There should be no rush to make an "indefeasible" payment of $6 million to the Thermo Lenders where the Committee has significant questions as to the amount of their claim, application of prior payments and penalty charges. Not only is it expensive to pay the Thermo Lenders, the payment operates as an undisclosed waiver of potential estate objections as to the amount of such claim.

34.     In addition, as described in the Higginson Objection, the cross-collateralization or "roll-up" of the Thermo Lenders' prepetition lien on the Thermo 1 assets to secure DIP Lenders' post-petition advances in exchange for the Thermo Payment is a violation of the Bankruptcy Code. See, e.g., In re Saybrook Manufacturing Co., 963 F.2d 1490 (11th Cir.

1992) (holding that cross-collateralization is an impermissible means of post-petition financing). Once a bankruptcy has commenced, a prepetition claim (e.g., the Thermo Lenders' secured claim on the Thermo 1 assets) should only be paid under a plan of reorganization, and not as a condition precedent to receiving postpetition financing.

35.    The Debtors, DIP Lenders and Thermo Lenders may argue that this payment is "adequate protection" or "standard and acceptable under the circumstances." Regardless, however, of the terms they use to couch their argument, it is a plain and simple "roll-up" of prepetition debt that is inappropriate, especially where the Committee has questions concerning the amount of the Thermo Lenders' claim and the payment is indefeasible.  The Court should not permit such blatant derogation of one of the fundamental principles of the Bankruptcy Code to the detriment of all other creditor constituencies.

ii.    **No Declaration of Perfection of Thermo Lender Liens or Bridge Liens.**

36.    As described in the Merrill Objection, the situation above is further aggravated by the fact that in order to make the Thermo Payment, the Debtors ask for additional extraordinary relief—to recognize the liens and security interests of the Thermo Lenders as valid and properly perfected, as well as to authorize a $6 million "indefeasible" payment without requiring the Thermo Lenders to provide any accounting of their claim to the estates.

37.    By the DIP Financing Motion, the Debtors request that the final order approving the DIP Facility include a finding that the liens and security interests of the Thermo Lenders are valid and properly perfected, first-priority liens against the assets of the Thermo 1 plant (as the DIP Lenders are taking a roll-up of such perfected liens).  While not specifically requested in the DIP Financing Motion, but made apparent by the Interim Order, the Debtors are also requesting for the Bridge Lenders such a finding of valid and properly perfected (i) first-

priority liens against the assets of Debtor Raser Technologies, Inc. ("Raser") and (ii) second-priority liens against the assets of the Thermo 1 plant.

38.     To justify this extraordinary relief, the Debtors state that they "undertook an extensive review of the validity and priority of the liens of the Thermo Lender… [t]o the extent an official committee… desires to analyze those liens, a significant amount of due diligence… can easily be provided by the Debtors."  DIP Financing Motion, p. 24.   In this regard, the Committee has requested such diligence from the Debtors.  While the Debtors have provided copies of various loan documents and security instruments, as of the date of this Objection, they have yet to provide any sort of report with any conclusions regarding perfection, nor have they provided any documents relating to use of proceeds of the Bridge Loan or the Thermo Lenders' loans, sources of payments to the Bridge Lenders and Thermo Lenders or an accounting of the Bridge Lenders' and Thermo Lenders' claim.  Without such documents, the Committee objects to the validity and perfection of the liens and claim of the Thermo Lenders. Accordingly, the Committee objects to this request for extraordinary relief.

39.     Furthermore, as to the Bridge Loan, this request is inappropriate on its face as two creditors filed Financing Statements under the Uniform Commercial Code in the State of Delaware against certain assets of Raser prior in time to the Bridge Lenders. Accordingly, Bridge Lenders do not have properly perfected, first-priority liens against all assets of Raser.

### iii.    No Release Or Indemnity Of The Thermo Lenders.

40.     Pursuant to the PSA and the Thermo Settlement, upon the effective date of the PSA Plan, the Debtors, their bankruptcy estates, the reorganized Debtors, the DIP Lenders and their respective successors and assigns agree to release and waive all claims, actions,

demands, etcetera against Thermo Lenders and their respective successors and assigns relating to or arising from the Thermo 1 Financing Documents (as defined in the PSA).

41.     In addition, under the PSA, (i) the Debtors shall indemnify the Thermo Lenders for three years from the effective date of the Plan and (ii) creditors and entities in the bankruptcy proceedings shall be enjoined from initiating a suit against the Thermo Lenders for (a) any matters that have been released pursuant to the Plan or (b) which the Thermo Lenders have indemnity.

42.     These provisions are unreasonable on their face and defeat the Committee's statutory purpose of investigating and pursuing claims against the Thermo Lenders, as well as the Carve-Out provisions which contemplate such an investigation. Having been formed only two weeks ago, the Committee does not yet know whether claims may exist against the Thermo Lenders. The Committee should be provided with an opportunity to review and challenge these transactions; section 1103 of the Bankruptcy Code specifically empowers the Committee to participate in a meaningful fashion in Debtors' chapter 11 cases. Approval of these proposed limitations would prevent the Committee from undertaking one of its most fundamental and essential functions – the investigation and prosecution of causes of action in order to maximize value of the Debtors' estates, including, among others, the investigation of the validity of the Thermo Lenders' alleged security interests in the Debtors' assets. Furthermore, if the Debtors are compelled to indemnify the Thermo Lenders for any recovery the Committee may obtain, such indemnity provision in effect vitiates any such recovery to the determent of all creditors.

## H.     No Advance Automatic Relief From The Automatic Stay.

43.     Pursuant to the Plan Term Sheet, in the event that the PSA Plan is not confirmed with respect to any subsidiary Debtor as a result of holders of allowed claims voting

against the plan, (i) such subsidiary will be deemed to be removed from the plan and the plan will become effective with respect to the other Debtors and (ii) the confirmation order entered in connection with the plan will grant to DIP Lenders automatic relief from the automatic stay, notwithstanding the requirements of section 362 of the Bankruptcy Code, to exercise their rights against the assets of such subsidiary. If permitted, neither the Committee nor any interested creditor will be able to act to prevent the DIP Lenders from capturing all remaining value of the subsidiary Debtors' estate without any review or hearing by this Court.

44. The Committee does not intend to challenge the DIP Lenders' right, upon an Event of Default, to file a motion seeking immediate relief from the automatic stay, on shortened notice if necessary. However, the burdens and requirements imposed by sections 362(d) and (g) of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure must apply and be preserved for the benefit of the Committee and other parties to review any such motion. At a bare minimum, the PSA should be modified to reflect that the Committee may object to any modification of the stay upon at least 5 days' notice, and the Court will set a hearing to determine the matter if an objection is timely filed.

I.    **Certain Provisions Of The DIP Term Sheet Are Unreasonable And Should Be Stricken or Modified.**

45. In addition, the following provisions in the DIP Financing Agreement are not fair and reasonable under the present circumstances:

> i.    the proposed interest rate of 15% is too high;
>
> ii.    the proposed fees of 10% are too high;
>
> iii.    the appointment of a chapter 11 trustee should not result in an Event of Default;
>
> iv.    the threshold of $350,000 as an Event of Default if the Court allows a holder of a lien to foreclose on any assets is too low;
>
> v.    the estates' chapter 5 claims should be specifically excluded from collateral provided to DIP Lenders; and
>
> vi.    early repayment of the DIP Facility should be allowed.

**J.    The Debtors Must File A Proposed Form Of Final DIP Order.**

46.    The Debtors did not attached a proposed form of final order to the DIP Financing Motion. Under Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware ("Local Rules"), "[A]ll motions shall have attached thereto…a proposed form of order specifying the exact relief requested…" Local Rule 9013-1(f). While the Committee received a "draft" form of order on Monday, one day before the objection deadline, such belated notice does not conform with the required local rules, nor provide proper notice to the Committee, any other parties-in-interest, the U.S. Trustee or the Court. The Committee objects to the entry of any final DIP order approving the DIP Financing Motion given the foregoing, and requests further time to review and comment upon same with all rights reserved.

**RESERVATION OF RIGHTS**

47.    The Committee continues to analyze the DIP Financing Motion. As such, this Objection is submitted without prejudice to, and with a full reservation of, the Committee's rights to supplement this Objection in advance of or in connection with the hearing on the DIP Financing Motion.

## NOTICE

48.     Notice of this Objection has been provided via electronic mail and first class mail to (a) counsel to the Debtors, (b) counsel to the Thermo Lenders, (c) counsel to the DIP Lenders, (d) the U.S. Trustee for the District of Delaware; and via CM/ECF to (e) all parties who have filed a notice of appearance and requested service of papers in these cases.  The Committee submits that no other or further notice need be provided.

*[remainder of page intentionally left blank]*

## CONCLUSION

49.     For the foregoing reasons, the Court should deny the DIP Financing Motion to the extent of the Committee' objections, and grant the Committee such other and further relief as the Court may deem just, proper and equitable.

Dated: May 24, 2011

Respectfully submitted,

**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**

__/s/ Michael G. Busenkell_____
Francis A. Monaco, Jr. (No. 2078)
Michael G. Busenkell (No. 3933)
222 Delaware Avenue, Ste. 1501
Wilmington, DE  19801
Telephone:  (302) 252-4320
Facsimile:  (302) 252-4330
E-mail: mbusenkell@wcsr.com

-and-

**FOLEY & LARDNER LLP**
Douglas E. Spelfogel
Richard J. Bernard
90 Park Avenue
New York, NY 10005
(212) 682-7474 (Telephone)
(212) 687-2329 (Facsimile)
Email: dspelfogel@foley.com
Email: rbernard@foley.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*