# IN THE UNITED STATES BANKRUPTCY COURT

# DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>RASER TECHNOLOGIES, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 11-11315 (KJC)-<br><br>(Jointly Administered)<br>Hearing Date: 6/1/2011 at 10:00 a.m.<br>Re: Docket No. 9, 34, 108 |

**REPORT AND SUPPLEMENTAL OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014, (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES AND (IV) SCHEDULING <u>FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)</u>**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Raser Technologies, Inc., and its debtor affiliates (collectively, the "<u>Debtors</u>"), by and through its undersigned proposed counsel, Foley & Lardner LLP and Womble Carlyle Sandridge & Rice, PLLC, hereby files its report and supplemental objection (the "<u>Supplemental Objection</u>") to the Debtors' *Motion for Entry of Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014, (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Granting Liens and Super-Priority Claims, (III) Granting Adequate Protection to Pre-Petition Secured Parties, and (IV) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P.*

---

[1] The Debtors are the following: Raser Technologies, Inc., Raser Technologies Operating Company, Inc., Raser Power Systems, LLC, RT Patent Company, Inc., Pacific Renewable Power, LLC, Western Renewable Power, LLC, Intermountain Renewable Power, LLC, Los Lobos Renewable Power, LLC, Columbia Renewable Power, LLC, Truckee Geothermal No. 1 SV-01, LLC, Truckee Geothermal No. 2 SV-04, LLC, Trail Canyon Geothermal No. 1SV-02, LLC, Devil's Canyon Geothermal No. 1 SV-03, LLC, Thermo No. 1 BE-01, LLC, Thermo No. 2 BE-02, LLC, Thermo No. 3 BE-03, LLC, Cricket Geothermal No. 1 MI-01, LLC, Harmony Geothermal No. 1 IR-01, LLC, Lightning Dock Geothermal HI-01, LLC, and Klamath Geothermal No. 1 KL-01, LLC.

*4001 (b) and (c)* (the "DIP Financing Motion") [Dkt. No. 9]. In support of its Supplemental Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1. Since the hearing on May 25, 2011, the Committee through counsel has had several discussions with counsel for Linden Capital L.P. ("Linden"), the Debtors, and Kraig Higginson ("Higginson") in an effort to resolve the pending objections to the DIP Financing Motion. The Committee has additional meetings with the respective parties scheduled for May 31, and continues its efforts to resolve the open issues between the parties. As of the time of the filing of this Supplemental Objection, the disputes have not been resolved.

2. As stated in its objection filed on May 24, 2011 (the "Objection")[2] [Dkt. No. 108], the Committee has a multitude of objections to the DIP Financing Motion; in particular, the "linking" of the DIP Financing under a so-called pre-arranged "insider" plan of reorganization with Linden, Tenor Capital Master Opportunity Fund, Ltd. and Aria Opportunity Fund, Ltd. (collectively, the "DIP Lenders") which cedes control of these cases to the DIP Lenders within one month of the Filing Date under a mandated plan that has not been negotiated, voted upon, or otherwise provide for any treatment for general unsecured creditors.

3. At the hearing held before the Court on May 25, 2011, the Debtors represented that they would "delink" the DIP Financing Motion, which, upon information and belief, was to be addressed in a revised Final DIP Order. While the Committee has had several discussions with the Debtors and Linden as noted above, the Committee submits that the proposed "delink," at least to date, have not materialized, nor has the Committee received information as to the intended meaning of "delink."

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Objection.

4. In addition, while the Debtors have asserted that they have unfettered discretion to negotiate whatever financing they singularly deem appropriate, where the financing is "linked" to and locks up a plan of reorganization as here, it is impermissible for the Debtors to enter any such transaction without the input of and coordination with the Committee.

5. Similarly, where an alternative financing proposal has been proffered as here by Higginson (the "Higginson Financing"), irrespective of whether it provides more favorable financing terms (here, the terms as modified since the last hearing appear to be more favorable on their face), it is impermissible for the Debtors not to explore and rule out such a financing commitment before moving forward with final approval of any DIP financing.

**OBJECTIONS**

**A.   The DIP Financing Motion is Inextricably Tied to the Plan Support Agreement.**

6. While the Committee continues to discuss a consensual resolution of its objections with the Debtors and Linden, to the extent that the DIP financing as proposed by the DIP Lenders continues to require that the Debtors can only file and confirm the PSA Plan specifically, such a financing package, no matter the spin, is not "delinked" and flies in the face of the Bankruptcy Code as discussed more fully in the Committee's Objection.

7. Here, the DIP Facility and PSA are linked in several significant ways -- the DIP Term Sheet is actually attached to the PSA as Exhibit B thereto, as well as the Auction and Bid Procedures (the Bid Procedures are set forth in the Plan Term Sheet, which is attached to the PSA as Exhibit A thereto) and a settlement with the Thermo Lenders (the Thermo Settlement Agreement Term Sheet is attached to the PSA as Exhibit E thereto).

8. For example, as detailed more particularly in the Committee's Objection, the PSA provides for the following terms that are incorporated within and dictate the DIP Facility, Auction and Bid Procedures and the Thermo Settlement and demonstrate that they are

all inextricably intertwined. The PSA, DIP Term Sheet and DIP Financing Motion require as follows:

- The entry of the Interim Order by May 4, 2011 and entry of final order approving the DIP Financing Motion by May 20, 2011 (waived by the DIP Lenders).

- Confirmation of chapter 11 plan of reorganization in conformance with the PSA and Plan Term Sheet by August 11, 2011 and ensuring an effective plan date by August 26, 2011.

- Failure to confirm the PSA Plan and meet any of the above deadlines constitutes an Event of Default under the DIP Facility, and threatens the termination and acceleration of the Debtors' postpetition financing and foreclosure of all of the Debtors' assets by the DIP Lenders. PSA, p. 3; DIP Term Sheet, p. 10; DIP Financing Motion, p. 9.

- The DIP Facility shall be repaid in full and the commitment will terminate on the earlier of (a) May 4, 2011 if the Interim Order is not entered; (b) May 20, 2011 if the final DIP order is not entered (waived by the DIP Lenders); (c) August 11, 2011 if an order confirming a chapter 11 plan of reorganization in conformance with the PSA and Plan Term Sheet is not entered; (d) the Effective Date of the PSA Plan; (e) August 26, 2011 (the deadline by which the PSA Plan is supposed to be effective); and (f) the acceleration of loans and termination of the commitments under the terms of the DIP Term Sheet and related loan documents. DIP Financing Motion, p. 6-7.; DIP Term Sheet, p. 4.

- The DIP Financing may not be prepaid. DIP Term Sheet, p. 5. This term effectively prevents another lender from coming in once the DIP Financing Motion is approved and locks in the PSA Plan.

- The PSA must be in full force and effect as a condition of initial lending. DIP Term Sheet, p. 5.

- The DIP Facility provides as an event of default that the PSA has been terminated. DIP Financing Motion, p. 8; DIP Term Sheet, p. 5. In addition, the PSA will automatically terminate if: (a) the Debtors propose or seek confirmation of any plan other than the PSA Plan; (b) if any other plan is confirmed; (c) an Event of Default occurs under the DIP Facility; (d) the Court enters an order denying the DIP Financing Motion or refusing to confirm the validity of the Thermo Lenders' liens; (e) a Final DIP Order is not entered by August 1, 2011; and (f) the Thermo Payment is not made by August 3, 2011. PSA, p. 6-8.

- On the Effective Date of the PSA Plan, the DIP Lenders shall receive either the consideration provided for in the Stalking Horse Bid or be paid off all amounts owed under the Bridge Loan and DIP Facility. Plan Term Sheet, p. A-2.

- The PSA adopts the Plan Term Sheet setting forth the same Bid Procedures, Break-Up Fee, Overbid, Purchase Price and Exit Facility terms that are in the Sale Motion and provides that the Thermo Lenders receive the relief provided for in the Thermo Settlement. Plan Term Sheet, p. A-5.

9.      Absent amendment, the provisions of the DIP Facility put the DIP Lenders in the "driver's seat," granting them freedom to veto actions that may be preferred by the Debtors and their creditors, in pursuit of a maximized recovery for the DIP Lenders. They undermine the fundamental principle that a debtor operating in chapter 11 owes a fiduciary duty to all of its creditors, not merely to its lenders who may exert undue leverage against the debtor. See In re Tenney Village, 104 B.R. 562 (Bankr. D. N.H. 1989) (denying proposed financing facility that afforded procedural and substantive advantages to the Debtors' prepetition lenders).

**B.      Debtors Cannot Ignore the Higginson Proposal Or Other Financing Options.**

10.     The DIP Facility fails to meet the standards for approval in this Circuit and District. The law is well-settled that a court should only approve proposed debtor-in-possession financing if such financing is fair, reasonable and adequate. See In re Ames Dep't Stores, 115 B.R. 34, 39 (Bankr. S.D.N.Y 1990) (citing In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), aff'd, 75 B.R. 553 (E.D. Pa. 1987)). Moreover, the DIP Facility cannot be approved because the Debtors have failed to demonstrate that less onerous financing is not otherwise available.

11.     To authorize postpetition financing under section 364 of the Bankruptcy Code, the Debtors must "demonstrate that less onerous post-petition financing was unavailable." In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). Although section 364 of the Bankruptcy Code does not require the Debtors to "contact a seemingly infinite number of possible lenders" the Debtors are required "*to make an effort* to carry the burden." Id. (emphasis in original); see also In re Ames Dept. Stores, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("A court,

however, may not approve any credit transaction under subsection (c) unless the debtor demonstrates that it has ***reasonably attempted, but failed,*** to obtain unsecured credit under sections 364(a) or (b)") (emphasis added); Bland v. Farmworker Creditors, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (considering "whether ***any better offers***, bids, or timely proposals are before the court") (emphasis added); Suntrust Bank v. Den-Mark Const., Inc. (In re Den-Mark Const., Inc.), 406 B.R. 683, 692-93 (E.D.N.C. 2009) (collecting cases).  In Crouse, the Bankruptcy Court for the Eastern District of Pennsylvania held that seeking postpetition credit from ***only one lender*** and the debtor's failure to approach other large prepetition creditor was insufficient for a debtor to carry its burden under section 364 of the Bankruptcy Code.  71 B.R. at 550.

12. Here, the Debtors conceded that they did not solicit Higginson (the former CEO and Chairman of the Debtors) when seeking postpetition financing, nor engage in any discussions with Higginson.  Notwithstanding, Higginson has come forward and offered what on its face appears to be more attractive financing to the Debtors.  In this regard, subsequent to the hearing on May 25, 2011, Higginson has improved his financing proposal to, upon information and belief, provide for a committed cash infusion of $4.75 million, without priming any existing lenders (secured as a first position on the Via Motors stock), nor requiring payment of interest on the front end of the loan, and provides an otherwise "no strings attached" financing.  Moreover, the Higginson Financing does not require that the Debtors pay a loan fee, whereas the DIP Lenders are seeking a loan fee of ten points (equal to $875,000).  Additionally, the interest rate proposed in the Higginson Financing is five percent lower than the interest rate proposed in the DIP Facility.  Finally, the Higginson proposal does not include an unnecessary payoff to the Thermo Lenders, as Higginson will take a lien on otherwise unencumbered assets as security for the financing.

13.     In In re Aqua Assoc., the court was faced with a similar factual situation. 123 B.R. 192 (Bankr. E.D. Pa. 1991). In Aqua, the debtor sought $162,000 in postpetition financing to complete renovations at its property. Id. at 194. The debtor approached approximately thirteen potential lenders and ultimately agreed to accept a loan with a five year term, an interest rate of five percent above prime and secured by a first priority lien on the debtor's property. Id. At the hearing on the debtor's motion to obtain postpetition financing, the existing mortgagee testified that he could provide $50,000 in financing with an interest rate of only two percent above prime – three percent lower than the debtor's proposed financing. Id. at 197. Despite the fact that the exiting mortgagee's proposed loan was only one third of the amount required by the debtor, the court noted that "the possibility of the Debtor's obtaining a $50,000 loan or an even larger loan from the Mortgagee at a lower rate of interest than five (5%) percent over prime appears to exist." Id. Ultimately, the court held that "the possibility of negotiating such a loan package *should be explored and ruled out* before the loan for $162,000 from the current lenders is consummated. Otherwise, the Debtor would be unable to meet the requirement that the loan terms are adequate given the Debtor's particular circumstances and *full exhaustion of more attractive alternative prospects*." Id. (emphasis added).

14.     To obtain postpetition financing, the Debtors must fully exhaust the more attractive, and less onerous, financing proposed by Higginson, and any other options. The Debtors cannot simply bury their head in the sand -- in particular, where the proposed financing in effect locks up the plan process. Moreover, the Debtors must include (and collaborate) with the Committee in connection with a process for DIP financing that, as in this case, locks in a plan process. Cf. In re 14605, Inc., (f/k/a Pharmaceutical Formulations, Inc.), 2007 WL 2745709, at *4 (Bankr. D. Del. Sept. 19, 2007) (finding that the court expects the committee to be active

participant in sale process where asset purchase agreement was negotiated and signed prepetition); see also 11 U.S.C. § 1103(c) (committee's powers include participation in formation of a plan and ability to investigate acts, conduct and operations of debtor's business and any other matter relevant to the case).

## CONCLUSION

15. For the foregoing reasons, the Court should deny the DIP Financing Motion to the extent of the Committee' objections, and grant the Committee such other and further relief as the Court may deem just, proper and equitable.

Dated: May 31, 2011                    Respectfully submitted,

**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**

_/s/ Michael G. Busenkell_____
Francis A. Monaco, Jr. (No. 2078)
Michael G. Busenkell (No. 3933)
222 Delaware Avenue, Ste. 1501
Wilmington, DE  19801
Telephone:  (302) 252-4320
Facsimile:  (302) 252-4330
E-mail:  fmonaco@wcsr.com
E-mail: mbusenkell@wcsr.com

-and-

**FOLEY & LARDNER LLP**
Douglas E. Spelfogel
Richard J. Bernard
90 Park Avenue
New York, NY 10005
(212) 682-7474 (Telephone)
(212) 687-2329 (Facsimile)
Email: dspelfogel@foley.com
Email: rbernard@foley.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*