# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RASER TECHNOLOGIES, INC., *et al.*,[1] | Case No. 11-11315 (KJC) |
| Debtors. | (Jointly Administered) |

## FINAL ORDER (I) APPROVING DEBTOR-IN-POSSESSION FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 362, AND 364 AND FED. BANKR. P. 2002, 4001 AND 9014 AND LOCAL BANKRUPTCY RULE 4001-2; (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362 AND 363 OF THE BANKRUPTCY CODE; (III) GRANTING ADEQUATE PROTECTION AND SUPERPRIORITY ADMINISTRATIVE CLAIMS; AND (IV) GRANTING RELATED RELIEF

Upon consideration of the motion (the "Motion") of Raser Technologies, Inc. ("Raser") and its subsidiaries, the debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors"), pursuant to sections 105(a), 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 4001-2 of the Local Bankruptcy Rules for the District of Delaware (the "Local Bankruptcy Rules"), seeking pursuant to an interim order (the "Interim Order") and Final Order (as defined below), among other things:

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Raser Technologies, Inc., Raser Technologies Operating Company, Inc, Raser Power Systems, LLC, RT Patent Company, Inc., Pacific Renewable Power, LLC, Western Renewable Power, LLC, Intermountain Renewable Power, LLC ("IRP"), Los Lobos Renewable Power, LLC, Columbia Renewable Power, LLC ("Columbia"), Truckee Geothermal No. 1 Sv-01, LLC, Truckee Geothermal No. 2, Sv-04, LLC, Trail Canyon Geothermal No. 1 Sv 02, LLC, Devil's Canyon Geothermal No. 1 Sv-03, LLC, Thermo No. 1 Be-01, LLC, Thermo No. 2 Be-02, LLC, Thermo No. 3 Be-03, LLC, Cricket Geothermal No. 1 Mi-01, LLC, Harmony Geothermal No. 1 Ir-01, LLC, Lightning Dock Geothermal Hi-01, LLC, Klamath Geothermal No. 1 Kl-01, LLC, And Borax Geothermal No. 1 Ha-01, LLC (collectively, the "Debtors"). The corporate address of the Debtors is 5152 Englewood Drive, Provo, Utah, 84604.

A.     Authorization and approval for the Debtors to obtain post-petition financing on an interim basis up to the aggregate principal amount of not more than $750,000 (the "Interim Amount Limit"), on the terms and conditions set forth in the Summary of Indicative Terms and Conditions for DIP Credit Facility, dated April 28, 2011 (the "Summary of DIP Terms") attached as Exhibit A to the Motion (the "Interim DIP Facility"), with such terms and conditions to be embodied (at the request of the DIP Lenders and Administrative Agent in their sole discretion) in (a) a debtor in possession credit agreement (the "DIP Credit Agreement"), among Raser, as borrower, and the other Debtors, as guarantors; Linden Capital, L.P. ("Linden") and Tenor Opportunity Master Fund, Ltd. and Aria Opportunity Fund, Ltd., as lenders (collectively, "Tenor", and together with Linden, the "DIP Lenders"), and Wilmington Trust FSB, in its capacity as administrative agent (the "Administrative Agent"), (b) a security agreement (the "Security Agreement"), among the Debtors, as grantors, and the Administrative Agent, and (c) control agreements, pledge agreements or other similar documents contemplated by the DIP Credit Agreement or Security Agreement, or as otherwise requested or required by the Administrative Agent or DIP Lenders, including, but not limited to, an agreement among the Administrative Agent, Debtors and DIP Lenders providing for, among other things, certain administrative and operational procedures, and certain customary exculpatory language and indemnification provisions in favor of the Administrative Agent in connection with the Interim DIP Facility prior to entry of the Final Order (the "Interim Lending Agreement", together with the Summary of DIP Terms, DIP Credit Agreement, Security Agreement and all other documents related to any of the foregoing, collectively, the "DIP Loan Documents"), all of which, if requested by the DIP Lenders or Administrative Agent in their sole discretion (other than the Summary of DIP Terms and Interim Lending Agreement, which were required by the

DIP Lenders and Administrative Agent, respectively), are to be executed and delivered by the parties thereto on or prior to June 3, 2011, in form and substance satisfactory to the DIP Lenders and Administrative Agent in their sole discretion, and which shall become effective only after approval by this Court at the Final Hearing (as each such term is defined below), other than the Summary of DIP Terms and Interim Lending Agreement, which became effective on an interim basis pursuant to the Interim Order, and upon entry of this order authorizing and approving all of the relief requested in the Motion and DIP Loan Documents on a final basis (the "Final Order");

B. Authorization, pursuant to section 364(c)(2) of the Bankruptcy Code, to grant to the Administrative Agent, for the benefit of the DIP Lenders, senior, first-priority, fully-perfected liens on and security interests in all Collateral (as defined below) (other than the Pre-Petition Senior Thermo Collateral, as defined below) that is not otherwise subject to a prior lien;

C. Prior to the entry of the Final Order and the Debtors paying $6,000,000 in a single draw-down to pay and satisfy a portion of the Pre-Petition Senior Thermo Obligations (as defined below) (the "Senior Thermo Lender Paydown") and an amount sufficient to reimburse or pay the Pre-Petition Senior Thermo Lenders and the Prepetition Senior Agent (as each such term is defined below) their reasonable, documented out-of-pocket attorneys' fees and expenses in documenting this transaction, to the extent such amounts have not been paid or are not payable under and in accordance with the retainer previously provided to them by the Debtors (the "Senior Thermo Lender Reimbursement Amount"; together with the Senior Thermo Lender Paydown, the "Senior Thermo Lender Payment"), authorization, pursuant to section 364(c)(3) of the Bankruptcy Code, to grant to the Administrative Agent, for the benefit of the DIP Lenders, fully-perfected junior liens on and security interests in all Collateral that is subject to a prior lien (including, but not limited to, the Pre-Petition Senior Thermo Collateral) and

following the entry of this Final Order and the payment of the Senior Thermo Lender Payment, authorization, pursuant to section 364(d)(i) of the Bankruptcy Code, to grant to the Administrative Agent, for the benefit of the DIP Lenders, fully-perfected first-priority liens on and security interests in all Collateral, which liens shall prime the Pre-Petition Liens (as defined below) but which shall be junior to all other prior liens, and authorization to grant to the Administrative Agent, for the benefit of the DIP Lenders, Superpriority Claims (as defined below) (the liens and security interests described in paragraphs B and C hereof shall be collectively referred to herein as the "DIP Liens");

D.     A finding in the Final Order that the Pre-Petition Lien Holders' respective liens on and security interests in the Pre-Petition Collateral are valid, perfected and enforceable;

E.     Authorization of the Debtors to use Cash Collateral (as defined below) in which the Pre-Petition Senior Thermo Lenders and Pre-Petition Bridge Lenders (as defined below) have an interest;

F.     Authorization to grant adequate protection, including, among other things, Replacement Liens (as defined below) and Superpriority Claims pursuant to section 364(c)(1) of the Bankruptcy Code to the Pre-Petition Senior Thermo Lenders (and the Pre-Petition Senior Agent (as defined below) on their behalf) with respect to the Debtors' use of Cash Collateral and all diminution in value of the Pre-Petition Senior Thermo Collateral (as defined below), which Replacement Liens shall have the same priority as the liens and security interests on the Pre-Petition Senior Thermo Collateral until entry of the Final Order and payment of the Senior Thermo Lender Payment;

G.     Authorization to grant adequate protection, including Replacement Liens and Superpriority Claims to the Pre-Petition Bridge Lenders with respect to the Debtors' use of

Cash Collateral and all diminution in value of the Pre-Petition Bridge Loan Collateral (as defined below), which Replacement Liens shall be junior to the DIP Liens and the Replacement Liens granted to the Pre-Petition Senior Thermo Lenders, and Superpriority Claims which shall be junior to the DIP Liens and Superpriority Claims granted to the Administrative Agent, for the benefit of the DIP Lenders, and junior to the Superpriority Claims granted to the Pre-Petition Senior Thermo Lenders, and which shall in all respects be governed by the Subordination Agreement (as defined below);

       H.     Pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Court on or prior to May 4, 2011, to consider entry of the Interim Order; and

       I.     Pursuant to the Interim Order, that this Court schedule a final hearing (the "Final Hearing") on or prior to June 1, 2011, to consider entry of the Final Order, including authorizing the Debtors to obtain post-petition financing up to the aggregate principal amount of not more than $12,500,000, subject to the approval by this Court of the DIP Loan Documents (the "DIP Facility").

The Interim Hearing having been held by this Court on May 3, 2011, and the Final Hearing having been held by this Court on June 1, 2011, and upon the Declaration of Nicholas Goodman in Support of Chapter 11 Petitions and Related Motions; the record made by the Debtors at the Interim Hearing and Final Hearing and the evidence and arguments of counsel, and after due deliberation and consideration and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

1.      Petition Date.  On April 29, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Cases") with the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors are continuing in possession of their property, and operating and managing their businesses, as debtors in possession pursuant to Bankruptcy Code §§ 1107 and 1108.  The Debtors have filed a motion requesting joint administration of the Cases.  No trustee or examiner has been appointed in the Cases.

2.      Jurisdiction, Venue and Statutory Predicates.  This Court has jurisdiction over the Cases and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 361, 362, 363, and 364(d), 364(e) and 507 of the Bankruptcy Code; Bankruptcy Rules 2002, 4001 and 9014; and Local Bankruptcy Rule 4001-2(b).

3.      Committee Formation.  The official committee of unsecured creditors (the "Committee") was appointed in the Cases on May 12, 2011.

4.      Notice.  Notice of entry of the Interim Order and a copy of the Interim Order were served by the Debtors on (i) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (ii) the Administrative Agent, (iii) counsel to the Administrative Agent; (iv) counsel to the DIP Lenders; (v) the Pre-Petition Senior Agent; (vi) the Pre-Petition Senior Thermo Lenders and the Pre-Petition Bridge Lenders; (vii) Merrill Lynch; (viii) the Debtors' thirty (30) largest unsecured creditors, determined on a consolidated basis; (ix) all other known holders of pre-petition liens, encumbrances or security interests against the Debtors' property and (x) any other party which filed a request for notices in the cases with the

Bankruptcy cases prior to May 2, 2011. Under the circumstances, notice was sent under Bankruptcy Rules 4001(b), 4001(c) and 4001(d), Local Bankruptcy Rule 2002, 4001-2 and section 102(1) of the Bankruptcy Code, and no further notice of the relief sought at the Final Hearing and the relief granted herein is necessary or required.

5. <u>Necessity and Uses of Financing and Cash Collateral</u>. The DIP Facility and the Debtors' use of Cash Collateral will allow the Debtors to continue the operations of their businesses and administer and preserve the value of their estates during the pendency of the Cases. The DIP Facility shall be used exclusively to fund the working capital needs of the Debtors until the DIP Expiration Date and the Senior Thermo Lender Payment. Entry of this Final Order approving the DIP Facility and the Debtors' interim use of Cash Collateral will benefit the Debtors and their estates and creditors. Therefore, it is in the best interest of the Debtor's estates to establish on a final basis the DIP Facility, as described in the Motion, and to authorize and approve the Debtors' entry into the DIP Credit Agreement, substantially in the form attached hereto as <u>Exhibit A</u>, and the other DIP Loan Documents, and to authorize the Debtors' use of Cash Collateral, subject to the terms and conditions in the DIP Loan Documents and as set forth in this Final Order.

6. <u>No Credit Available on Other Terms</u>. The Debtors are unable to obtain unsecured credit allowable under sections 503(b)(1), 364(a) or 364(b) of the Bankruptcy Code.

7. <u>Willingness to Lend</u>. The Debtors are unable to obtain secured credit allowable solely under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting the DIP Liens to the Administrative Agent, for the benefit of the DIP Lenders, and the Superpriority Claims to the Administrative Agent, for the benefit of the DIP Lenders, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code under the

terms and conditions set forth in the DIP Loan Documents and this Final Order. The Debtors are also unable to obtain financing from sources other than the DIP Lenders, or on more favorable terms, than those set forth in the DIP Loan Documents.

8. <u>Business Judgment and Good Faith</u>. The terms and conditions of the DIP Facility, as set forth in the DIP Loan Documents, and the use of Cash Collateral, as described in the Motion, and as all were set forth at the Interim Hearing and Final Hearing (including the payment of interest to the DIP Lenders at the times, in the amount and in the manner provided in the DIP Loan Documents) are fair and reasonable and the entry into the DIP Facility on the terms and conditions set forth in the DIP Loan Documents represent a sound, prudent exercise of the Debtors' business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The DIP Facility and use of the Collateral, including Cash Collateral, were negotiated in good faith (as that term is used in section 364(e) of the Bankruptcy Code) and at arm's length and for fair consideration among the (i) Debtors, (ii) the DIP Lenders, (iii) the Administrative Agent, and (iv) the Pre-Petition Senior Thermo Lenders, the Pre-Petition Senior Agent and the Pre-Petition Bridge Lenders (the parties set forth in this subparagraph (iv), collectively, the "<u>Pre-Petition Lien Holders</u>"). Accordingly, all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility, the Summary of DIP Terms, and the DIP Loan Documents, and any obligations or indebtedness owing to the DIP Lenders or Administrative Agent, or any of their respective affiliates (all of the foregoing collectively, the "<u>DIP Obligations</u>"), shall be deemed to have been extended by the DIP Lenders and their respective affiliates in good faith (as that term is used in section 364(e) of the Bankruptcy Code), and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section

364(e) of the Bankruptcy Code in the event that the Interim Order or this Final Order or any provision thereof or hereof is vacated, reversed or modified, on appeal or otherwise.

9. Property of the Estate. Each item of the Collateral constitutes property of the estate of at least one Debtor.

10. Good Cause. Good and sufficient cause exists for the entry of this Final Order. The borrowings under the DIP Facility and the Debtors' use of Cash Collateral and the other relief requested in the Motion, are necessary, essential, appropriate and in the best interest of the Debtors, their creditors, and their estates, as the borrowings under the DIP Facility and access to Cash Collateral will, among other things, provide the Debtors with the liquidity necessary to fund the necessary expenses of their businesses, preserve and maximize the value of the Debtors' estates for the benefit of all creditors, enable the Debtors to implement the restructuring transactions contemplated under that certain Plan Support Agreement, dated as of April 28, 2011, among the Debtors, Linden, as Prepetition Lender, Tenor (together with its affiliate Parsoon Opportunity Fund, Ltd.) and Linden, as Sponsors, and the Pre-Petition Senior Thermo Lenders, and formulate and confirm the Plan, and avoid immediate and irreparable harm to the Debtors and their estates, their creditors, their businesses, their employees, and their assets which would result if the Debtors did not have access to the DIP Facility and Cash Collateral.

11. Thermo Pre-Petition Senior Indebtedness. Prior to the Petition Date, The Prudential Insurance Company of America and Zurich American Insurance Company (collectively, the "Pre-Petition Senior Thermo Lenders") pursuant to that certain Credit Agreement, dated as of August 31, 2008 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "Pre-Petition Senior Credit Agreement"), among Thermo No. 1 BE-01, LLC ("Thermo"), as borrower, the Pre-Petition

Senior Thermo Lenders, as lenders, and Deutsche Bank Trust Company Americas, in its capacities as Administrative Agent and Collateral Agent (the "Pre-Petition Senior Agent"), provided financing to Thermo in the original principal amount of up to $31,175,092. As of April 27, 2011, Thermo, and certain debtor guarantors, stipulate that they were liable to the Pre-Petition Senior Thermo Lenders in the amount of at least $10,326,878.25, which includes accrued but unpaid interest through April 27, 2011 (but is exclusive of fees and expenses), incurred under and in connection with the Pre-Petition Senior Credit Agreement as provided therein (collectively, the "Pre-Petition Senior Thermo Obligations"). The Pre-Petition Senior Thermo Obligations are secured by first priority, fully-perfected security interests in and liens on (i) all of Thermo's right, title and interest in, to and under the "Collateral" as defined in the various agreements between the parties, including without limitation, that certain Account and Security Agreement, dated as of August 31, 2008 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "Pre-Petition Senior Security Agreement") by and between Thermo and the Pre-Petition Senior Agent (in its further capacity thereunder as Securities Intermediary) and (ii) all of Intermountain Renewable Power, LLC's right title and interest in and to the "Pledged Collateral" as defined in that certain Pledge Agreement, dated as of August 31, 2008, between Intermountain Renewable Power, LLC and the Pre-Petition Agent and all of Columbia Renewable Power, LLC's right, title and interest in and to the "Pledged Collateral" as defined in the Pledge Agreement, dated as of December 4, 2009, between Columbia Renewable Power, LLC and the Pre-Petition Senior Agent and (collectively, the "Pre-Petition Pledge Agreements"), and together with the Pre-Petition Senior Credit Agreement and the Pre-Petition Security Agreement, the "Pre-Petition Senior Loan Documents") (all such collateral, the "Pre-Petition Senior Thermo Collateral").

12. <u>Bridge Loan</u>. Prior to the Petition Date, David Handsman and the other lenders party from time to time (the "<u>Pre-Petition Bridge Lenders</u>") to that certain Bridge Loan Agreement, dated as of April 15, 2011 (the "<u>Pre-Petition Bridge Loan Agreement</u>"), by and between Raser and Thermo, as borrowers (the "<u>Bridge Loan Borrowers</u>"), and the Pre-Petition Bridge Lenders, as lenders, provided financing to the Bridge Loan Borrowers in the original principal amount of $750,000. As of the Petition Date, the Bridge Loan Borrowers were liable to the Pre-Petition Bridge Lenders in the amount of $750,000, plus accrued but unpaid interest, fees and expenses incurred under and in connection with the Pre-Petition Bridge Loan Agreement as provided therein (collectively, the "<u>Pre-Petition Bridge Loan Obligations</u>"; together with the Pre-Petition Senior Thermo Obligations, the "<u>Pre-Petition Obligations</u>"). The Pre-Petition Bridge Loan Obligations are secured by (i) senior, first priority, fully-perfected security interests in and liens on all of Raser's right, title and interest in, to and under its respective "Collateral" as defined in that certain Security Agreement (Second Lien in Respect of the Company), dated as of April 15, 2011 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date the "<u>Bridge Loan Security Agreement</u>"; together with the Pre-Petition Bridge Loan Agreement, the "<u>Pre-Petition Bridge Loan Documents</u>"), and (ii) second lien, fully-perfected security interests in and liens on all of Thermo's right, title and interest in, to and under its respective "Collateral" as defined in the Bridge Loan Security Agreement (collectively, the "<u>Pre-Petition Bridge Loan Collateral</u>"; together with the Pre-Petition Senior Thermo Collateral, collectively, the "<u>Pre-Petition Collateral</u>").

13. <u>Subordination Agreement</u>. The Limited Consent Agreement, dated as of April 15, 2011, by and among Thermo, Zurich American Insurance Company, The Prudential Insurance Company of America, as Administrative Lender and Lender, and the Pre-Petition

Senior Agent (as amended, restated, amended and restated, supplemented or otherwise modified on or prior to the Petition Date, the "Subordination Agreement", and together with the Pre-Petition Senior Loan Documents and the Pre-Petition Bridge Loan Documents, collectively, the "Pre-Petition Debt Documents"), pursuant to which, as more fully set forth therein, the Pre-Petition Bridge Lenders agreed to, among other things, subordinate their liens on and security interests in the Pre-Petition Senior Thermo Collateral and to make the exercise of their rights and remedies under the Pre-Petition Bridge Loan Documents subject to the rights and remedies of the Pre-Petition Senior Thermo Lenders relating thereto, is valid, binding and enforceable against the parties thereto and shall govern the respective rights and priorities hereunder of the Pre-Petition Senior Thermo Lenders and Pre-Petition Senior Agent, on one hand, and the Pre-Petition Bridge Lenders, on the other hand (collectively, the "Pre-Petition Lien Holders"), as they relate to Thermo and its assets and the respective Replacement Liens and Superpriority Claims granted pursuant to the Interim Order and hereunder to such parties.

14.     Validity and Enforceability.  (i) The Pre-Petition Debt Documents are valid and enforceable by the Pre-Petition Lien Holders against the Debtors and as between the other parties thereto, (ii) the Pre-Petition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors and are secured by valid, binding, enforceable, duly perfected first liens and security interests granted by the Debtors to the Pre-Petition Senior Thermo Lenders in the Pre-Petition Senior Thermo Collateral (the "Pre-Petition Senior Thermo Liens"), valid, binding, enforceable, duly perfected first and second (relating to Thermo) liens and security interests granted by the Bridge Loan Borrowers to the Pre-Petition Bridge Loan Lenders (the "Bridge Loan Liens"), and collectively with the Pre-Petition Senior Thermo Liens, the "Pre-Petition Liens") on the Pre-Petition Collateral in the amount and to the extent set forth

in the Pre-Petition Debt Documents, including the proceeds derived therefrom, and (iii) the Pre-Petition Lien Holders duly perfected the Pre-Petition Liens by, among other things, filing financing statements and, where necessary, by possession of relevant instruments, certificates, cash or other property, and all such financing statements were validly executed by, or at the direction or with the consent of, authorized representatives of the Debtors.

15. **No Challenges.** **(i) No challenges of any kind or nature exist to any of the Pre-Petition Liens, pursuant to the Bankruptcy Code or applicable non-bankruptcy law and (ii) all Persons (as defined in the Bankruptcy Code), including, but not limited to the Debtors and their estates and the Committee, irrevocably waive any right to challenge the Pre-Petition Liens.**

16. Cash Collateral. All of the Debtors' cash constitutes Cash Collateral or proceeds of the Pre-Petition Collateral and, therefore, is Cash Collateral of the Pre-Petition Lien Holders. For purposes of this Final Order, the term "Cash Collateral" shall be deemed to include, without limitation: (i) all "cash collateral" as defined under Bankruptcy Code section 363; and (ii) all deposits subject to setoff and cash arising from the collection or other conversion to cash of property of the Debtors in which the Pre-Petition Lien Holders assert security interests, liens or mortgages, regardless of (a) whether such security interests, liens, or mortgages existed as of the Petition Date or arose thereafter pursuant to this Final Order, and (b) whether the property converted to cash existed as of the Petition Date or arose thereafter.

Based on the foregoing,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED**, that:

17. <u>Motion Granted</u>. The Motion is granted in accordance with the terms and conditions of this Final Order. Any objections to the Motion with respect to entry of this Final Order that have not been withdrawn, waived or settled, are hereby denied and overruled.

18. <u>Final Hearing.</u> The Final Hearing to consider entry of the Final Order was held on June 1, 2011.

19. <u>Authorization and Approval of the DIP Facility.</u> The Debtors are hereby authorized, pursuant to the terms of this Final Order and the DIP Loan Documents, to borrow funds under the DIP Facility up to an aggregate principal amount of no more than the $12,500,000 during the period from the date of entry of this Final Order until the DIP Expiration Date, in accordance with, and subject to, the terms of the DIP Loan Documents and this Final Order; provided that, borrowings under the DIP Loan Documents may not exceed $10,500,000 in the aggregate unless and until the Debtors deliver to the Administrative Agent an officer's certificate (the "<u>Lightning Dock Certificate</u>") signed by Nicholas Goodman, in his capacity as Chief Executive Officer of Raser and Lightning Dock Geothermal HI-01, LLC ("<u>Lightning Dock</u>"), certifying that (i) surface access to Lightning Dock's geothermal resources that is sufficient to effectuate Lightning Dock's business plan is reasonably assured, and (ii) the granting of water diversion permits from the applicable regulatory authorities sufficient to effectuate Lightning Dock's business plan is reasonably assured. The Debtors' use of borrowings under the DIP Facility, pursuant to the DIP Loan Documents, and use of Cash Collateral, subject to Permitted Variances and Permitted Variance Exceptions, shall be in accordance with the purposes described herein and the Original Budget (as defined below) and subsequent budgets approved by the DIP Lenders pursuant to the DIP Credit Agreement (a copy of which shall be promptly forwarded to counsel for the Committee upon approval thereof);

provided that, without limiting the foregoing, from and after delivery of the Lightening Dock Certificate to the Administrative Agent, not less than $2,000,000 in the aggregate shall be available for borrowing under the DIP Facility as DIP Loans (the "Lightning Dock Loans") the proceeds of which shall be used by Lightning Dock for the sole purpose of funding the drilling of new wells pursuant to Lightning Dock's business plan and related costs and expenses.

20. <u>Authorization of the DIP Loan Documents</u>. In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all reasonable fees and expenses of the Administrative Agent and DIP Lenders and their counsel or other retained professionals, that may be reasonably required or necessary for the Debtors' performance of their obligations under or in connection with the DIP Facility and DIP Loan Documents, including, without limitation:

a) the execution, delivery and performance of the DIP Credit Agreement and all other DIP Loan Documents (regardless of whether the form thereof is attached hereto) which the DIP Lenders may require the Debtors to enter into from time to time;

b) the execution, delivery and performance of one or more waivers, forbearances, consents or amendments to the DIP Loan Documents, in each case in such form as the Debtors and DIP Lenders may agree in writing, which do not (i) materially modify the DIP Loan Documents, (ii) shorten the maturity of the extensions of credit thereunder, (iii) increase the commitments of the DIP Lenders as set forth in the DIP Credit Agreement (the "DIP Commitments") or the rate of interest thereunder, (iv) change in a manner adverse to the Debtors any Event of Default under and as defined in the DIP Credit Agreement (a "DIP Event of

Default"), or add, remove or amend any covenants therein, or (v) materially and adversely affect the respective rights of the Debtors or as set forth in this Final Order; and

c)    the execution, delivery and/or performance of all other documents and acts required under or in connection with the Summary of DIP Terms or DIP Loan Documents.

21.    Upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall constitute valid, binding and enforceable obligations of the Debtors, enforceable against the Debtors in accordance with the terms thereof. No obligation, payment, transfer or grant of security under the DIP Loan Documents or this Final Order shall be voidable, or recoverable under the Bankruptcy Code (including without limitation, under section 502(d) of the Bankruptcy Code) or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

22.    **Authorization of the Senior Thermo Lender Payment. In furtherance of the foregoing and without further approval of this Court, the Debtors are hereby authorized and directed to make the Senior Thermo Lender Payment with proceeds of the DIP Credit Facility within one (1) business day of entry of this Final Order.[2] The Senior Thermo Lender Payment shall be paid in cash in full by the Debtors (net of application of any unapplied portion of the retainer previously provided to the Senior Thermo Lenders) and shall be indefeasible once paid by the Debtors. If any portion of the Senior Thermo Lender Reimbursement Amount is not paid as part of the lump sum contemplated in this ordered paragraph (either because such expense was not captured or was incurred or**

---

[2]    The Pre-petition Senior Thermo Lenders are to provide the Debtors with the total amount of the Senior Thermo Lender Payment , including the amount of the Senior Thermo Lender Reimbursement at least 4 hours prior to the payment contemplated herein.

billed after the one time payment), without further approval of this Court, the Debtors are hereby authorized and directed to make payment of such portion of the unpaid Senior Thermo Lender Reimbursement Amount promptly upon presentment of an invoice to the Debtors for the relevant expense. Any such payments shall be paid in cash in full by the Debtors and shall be indefeasible once paid by the Debtors.

23. <u>DIP Liens</u>. As security for the DIP Obligations, effective and perfected as of the date of entry of the Interim Order, and without the necessity of the execution, recordation of filings of mortgages, deeds of trust, security agreements, control agreements, pledge agreements, financing statements or other similar documents, the DIP Liens are hereby granted to the Administrative Agent for the benefit of the DIP Lenders as set forth herein, on (i) all of the Pre-Petition Collateral described and set forth in the Pre-Petition Security Agreement and Bridge Loan Security Agreement, whether existing on the Petition Date or thereafter acquired, and (ii) all other assets of the Debtors described below whether existing on the Petition Date or thereafter acquired, including, but not limited to, the following (the "<u>DIP Collateral</u>"; together with the Pre-Petition Collateral, the "<u>Collateral</u>"):

(a) all Accounts;

(b) all Chattel Paper;

(c) all Money, including Cash Collateral, and all Deposit Accounts, together with all amounts on deposit from time to time in such Deposit Accounts;

(d) all Documents;

(e) all General Intangibles (including patents, trademarks, service marks, copyrights, and other intellectual property), Payment Intangibles and Software;

(f) all Goods, including Inventory, Equipment and Fixtures;

(g)     all Instruments;

(h)     all Investment Property;

(i)     all Letter-of-Credit Rights and other Supporting Obligations;

(j)     all Records;

(k)     all Commercial Tort Claims;

(l)     all Proceeds and Accessions with respect to any of the foregoing Collateral;

(m)     the proceeds or property recovered from the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidances Actions") (to the extent not waived by the Debtors in the Cases in consultation with counsel for the Committee) in excess of the first $2,000,000 of proceeds (net of related legal fees and expenses) from the prosecution, settlement or other disposition of Avoidance Actions (the "Avoidance Actions Carve-Out"); and

(n)     each category of Collateral set forth above (other than Avoidance Actions) shall have the meaning set forth in the Uniform Commercial Code, it being the intention of the Debtors that the description of the DIP Collateral set forth above be construed to include the broadest possible range of assets.

24.     <u>First Lien on Unencumbered Property</u>. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens constitute valid, binding, continuing, enforceable, fully-perfected first priority senior security interests in and liens upon all of the Collateral to the extent not subject to valid, perfected, non-avoidable and enforceable liens in existence as of the Petition

Date or valid liens in existence as of the Petition Date that are perfected subsequent to such date to the extent permitted by Section 546(b) of the Bankruptcy Code.

25.    Junior Lien on Encumbered Property. Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Liens constitute valid, binding, continuing, enforceable, fully-perfected junior priority security interests in and liens upon all of the Collateral, to the extent subject to valid, perfected, non-avoidable and enforceable liens in existence as of the Petition Date (including, but not limited to, the Pre-Petition Collateral) or valid liens in existence as of the Petition Date that are perfected subsequent to such date to the extent permitted by section 546(b) of the Bankruptcy Code; provided, that, as set forth more fully below, following the Debtors making the Senior Thermo Lender Payment, the DIP Liens shall prime the Pre-Petition Liens.

26.    Priming Liens on Pre-Petition Liens. Subject to the Debtors making the Senior Thermo Lender Payment, pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Liens constitute valid, binding, continuing, enforceable, fully-perfected first priority, senior security interests in and liens upon all of the Collateral. Such security interests and liens (i) shall be senior and prime in all respects the Pre-Petition Liens and (ii) shall be senior in all respects to all Replacement Liens granted to the Pre-Petition Lien Holders; provided, that such liens shall be junior in all respects to valid, perfected, non-avoidable and enforceable liens in existence as of the Petition Date (other than the Pre-Petition Liens) and any valid, perfected and unavoidable interests in such property arising out of liens to which the liens of the Pre-Petition Lien Holders become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

27.    Liens Senior to Certain Other Liens.    The DIP Liens granted to the Administrative Agent, for the benefit of the DIP Lenders, shall be senior to and shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) subject to applicable law, any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors other than as expressly permitted under the DIP Credit Agreement, as applicable.

28.    DIP Lender Superpriority Claims.    Subject to the Debtors making the Senior Thermo Lender Payment, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over all administrative expenses (other than any fees arising under 28 U.C.S. §1930), diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (collectively, the "Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment or otherwise, which allowed claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof (including all proceeds of Avoidance Actions, to the extent not waived by the Debtors in the Cases, other than the Avoidance Actions Carve-Out).

29.    Protection of DIP Lenders' Rights.

(a)     So long as there are any borrowings or amounts outstanding (other than contingent indemnity obligations), any DIP Lender has a DIP Commitment outstanding under the DIP Credit Agreement or any other DIP Obligations are outstanding, the Pre-Petition Lien Holders shall (other than with the prior written consent of the Administrative Agent and the DIP Lenders) (i) take no action to foreclose upon or recover in connection with the Pre-Petition Liens, the Replacement Liens or any other liens granted pursuant to any other agreements or operation of law, or otherwise exercise remedies against any Collateral, except to the extent expressly authorized by a non-appealable order of this Court, (ii) be deemed to have consented to any release of Collateral authorized under the DIP Loan Documents, (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the Collateral unless, solely as to this clause (iii), the DIP Lenders file financing statements or other documents to perfect the liens granted to them pursuant to the Interim Order or this Final Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date, and (iv) not seek to terminate or modify the use of Cash Collateral, or obtain additional or different adequate protection than as set forth in this Final Order. Nothing herein shall permit the Pre-Petition Lien Holders to take any action in violation of the Bankruptcy Code or other applicable law or that is contrary to this Final Order.

(b)     The Administrative Agent shall provide five (5) business days' (or, in the case of a DIP Event of Default under Section 8.1(n)(ii) of the DIP Credit Agreement, seven (7) business days') prior written notice of a DIP Event of Default to counsel for the Debtors, counsel for the Committee, and the U.S. Trustee (the "DIP Default Notice"). Absent entry of an order prohibiting such action, on the sixth business (6th) day (or, in the case of a DIP Event of Default

under Section 8.1(n)(ii) of the DIP Credit Agreement, the eighth (8th) business day) after receipt of the DIP Default Notice by counsel for the Debtors, counsel for the Committee, and the U.S. Trustee, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified (without further notice or hearing) to permit the Agents and DIP Lenders to exercise immediately, and at any times thereafter, all rights and remedies under the DIP Loan Documents which permit the DIP Lenders to take any and all actions and exercise any and all rights and remedies against the Collateral or the Debtors as permitted under the DIP Loan Documents or applicable law which the DIP Lenders may deem appropriate (including, but not limited to, freezing monies or balances in the Debtors' accounts or in accounts maintained by the Agents or DIP Lenders, charging default interest, and effectuating setoff of monies of the Debtors in accounts maintained with the Agents or DIP Lenders, if any); _provided_, that the Administrative Agent is not required to submit a DIP Default Notice in order to declare the principal of, and accrued interest on the outstanding borrowings under the DIP Credit Agreement to be due and payable or to terminate the DIP Commitments; _provided_, _further_ that notwithstanding anything in this Final Order to the contrary, upon receipt of the DIP Default Notice, the Debtors may continue to make ordinary course disbursements from its Deposit Accounts (as defined in the DIP Credit Agreement) to the extent and at the times set forth in the Original Budget or any subsequent approved budget, but may not withdraw or disburse any other amounts from such accounts (in any hearing after the giving effect of the DIP Default Notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, a DIP Event of Default has occurred and is continuing).

30.     _Adequate Protection for Pre-Petition Lien Holders._  In this Final Order, the term "_Replacement Lien_" shall mean that, subject to the terms and conditions set forth in this

Final Order, the Pre-Petition Lien Holders shall have and are hereby granted (effective as of the date of entry of the Interim Order and without the necessity of the Debtors or the Pre-Petition Lien Holders' execution of mortgages, deeds of trust, security agreements, pledge agreements, control agreements, financing statements or otherwise), valid and perfected, security interests in, and liens upon the Collateral, in the same relative priority and to the same extent, priority, enforceability, unavoidability and validity applicable to the respective Pre-Petition Lien Holders' security interests and liens in the Pre-Petition Collateral.

31. The Pre-Petition Lien Holders are granted the following adequate protection for any diminution in the value of their respective interests in the Pre-Petition Collateral from the Petition Date resulting from (a) the imposition of the DIP Liens, (b) the use, sale, lease, disposition, shrinkage, decline in market value, consumption or physical deterioration of the Pre-Petition Collateral (including Cash Collateral) by the Debtors, and (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "Adequate Protection Obligations"):

(A) The Pre-Petition Lien Holders shall have and are hereby granted the Replacement Liens subject to (i) unavoidable, duly perfected liens existing as of the Petition Date, which liens shall retain their respective priorities *vis a vis* the Replacement Liens granted hereby to the Pre-Petition Lien Holders; (ii) the priorities set forth herein; and (iii) the Subordination Agreement. Subject in all respects to the Subordination Agreement, and except as otherwise set forth herein, the Replacement Liens granted to the Pre-Petition Lien Holders pursuant to the Interim Order and this Final Order shall be prior and senior to all liens and encumbrances (other than fees arising under 28 U.S.C. §1930) of (a) all other secured creditors in and to such property granted, or arising,

subsequent to the date of this Final Order, (b) any intercompany claim of the Debtors or any subsidiary or affiliate of the Debtors, and (c) any security interest or lien that is avoided or otherwise preserved for the benefit of the Debtors' estates pursuant to Bankruptcy Code section 551; provided, however, that, subject to the Debtors making the Senior Thermo Lender Payment, the Replacement liens granted to the Pre-Petition Lien Holders shall be junior in all respects to the DIP Liens; and

(B)     The Pre-Petition Lien Holders are hereby granted allowed Superpriority Claims in the same relative priority and to the same extent, priority, enforceability, unavoidability and validity applicable to the Pre-Petition Lien Holders' security interests and liens in the Pre-Petition Collateral, provided, however, that, subject to the Debtors making the Senior Thermo Lender Payment, the Superpriority Claims granted to Pre-Petition Lien Holders shall be junior in all respects to the Superpriority Claims granted to the Administrative Agent and DIP Lenders. No cost or expense of administration under Bankruptcy Code §§ 105, 503(b) and 507(b) shall be senior to, or *pari passu* with, any Superpriority Claims.

32.     The Administrative Agent may issue a written notice of the occurrence of a Cash Collateral Event of Default (as defined below) to counsel for the Debtors, counsel for the Committee, and the U.S. Trustee (the "Cash Collateral Default Notice"). Absent entry of an order to the contrary, on the sixth (6th) business day after receipt of the Cash Collateral Default Notice by counsel for the Debtors, counsel for the Committee, and the U.S. Trustee, the Debtors shall be prohibited from using any Cash Collateral; provided, that the Administrative Agent is not required to submit a Cash Collateral Default Notice in order to declare the principal of, and accrued interest on the outstanding borrowings under the DIP Credit Agreement to be due and

payable or to terminate the DIP Commitments; provided, further that notwithstanding anything in this Final Order to the contrary, upon receipt of the Cash Collateral Default Notice, the Debtors may continue to make ordinary course disbursements from its Deposit Accounts (as defined in the DIP Credit Agreement) to the extent and at the times set forth in the Original Budget or any subsequent approved budget, but may not withdraw or disburse any other amounts from such accounts (in any hearing after the giving effect of the Cash Collateral Default Notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, a Cash Collateral Event of Default has occurred and is continuing). For purposes of this Final Order, a "Cash Collateral Event of Default" shall occur with respect to the Debtors' use of Cash Collateral if (a) the Debtors fail to perform any of their obligations in accordance with the terms of this Final Order, including, without limitation, the Debtors' failure to use Cash Collateral in compliance with the Original Budget (subject to Permitted Variances and Permitted Variance Exceptions) or subsequent approved budgets or to provide the information or access as required herein, (b) any representation or warranty made by the Debtors under the Summary of DIP Terms, the Interim Order, or any other documents or agreements delivered or entered into in connection with the DIP Facility, proves to have been false or misleading in any material respect as of the time made or given (including by omission of material information or fact necessary to make such representation, warranty or statement not materially misleading), (c) the appointment of a chapter 11 trustee or examiner with expanded powers, (d) any of the Cases are converted to cases under chapter 7, (e) without the prior written consent of the Pre-Petition Lien Holders, the Debtors shall purport to grant or file a motion seeking to grant a third party a security interest or lien (other than the DIP Liens) upon all or part of any property of the Debtors that has a priority which is senior to, or equal with, any of the Pre-Petition Liens or Replacement Liens granted

hereunder in all or any of a portion of such property, or (f) a DIP Event of Default shall have occurred.

33.    <u>Carve-Out</u>.    Any provision of this Final Order to the contrary notwithstanding, the DIP Liens, Replacement Liens and Superpriority Claims granted hereunder to the Administrative Agent for the benefit of the DIP Lenders and the Pre-Petition Lien Holders, as the case may be, shall be subject and subordinate to a carve-out (the "<u>Carve-Out</u>") for (a) allowed fees and expenses of attorneys and financial advisors (collectively, the "<u>Professionals</u>") employed by the Debtors and the Committee, accrued before the termination of the DIP Facility and/or the Debtors' use of Cash Collateral hereunder, (b) following notice of the termination of the DIP Facility and/or Debtors' use of Cash Collateral, the payment of allowed fees and expenses incurred or accrued after such notice of termination by the Professionals in an aggregate amount not to exceed $250,000 and (c) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court; <u>provided, however,</u> the Carve-Out shall not include professional fees and disbursements incurred in connection with the commencement and prosecution of any adversary proceeding or contested matter in which any person or entity asserts any claims or causes of action against any or all of the Administrative Agent, DIP Lenders or Pre-Petition Lien Holders or challenges or raises any defense to the DIP Liens, DIP Lenders, Pre-Petition Obligations, Pre-Petition Liens, Pre-Petition Lien Holders, Replacement Liens or the Superpriority Claims; <u>provided, further</u> that nothing herein shall be construed to impair the ability of any party, including, but not limited to the DIP Lenders and Pre-Petition Lien Holders, to object to any fees, expenses, reimbursement or compensation described in this Paragraph. As long as the Debtors are entitled to use borrowings under the DIP Facility or Cash Collateral pursuant to the terms of this Final Order, the Debtors

shall be permitted to pay all reasonable and necessary compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be payable, and the amount so paid shall not reduce the Carve-Out. In the event of a liquidation of any of the Debtors' estates, an amount equal to the Carve-Out (or a *pro rata* amount in the event of a liquidation of only one of the Debtors) shall be reserved from the proceeds of such liquidation, or from cash held in the estates at such time, and held in a segregated account prior to the making of the distributions.

34.     So long as no DIP Event of Default or Cash Collateral Event of Default shall have occurred and be continuing, the Debtors shall be permitted to pay administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code incurred in the ordinary course of business of the Debtors, subject to the maximum amounts for such type of expenditures contained in the provisions of the DIP Loan Documents and Original Budget or any subsequent approved budget, as the case may be, in the aggregate, as the same may be due and payable.

35.     Proceeds of Subsequent Financing.  Without limiting any of the other provisions of this Final Order, if at any time prior to (i) the indefeasible repayment in full in cash of all DIP Obligations, and (ii) the termination of the DIP Commitments, any Debtor or any trustee subsequently appointed in the Cases shall obtain credit or incur debt pursuant to section 364(b), 364(c) or 364(d) of the Bankruptcy Code (regardless of whether obtaining such credit is a DIP Event of Default or Cash Collateral Event of Default), then, except as otherwise permitted by the DIP Credit Agreement, all of the proceeds of such credit or debt shall immediately be applied to the indefeasible payment in full in cash of the DIP Obligations in accordance with the DIP Loan Documents.

36.     Limitation on Charging Expenses Against Collateral.  No expenses of administration of the Cases shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lenders, the Pre-Petition Lenders, as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lenders and/or the Pre-Petition Lien Holders.

37.     Termination.  All (i) DIP Obligations of the Debtors to the Administrative Agent and DIP Lenders shall be due and payable in accordance with the DIP Credit Agreement and (ii) authorization to use Cash Collateral shall cease, on the date (the "DIP Expiration Date") that is the earliest to occur of: (a) September 12, 2011, unless this Court shall have entered an order pursuant to section 1129 of the Bankruptcy Code confirming the Plan on or prior to 11:59 p.m. (Wilmington, Delaware time) on such date; (b) September 30, 2011, unless the Plan shall have become effective prior thereto; and (c) the occurrence of a DIP Event of Default and/or Cash Collateral Event of Default.

38.     Access to Collateral.  The DIP Lenders and the Administrative Agent and their respective agents, experts and advisors shall be given reasonable access to the Collateral for purposes of monitoring the business of the Debtors and valuing the Collateral.

39.     Information.  The Debtors shall provide the Administrative Agent, DIP Lenders and Pre-Petition Lien Holders with all inspection rights and reports (in addition to those required by this Final Order) to the extent required under the Pre-Petition Debt Documents or as otherwise reasonably requested by the Administrative Agent, DIP Lenders or Pre-Petition Lien Holders.

40.    Reservation of Rights of Pre-Petition Lien Holders. Except as expressly provided herein, nothing contained in this Final Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity, to the Administrative Agent, DIP Lenders or Pre-Petition Lien Holders, including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion), except as limited by the Subordination Agreement.

41.    Perfection of DIP Liens and Replacement Liens. The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby vacated and modified to permit the Debtors to grant the liens and security interests to the DIP Lenders and Pre-Petition Lien Holders contemplated by the DIP Loan Documents (with respect to the DIP Lenders) and this Final Order.

42.    The DIP Liens and Replacement Liens granted pursuant to this Final Order shall constitute valid and duly perfected security interests and liens, and the Administrative Agent, DIP Lenders and the Pre-Petition Lien Holders shall not be required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal, state or local law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the DIP Liens or Replacement Liens shall in no way affect the validity, perfection or priority of such liens. The Administrative Agent, DIP Lenders and Pre-Petition Lien Holders are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of

lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the Administrative Agent, DIP Lenders or Pre-Petition Lien Holders shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, nonavoidable and not subject to challenge, dispute or subordination, at the time and as of the date of entry of this Final Order. Upon the request of the Administrative Agent or DIP Lenders, the Debtors and the Pre-Petition Lien Holders, without any further consent of any party, are authorized to take, execute and deliver such instruments (in each case without representation or warranty of any kind) to enable the Administrative Agent, DIP Lenders, and the Pre-Petition Lien Holders to further validate, perfect, preserve and enforce the DIP Liens.

43. A certified copy of this Final Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Final Order for filing and recording.

44. <u>Use of DIP Loan Proceeds and Cash Collateral; Budget</u>. Subject in all respects to the terms and conditions set forth herein, the Debtors are authorized to use the proceeds of the DIP Loans and the Cash Collateral in the amounts set forth in the Original Budget attached to the Interim Order (the "<u>Original Budget</u>"), or any subsequent approved budget, subject to Permitted Variances and Permitted Variance Exceptions (each as defined below), through the date of entry of this Final Order until the occurrence of the DIP Expiration

Date; provided that, without limiting the foregoing, from and after delivery of the Lightening Dock Certificate to the Administrative Agent, the proceeds of the Lightning Dock Loans shall be used by Lightning Dock for the sole purpose of funding the drilling of new wells pursuant to Lightning Dock's business plan and related costs and expenses.

45.     The Original Budget reflects on a line-item thirteen (13) week rolling-basis the Debtors' anticipated aggregate cash receipts and aggregate necessary and required working capital expenses for each week covered by the Original Budget. For each two-week period covered by the Original Budget and any subsequent budget, the aggregate actual disbursements by the Debtors during such two-week period of determination must be no greater than 120% of the aggregate amount of projected disbursements for such period as set forth in the Original Budget or any subsequent budget (the "Permitted Variance"). For the avoidance of doubt, for purposes of calculating the Permitted Variance, any unused amounts set forth in the Original Budget or any subsequent budget for any period of determination may be carried forward and used during subsequent periods on a line-by-line basis, with no carry-over to any other line item. Upon the prior written request of the Debtors, or upon its own initiative, the Administrative Agent may, but is not required to, authorize the Debtors to exceed the Permitted Variance without further order from the Court (each, a "Permitted Variance Exception"), with notice of any such authorized request being promptly forwarded to counsel for the Committee. Except as expressly set forth herein, nothing in the Original Budget, any subsequent approved budget, the Interim Order, or this Final Order shall be deemed or construed as (x) a finding or admission as to the validity of any claim relating to a budgeted amount, (y) an agreement or promise by any party in interest to pay any such budgeted claim, or (z) a waiver of the rights of any party in interest to contest any such claim. Furthermore, nothing in this Final Order shall

authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, nor authorize the use by the Debtors of any proceeds from any such disposition of assets. The Original Budget may be amended or modified in writing from time to time only with the prior written consent of the Administrative Agent and DIP Lenders and with substantially contemporaneous notice of any such amendment or modification being forwarded to counsel for the Committee.

46. The Debtors shall provide to the U.S. Trustee, Administrative Agent, DIP Lenders, Pre-Petition Senior Agent, Pre-Petition Lenders and counsel to the Committee, so as to actually be received within four (4) business days following the end of each two-week period (with the first such date of delivery being no later than June 16, 2011, for the two-week period ending June 10, 2011), (a) an updated rolling 13-week budget, and (b) a line-by-line variance report for the immediately preceding two-week period and on a cumulative basis from the Petition Date to the report date, comparing actual cash receipts and actual cash disbursements to cash receipts and cash disbursements forecasted in the Original Budget for such period and showing on a line-by-line basis any variance to the corresponding line-item of the Original Budget together with an explanation for such variance. A copy of the current updated budget is attached hereto as Exhibit B.

47. Marshalling. In no event shall the DIP Lenders or the Pre-Petition Lien Holders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

48. Section 552(b). The DIP Lenders and Pre-Petition Lien Holders are entitled to all of the rights and benefits of section 552(b)(1) of the Bankruptcy Code and the "equities of the case" exception therein shall not apply.

49. <u>Proofs of Claim</u>. The Administrative Agent and DIP Lenders, and the Pre-Petition Lien Holders, may, but shall not be required to file proofs of claim in the Cases or any successor cases and any order entered by the Court in relation to the establishment of procedures to file proofs or a bar date in any of the Cases or any successor cases shall, or shall be deemed to, so provide.

50. <u>Preservation of Rights Granted Under this Final Order</u>. Except as otherwise set forth herein, no claim *or* lien having a priority superior to or *pari passu* with those granted by this Final Order to the Administrative Agent and DIP Lenders or to the Pre-Petition Lien Holders, respectively, shall be granted or allowed while any portion of the DIP Facility (or any refinancing thereof), the DIP Commitments, the DIP Obligations or the Adequate Protection Obligations remain outstanding, and the DIP Liens and the Replacement Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

51. To the extent permitted by applicable law, if an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), to the fullest extent permitted by law, that (i) the DIP Liens, Replacement Liens and Superpriority Claims pursuant to the Interim Order and this Final Order shall continue in full force and effect and shall maintain their priorities as provided in this Final Order (and pursuant to the Subordination Agreement as applicable to the Pre-Petition Lien Holders) until all DIP Obligations and Adequate Protection Obligations shall have been paid and satisfied in full and

that such DIP Liens, Replacement Liens and Superpriority Claims, shall, notwithstanding such dismissal, remain binding on all parties-in-interest and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to and provided for in this Final Order.

52.     If any or all of the provisions of the Interim Order or Final Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations or Adequate Protection Obligations incurred prior to the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the Summary of DIP Terms or DIP Loan Documents, as applicable, with respect to any DIP Obligations or with respect to the Adequate Protection Obligations. Notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral, or DIP Obligations or Adequate Protection Obligations incurred by the Debtors prior to the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of the Interim Order and/or Final Order, as the case may be, and the Administrative Agent, DIP Lenders and Pre-Petition Lien Holders shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Final Order and pursuant to the DIP Loan Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

53.     Except as expressly provided in this Final Order or in the Summary of DIP Terms or DIP Loan Documents, the DIP Liens, Replacement Liens, Superpriority Claims and all other rights and remedies of the Administrative Agent, DIP Lenders and Pre-Petition Lien Holders granted by the provisions of the Interim Order, this Final Order and the DIP Loan

Documents, as applicable, shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Cases, terminating the joint administration of the Cases or by any other act or omission or (ii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations. The terms and provisions of the Interim Order, this Final Order and the DIP Loan Documents shall continue in these Cases (whether or not these Cases cease to be jointly administered), or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, Replacement Liens and Superpriority Claims and all other rights and remedies of the Administrative Agent, DIP Lenders and Pre-Petition Lien Holders granted pursuant to the Interim Order, this Final Order, Summary of DIP Terms or DIP Loan Documents, as applicable, shall continue in full force and effect.

54. <u>Limitation on Use of DIP Facility Proceeds and Cash Collateral</u>. Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings under the DIP Facility, Cash Collateral or Collateral may be used to (a) object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under the DIP Loan Documents or the Pre-Petition Debt Documents, or the liens or claims granted under the Interim Order, this Final Order, the Summary of DIP Terms or the DIP Loan Documents, as applicable, or the Pre-Petition Debt Documents, or the payment of the Senior Thermo Lender Payment, (b) assert claims and defenses or any other causes of action against the Administrative Agent, DIP Lenders or the Pre-Petition Lien Holders or their respective agents, affiliates, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the Administrative Agent, DIP Lenders' or Pre-Petition Lien Holders' assertion,

enforcement or realization on the Collateral in accordance with the DIP Loan Documents, the Pre-Petition Debt Documents or this Final Order, (d) seek to modify any of the rights granted to the DIP Lenders or the Pre-Petition Lien Holders hereunder or under the DIP Loan Documents or the Pre-Petition Debt Documents, in each of the foregoing cases without such parties' prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date or any professional fees and disbursements incurred in connection with such claims or any of the actions set forth in the foregoing clauses (a) through (e) unless in each case such payments are (i) approved by an order of this Court and (ii) in accordance with the DIP Credit Agreement and the Original Budget or other approved budget, unless otherwise approved by the DIP Lenders in their sole discretion.

55. **Effect of Agreements, Stipulations and Findings. The agreements, stipulations and findings contained in Paragraphs 11-15 of this Final Order shall be binding upon all Persons (as defined in the Bankruptcy Code), including, but not limited to, the Debtors and the Committee.**

56. Right to Credit Bid. The Administrative Agent, DIP Lenders and Pre-Petition Bridge Lenders shall have the right to "credit bid" all or a portion of the allowed amount of their claims during any sale of all or any part of the Collateral, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or as part of a plan of reorganization subject to confirmation under section 1129 of the Bankruptcy Code, and shall have standing with respect to all aspects of any such sales or hearings related thereto.

57. Reimbursement of Fees and Expenses. The Debtors shall reimburse the Administrative Agent and DIP Lenders for all of their reasonable costs, fees, charges and expenses incurred in connection with the Summary of DIP Terms, DIP Facility, DIP Loan

Documents and the Cases (including, without limitation, their reasonable attorneys' and financial advisors' fees and expenses), whether incurred prior to or after the Petition Date and in connection with the enforcement of any rights or remedies of the Administrative Agent and DIP Lenders relating to the DIP Facility in accordance with this Final Order, Summary of DIP Terms or DIP Loan Documents, as applicable. A copy of any invoice submitted by the Administrative Agent or DIP Lenders to the Debtors shall also be delivered simultaneously to the Debtor, the U.S. Trustee and counsel to the Committee (the "Fee Notice"). None of such costs, fees, charges and expenses shall be subject to Court approval or required to be recorded or maintained in accordance with the United States Trustee guidelines relating to compensation and reimbursement of expenses and no recipient of any such payment shall be required to file any interim or final fee application with the Court. Subject to the Debtors, the Committee, or the U.S. Trustee filing a written objection with this Court to any such fees and expenses within ten (10) days after receipt of the Fee Notice, the Debtors shall pay promptly such invoice in accordance with this Final Order, Summary of DIP Terms or DIP Credit Agreement, as applicable. To the extent a timely filed objection is filed by the Debtors, the Committee, or the U.S. Trustee, the Debtors (a) shall pay such portion of the fees and expenses to which no objection is interposed and (b) shall pay any remaining fees and expenses as ordered by the Bankruptcy Court (or upon withdrawal or resolution of the objection).

58.     Order Governs; DIP Loan Documents Govern.     In the event of any inconsistency between the provisions of this Final Order and the Motion, the Interim Order, the Summary of DIP Terms, the DIP Loan Documents and/or the Pre-Petition Debt Documents, the provisions of this Final Order shall govern and control. In the event of any inconsistency

between the provisions of the DIP Loan Documents and the Summary of DIP Terms, the provisions of the DIP Loan Documents shall govern and control.

59. <u>Enforceability</u>. This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entity and there shall be no stay of execution or effectiveness of this Final Order.

60. <u>Binding Effect; Successors and Assigns</u>. The DIP Loan Documents and the provisions of this Final Order, including all agreements, stipulations and findings herein shall be binding upon all parties-in-interest in the Cases, including, without limitation, the DIP Lenders, the Pre-Petition Lien Holders, the Committee and the Debtors and their respective successors and assigns (including any estate representative or any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the Administrative Agent, the DIP Lenders, the Pre-Petition Lien Holders and the Debtors and their respective successors and assigns; <u>provided</u>, <u>however</u>, that the DIP Lenders and the Pre-Petition Lien Holders shall have no obligation to permit the use of Cash Collateral or extend any financing, as the case may be, to any trustee or similar responsible person appointed for the estate of any Debtor.

61. <u>Retention of Jurisdiction</u>. The Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Final Order and the rights of the parties set forth herein, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan

for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or order confirming such chapter 11 plan or any order dismissing or closing the Cases.

62.     Exculpation.  Nothing in this Final Order, the DIP Loan Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the Administrative Agent, DIP Lenders or Pre-Petition Lien Holders any liability for any claims arising from the pre-petition or post-petition activities of the Debtors either in the operation of their business or in connection with their restructuring or financing efforts or the sale of their assets.

Dated: June ___, 2011
       Wilmington, Delaware

Honorable Kevin J. Carey
Chief United States Bankruptcy Judge