**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re | ) Chapter 11 |
| RASER TECHNOLOGIES, INC., *et al.*,[1] | ) Case No. 11-11315 (KJC) |
| Debtors. | ) (Jointly Administered) |

## DISCLOSURE STATEMENT WITH RESPECT TO THE
## ~~FIRST AMENDED~~ JOINT PLAN OF REORGANIZATION OF RASER
## TECHNOLOGIES, INC. AND ITS AFFILIATED DEBTORS

Dated: ~~June 21,~~ **July 22,** 2011

**HUNTON & WILLIAMS LLP**
Peter S. Partee, Sr.
Richard P. Norton
200 Park Avenue, 53rd Floor
New York, New York 10166-0136
Telephone: (212) 309-1000
Telecopier: (212) 309-1100

-and-

Michael G. Wilson (DE No. 4022)
Henry P. Long, III
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone:  (804) 788-8200
Telecopier:  (804) 788-8218

**BAYARD, P.A.**
Neil B. Glassman (DE No. 2087)
Jamie L. Edmonson (DE No. 4247)
GianClaudio Finizio (DE No. 4253)
222 Delaware Avenue, Suite 900
Wilmington, DE  19801
Telephone:  (302) 655-5000
Telecopier:  (302) 658-6395

---

[1]    The Debtors are the following:  Raser Technologies, Inc., Raser Technologies Operating Company, Inc, Raser Power Systems, LLC,  RT Patent Company, Inc., Pacific Renewable Power, LLC, Western Renewable Power, LLC, Intermountain Renewable Power, LLC, Los Lobos Renewable Power, LLC, Columbia Renewable Power, LLC, Truckee Geothermal No. 1 SV-01, LLC, Truckee Geothermal No. 2, SV-04, LLC, Trail Canyon Geothermal No. 1 SV-02, LLC, Devil's Canyon Geothermal No. 1 SV-03, LLC, Thermo No. 1 BE-01, LLC, Thermo No. 2 BE-02, LLC, Thermo No. 3 BE-03, LLC, Cricket Geothermal No. 1 MI-01, LLC, Harmony Geothermal No. 1 IR-01, LLC, Lightning Dock Geothermal HI-01, LLC, and Klamath Geothermal No. 1 KL-01, LLC.  For the purpose of these chapter 11 cases, the service address for all Debtors is: Raser Technologies, Inc., 5152 North Edgewood Drive, Provo, UT  84604.

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE AS COMPLYING WITH THE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED.  INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS SUBJECT TO COMPLETION AND AMENDMENT.

**IMPORTANT NOTICE**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS AND HOLDERS OF INTERESTS ENTITLED TO VOTE ON THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND ALL EXHIBITS HERETO, INCLUDING THE PLAN, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE DISCLOSURE STATEMENT AND THE PLAN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN.  THE TRANSMISSION OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.  AFTER THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL BE MATERIALLY ACCURATE, AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THEY CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING, SECURITIES OF THE DEBTORS SHOULD NOT RELY UPON THIS DISCLOSURE

STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, AS A STIPULATION OR AS A WAIVER, BUT, RATHER, AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE LIQUIDATION OR THE PLAN ON HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR.

**PARTIES SHOULD CONSULT WITH THEIR OWN COUNSEL, ACCOUNTANTS, AND/OR TAX ADVISERS WITH RESPECT TO THE LEGAL EFFECTS AND OTHER CONSEQUENCES OF THE PLAN.**

# TABLE OF CONTENTS

**Page**

I. PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT ........................ 1

II. SHORT SUMMARY OF THE PLAN ........................................................................ 1

III. SOLICITATION AND VOTING PROCEDURES ............................................... ~~4~~5

    A. CHAPTER 11 GENERALLY ........................................................... ~~4~~5
    B. SOLICITATION OF ACCEPTANCES OF THE PLAN ........................................................................... ~~5~~6
    C. VOTING ON THE PLAN ........................................................... 6
    D. OTHER GENERAL INFORMATION ........................................ 9

IV. GENERAL INFORMATION ON THE DEBTORS AND EVENTS LEADING TO THE COMMENCEMENT OF THE CASES ......................... 10

    A. THE DEBTORS' BUSINESS AND CORPORATE STRUCTURE ........................................................... 10
    B. THE DEBTORS' CAPITAL STRUCTURE ........................ 13
    C. EVENTS LEADING TO CHAPTER 11 FILING ............... 17
    D. SIGNIFICANT POST-PETITION DATE FILINGS AND EVENTS ........................................................... ~~21~~20

V. THE PLAN ............................................................................................................... 23

    A. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........................................... 23
    B. DISPUTED CLAIMS AND INTERESTS ........................ ~~29~~28
    C. MEANS FOR IMPLEMENTATION OF THE PLAN ......... 29
    D. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................................................... ~~33~~39
    E. RETENTION OF JURISDICTION ............................... ~~35~~41

VI. CONFIRMATION AND CONSUMMATION PROCEDURE ......................... ~~38~~44

    A. DISCLOSURE AND SOLICITATION ........................ ~~38~~44
    B. ACCEPTANCE OF THE PLAN ............................... ~~38~~44
    C. CLASSIFICATION ........................................... ~~39~~44
    D. CONFIRMATION ........................................... ~~39~~44

VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ......................... ~~41~~46

    A. TAX CONSEQUENCES FOR THE DEBTORS ............... ~~41~~47
    B. TAX CONSEQUENCES FOR HOLDERS OF CLAIMS AND INTERESTS ................................... ~~42~~47

VIII. CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS ......................... ~~43~~48

# TABLE OF CONTENTS

A.     Risk of Breach or Non-Closing of the Transactions Contemplated by the Plan Support Agreement and the Plan ........... 43~~48~~

B.     Risk of Loss From Operations ........... 43~~48~~

C.     Risk of Successfully Creating Value for Creditors Through the Liquidation LLC and the Creditor ~~LLC43~~**Trust** ........... **48**

D.     Forward Looking Statements in this Disclosure Statement May Prove to be Inaccurate ........... ~~43~~**49**

IX.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ........... ~~44~~**49**

A.     Liquidation Under Chapter 7 ........... ~~44~~**49**

B.     Alternative Plan(s) of Reorganization ........... ~~45~~**50**

X.     CONCLUSION AND RECOMMENDATION ........... ~~46~~**51**

## EXHIBITS

Exhibit A            **First Amended** Joint Plan of Reorganization of Raser Technologies, Inc., and its Affiliated Debtors

Exhibit B            Liquidation Analysis

# I. PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT

This Disclosure Statement is submitted by the Debtors, which are the proponents of the Plan. The purpose of the Disclosure Statement is to provide Creditors and other parties in interest who are entitled to vote on the Plan with sufficient information to enable them to make an informed decision as to whether to vote to accept or reject the Plan. The purpose of the Plan is to effect a restructuring of the Debtors' liabilities in a manner that will maximize recoveries by Creditors and ensure the future viability of the Reorganized Debtors. ***Defined terms used, but not defined in this Disclosure Statement, shall have the meaning ascribed to such terms in the Plan. Accordingly, please refer to the Plan for definitions of certain important terms used in this Disclosure Statement.***

This Disclosure Statement:

- Summarizes the Plan and the proposed treatment of Creditors under the Plan (Section V, *The Plan*);

- Describes the procedures for soliciting and casting votes on and confirming the Plan (Section III, *Solicitation and Voting Procedures*);

- Describes the background and events leading to the Debtors' decision to commence the Chapter 11 Cases (Section IV, *General Information Regarding the Debtors and Events Leading to the Commencement of the Cases*);

- Describes the Debtors' capital structure (Section IV.B, *The Debtors' Capital Structure*);

- Describes the significant events that have occurred during the Chapter 11 Cases (Section IV.D, *Significant Events During the Chapter 11 Cases* );

- Describes the means for implementing the Plan (Section VI.D.2, *Feasibility*);

- Projects the total percentage recovery that each Class of Allowed Claims and Interests may receive (Section II, *Short Summary of the Plan*);

- Evaluates liquidation under Chapter 7 of the Bankruptcy Code as an alternative to the Plan (Section IX.A, *Liquidation Under Chapter 7*); and

- Describes certain risk factors that may effect the feasibility of the Plan and potential distributions to creditors (Section VIII, *Certain Risk Factors and Other Considerations*).

# II. SHORT SUMMARY OF THE PLAN

The Plan provides for:

- The reorganization of the Debtors' business through the transactions

contemplated in the Plan Support Agreement;

- The deleveraging of the Debtors' balance sheet and the sale of 100% of the equity in Reorganized Debtors to the Sponsors of the Plan;

- The creation of a Litigation LLC and the Creditor ~~LLC~~**Trust** to pursue certain of the Debtors' Causes of Action, the proceeds of which will be shared with the Debtors' creditors; and

- The cancellation of outstanding Interests in the Debtors.

The following table briefly summarizes the treatment of Allowed Claims and Interests, the estimated recoveries and the provisions of the Plan. As discussed in more detail below, the table makes a number of significant assumptions regarding the amount of Allowed Claims, the value of the business of the Reorganized Debtors, and the recovery on certain other Assets owned by the Debtors. **Please be sure to review Article VIII below regarding the risks associated with such assumptions.** For a more detailed description of the terms and provisions of the Plan, see Article V below.

In accordance with Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims have not been classified under the Plan. Similarly, Professional Fee Claims are not classified under the Plan. Section V.A.1 below describes the treatment of such Unclassified Claims.

| *Class* | *Treatment Under the Plan and Entitlement to Vote* | *Estimated Allowed Claims* | *Estimated Recovery* |
|---|---|---|---|
| **Class 1** <br> **Priority Non-Tax Claims** | Unimpaired; Not entitled to Vote; Allowed Class 1 Claims will be paid in full in cash. | $0 | 100% |
| **Class 2** <br> **Thermo 1 Secured Claims** | Impaired; Entitled to Vote; Allowed Class 2 Claims will receive ~~the consideration~~**releases and indemnification** provided for ~~under~~**in Section 9.5 of the Plan, and** the Thermo Lenders ~~Settlement~~**shall irrevocably and absolutely release and waive any and all remaining Claims against the Debtors and all Liens against Assets**. | $[ ] | [ ]% |
| **Class 3** <br> **Raser Power Secured Claims** | Impaired; Entitled to Vote; Allowed Class 3 Claim shall receive (a) a new promissory note **made by Debtor Raser Power Systems, LLC,** secured by ~~the same property of the Estate;~~**a Lien on the Assets that constitute collateral security for such Class 3 Secured Claim and requiring payments having an aggregate** | $[ ] | 100% |

| Class | Treatment Under the Plan and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| | **present value equal to the value of such collateral security;** or (b) the property of the Estate that constitutes collateral security for such Claim. | | |
| **Class 4** ~~Sponsor~~**Bridge Facility Secured Claims** | Impaired; Entitled to Vote; **the Holders of** Allowed Class 4 Claims shall ~~receive the consideration provided for under Section 6.5 of the Plan~~**credit all outstanding obligations owed by the Debtors under the Bridge Facility as part of the Purchase Price**. | $750,000 | 100% |
| **Class 5** **Lightning Dock Secured Claims** | Impaired; Entitled to Vote; Allowed Class 5 Claims shall receive ~~(a) a new promissory note secured by the same property of the Estate, or (b)~~ the property of the Estate that constitutes collateral security for such Claim. | $[ ] | 100% |
| **Class 6** **Other Secured Claims** | ~~Unimpaired; Not~~**Impaired;** Entitled to Vote; Allowed Class 6 Claims shall **(a)** be paid 100% of the Allowed amount of such Claims**,** or ~~the obligation(s) shall be reinstated in full~~**(b) receive the property of the Estate that constitutes collateral security for such Claim**. | $[ ] | 100% |
| **Class 7(a)** **General Unsecured Claims Against Raser** | Impaired; Entitled to Vote; Allowed Class 7(a) Claims shall receive their Ratable Portion of (i) the membership interests in the Creditor ~~LLC~~**Trust**, and (ii) the Class B Membership Interests **in the Litigation LLC**. | $[ ] | [ ]% |
| **Class 7(b)** **General Unsecured Claims Against Thermo 1 Project Entity** | Impaired; Entitled to Vote; Allowed Class 7(b) Claims shall receive their Ratable Portion of (i) the membership interests in the Creditor ~~LLC~~**Trust**, and (ii) the Class B Membership Interests **in the Litigation LLC**. | $[ ] | [ ]% |
| **Class 7(c)** **General Unsecured Claims Against Lightning Dock Project Entity** | Impaired; Entitled to Vote; Allowed Class 7(c) Claims ~~shall have their claims cancelled~~shall receive their Ratable Portion of (i) the membership interests in the Creditor ~~LLC~~**Trust**, and (ii) the Class B Membership Interests **in the Litigation LLC.**. | $[ ] | [ ]% |
| **Class 7(d)** | Impaired; Entitled to Vote; Allowed | $[ ] | [ ]% |

| Class | Treatment Under the Plan and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| **General Unsecured Claims Against ML Debtors** | Class 7(d) Claims shall have ~~their claims cancelled and discharged and shall receive (a)~~ the Reorganized Raser Note, and ~~(b) an amount of Cash equal to fifty-percent (50%) of the difference of (x) the Net Raser Proceeds~~ ~~less (y) $15 million~~ **release and waiver of any and all Causes of Action, including without limitation Avoidance Actions, against Merrill Lynch**. | | |
| **Class 7(e)** **General Unsecured Claims Against Non-ML Subsidiary Debtors** | Impaired; Entitled to Vote; Allowed Class 7(e) Claims shall receive their Ratable Portion of (i) the membership interests in the Creditor ~~LLC~~**Trust**, and (ii) the Class B Membership Interests **in the Litigation LLC.**~~.~~ | <mark>$[ ]</mark> | <mark>[ ]%</mark> |
| **Class 8** **Convenience Class Claims** | Impaired; Entitled to Vote; Allowed Class 8 Claims shall receive their ratable portion of the Convenience Class Fund. | <mark>$[ ]</mark> | <mark>[ ]%</mark> |
| **Class 9** **Opt-Out Unsecured Claims** | Impaired; Not entitled to Vote; Allowed Class 9 Claims will not receive any ~~property~~**Assets or Distribution** under the Plan and are deemed to have voted to reject the Plan. | Unknown | 0% |
| **Class 10** **Cash Election Clams** | Impaired; Entitled to Vote; Allowed Class 10 Claims shall receive a Cash ~~distribution~~**Distribution** equal to one-percent (1%) of the Allowed Amount of such Claims | Unknown | 1.0% |
| **Class 11** **Subordinated Securities Law Claims** | Impaired; Not entitled to Vote; Allowed Class 11 Claims will not receive any ~~property~~**Assets or Distribution** under the Plan and are deemed to have voted to reject the Plan. | Unknown | 0% |
| **Class 12** **Interests in Raser** | Impaired; Not entitled to Vote; Allowed Class 12 Interests will not receive any ~~property~~**Assets or Distribution** under the Plan and are deemed to have voted to reject the Plan. | N/A | 0% |
| **Class 13** | Impaired; Not entitled to Vote; | N/A | 0% |

| Class | Treatment Under the Plan and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| **Interests in Subsidiary Debtors** | Allowed Class 13 Interests will not receive any ~~property~~**Assets or Distribution** under the Plan and are deemed to have voted to reject the Plan. | | |

## III. SOLICITATION AND VOTING PROCEDURES

### A.     Chapter 11 Generally

Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to take certain actions to reorganize or sell its business for the benefit of its creditors, shareholders and other parties in interest.  The confirmation and consummation of a plan of reorganization or liquidation is the objective of a Chapter 11 reorganization case. A plan sets forth the means for satisfying claims against, and interests in, a debtor, and is implemented only after it has been confirmed by the Bankruptcy Court.  Confirmation of a plan by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity security holder of the debtor.  Subject to certain limited exceptions, the confirmation order discharges the debtor from any debt that arose before the date of confirmation of the plan in exchange for the consideration specified under the confirmed plan.

Generally, the holders of claims against or interests in a debtor that are classified under the plan are permitted to vote to accept or reject the Plan.  For the Bankruptcy Court to confirm a plan, the plan must be accepted by at least one class of creditors whose interests or rights are impaired under the plan.  The Bankruptcy Code provides that a plan has been accepted by a class of claimants if holders of at least two-thirds in dollar amount and more than one-half in number of the allowed claims of that class have voted in favor of the plan.

**ONLY THE VOTES OF HOLDERS WHO SUBMIT PROPERLY COMPLETED BALLOTS VOTING FOR OR AGAINST THE PLAN WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER THE REQUISITE ACCEPTANCES OF THE CLASSES OF CLAIMS AND INTERESTS HAVE BEEN RECEIVED.  FAILURE BY A HOLDER TO DELIVER A DULY SIGNED BALLOT WILL CONSTITUTE AN ABSTENTION BY THAT HOLDER WITH RESPECT TO THE VOTE ON THE PLAN. ABSTENTIONS WILL NOT BE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN AND THEREFORE WILL HAVE NO EFFECT.  FURTHERMORE, THE DEBTORS RESERVE THE RIGHT PRIOR TO CONFIRMATION OF THE PLAN TO SEEK TO HAVE ANY PARTY'S VOTE ESTIMATED SOLELY FOR PURPOSES OF COUNTING SUCH VOTE IN ACCORDANCE WITH FEDERAL RULE OF BANKRUPTCY PROCEDURE 3018.**

The Bankruptcy Code also requires that the solicitation of acceptances of the proposed plan must be accompanied by a disclosure statement containing adequate information of a kind,

and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. That is the purpose of this Disclosure Statement.

The Plan provides for specified distributions to the various Classes of Holders of Claims and Interests, which are described in detail herein. The Debtors believe that the Plan provides consideration to all Classes of Claims and Interests that reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of those Claims and Interests. In addition to the voting requirements discussed above, the Bankruptcy Court must find that various statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed.

**B.      Solicitation of Acceptances of the Plan**

Under the Plan, all Claims and Interests have been categorized based on the nature and priority of the Claim or Interest by placing Claims and Interests in Classes and by categorizing certain Claims as unclassified Claims. Each Claim or Interest is either impaired or unimpaired under the Plan, as such terms are defined in section 1124 of the Bankruptcy Code. A Class of Claims or Interests that is unimpaired is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, is not entitled to vote on the Plan. Similarly, a Class of Claims or Interests that does not receive or retain any property under the Plan is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, likewise, is not entitled to vote. Accordingly, acceptances of the Plan are being solicited only from Holders of Claims in impaired Classes that are to receive distributions under the Plan. The only such Classes are Classes 2, 3, 4, 5, **6,** 7(a), 7(b), 7(c), 7(d), 7(e), 8 and 10. As discussed above, for impaired Classes, section 1126 of the Bankruptcy Code provides that an impaired Class of Claims or Interests is deemed to accept the Plan if Holders of at least two-thirds in dollar amount and a majority in number of the Claims who cast Ballots vote to accept the Plan.

Only those Holders who vote to accept or reject the Plan will be counted for purposes of determining whether the Plan is accepted or rejected. Therefore, the Plan could be accepted by any impaired Class of Claims with the affirmative vote of significantly less than two-thirds in dollar amount and a majority in number of the Claims in a Class.

**C.      Voting on the Plan**

The Bankruptcy Court set [   ], 2011 as the deadline for casting ballots approving or rejecting the Plan (the "Ballot Deadline").

1.      Who May Vote

Only Holders of Claims in Classes that are impaired are eligible to vote on the Plan. Accordingly, only Holders of Claims in Classes 2, 3, 4, 5, **6,** 7(a), 7(b), 7(c), 7(d), 7(e), 8 and 10 are eligible to vote.

2.     <u>Voting Deadline and Extensions</u>

**The Ballot Deadline is *[], 2011*.** **You must return your completed Ballot to [ ], so that it is actually received by 5:00 p.m., prevailing Eastern Time, on the Ballot Deadline.**

To be counted for purposes of voting on the Plan, all of the information requested on the applicable Ballot must be provided. The Debtors reserve the right, in their sole discretion, to extend the Ballot Deadline, in which case the term "Ballot Deadline" will mean the latest date on which a Ballot will be accepted. To extend the Ballot Deadline, the Debtors will notify you of any extension by oral or written notice and as promptly as practicable mail written notice thereof to each record Holder of Claims entitled to vote. The notice may state that the Debtors are extending the Ballot Deadline for a specified period of time or on a daily basis until 5:00 p.m., Eastern Time, on the date on which the Debtors have received sufficient acceptances to seek confirmation of the Plan.

3.     <u>Voting Procedures</u>

An appropriate Ballot is enclosed in the solicitation package included with this Disclosure Statement. All votes to accept or reject the Plan must be cast by using that Ballot. Votes that are cast in any manner other than on the designated Ballot will not be counted. Ballots must be actually received by American Legal Claims Services, LLC (the "<u>Ballot Agent</u>"), at the address indicated on the Ballot, by no later than 5:00 p.m., Eastern Time, on the Ballot Deadline.

If you elect to vote on the Plan, you should complete and sign the Ballot in accordance with the instructions thereon, being sure to fill in the amount of your Claim in the appropriate space provided and check the appropriate box entitled "Accept the Plan" or "Reject the Plan." You may not split your vote on the Plan with respect to a particular Class.

In the event that a Ballot is properly executed, but leaves the amount of the Claim blank, the aggregate amount of the Claim for voting purposes will be the amount shown on the Debtors' books and records, unless otherwise ordered by the Bankruptcy Court. If the aggregate amount of the Claims filled in on your Ballot exceeds the amount indicated by the Debtors' books and records and listed in the Debtors' schedules, the Debtors reserve the right to seek an order of the Bankruptcy Court determining the proper amount of your Claims for voting purposes pursuant to Bankruptcy Rule 3018. Failure of a Holder to deliver a duly signed Ballot will constitute an abstention by that Holder with respect to a vote on the Plan. Abstentions will not be counted as either acceptances or rejections of the Plan. Because abstentions will have no effect on voting

with respect to the Plan, it is extremely important that you timely return your Ballot to indicate whether you accept or reject the Plan.

Submission of all Ballots must be made directly to the Ballot Agent in accordance with the instructions on the Ballots. In all cases, sufficient time should be allowed to assure timely delivery. You may receive multiple solicitation packages. You should only vote one Ballot for each Class of which you are a member.

(i)     Convenience Class Election or Cash Election

Holders of one or more Unsecured Claims against the Debtors that exceed $100,000 in the aggregate have the option of making the Convenience Class Election and having such Claim treated under Class 8 as a "Convenience Class Claim," or of making the Cash Election and having such Claim treated as an Allowed Class 10 Claim.

A "Convenience Class Claim" is defined in the Plan as an Unsecured Claim against one or more of the Debtors that has an aggregate face amount of $100,000.00 or less. As discussed in more detail below, Allowed Class 8 Claims shall receive ~~a Cash payment on the Effective Date equal to 10% of the Allowed Amount of such Claim~~**its Ratable Portion of the Convenience Class Fund**. In order to make the Convenience Class Election, Holders of Unsecured Claims shall have (i) agreed to reduce the face amount of such Claim(s) for purposes of voting and distributions under the Plan to a single Claim in an amount equal to $100,000.00, and (ii) voted all Claims held by such Holder in favor of the Plan.

An Allowed Class 10 Claim, on the other hand, shall receive on the Effective Date a cash distribution equal to one percent (1%) of the Allowed Amount of such Claim**; provided, however, that in making the Cash Election, the Holder of such Unsecured Claim(s) shall be deemed to have voted all Claims held by such Holder to accept the Plan**.

If you have questions concerning the procedure for voting, the option to make the Convenience Class Election or the Cash Election, or the terms of this Disclosure Statement and/or the Plan, please contact counsel for the Debtors indicated on the first page of this Disclosure Statement. If you did not receive the appropriate Ballot or Ballots, or if you received a damaged Ballot or have lost your Ballot, please contact the Ballot Agent.

(ii)    Creditor Opt-Out Election

In addition to the Convenience Class Election and the Cash Election, Holders of Unsecured Claims shall have the right to make the "Creditor Opt-Out Election," which will mean that such Claims will be treated under Class 9 of the Plan. The Plan contemplates that all Holders of Allowed Unsecured Claims will be entitled to receive certain recoveries in exchange for, among other things, granting releases to the Sponsors and the other Released Parties.

*By making the Creditor Opt-Out Election, Holders of Unsecured Claims are electing* ***NOT*** *to grant a release of all rights, claims or causes of action that arise as a result of, or are related to, such Holder's relationship with the Debtors and* ***NOT*** *to participate in the distributions provided for Holders of Allowed Claims in Classes 7(a), 7(b), 7(c), 7(d), 7(e), 8*

***and 10. HOLDERS OF UNSECURED CLAIMS THAT MAKE THE CREDITOR OPT-OUT ELECTION WILL RECEIVE NO PROPERTY OR OTHER DISTRIBUTION UNDER THE PLAN***.  To make the Creditor Opt-Out Election, Holders of claims must indicate their intent to make the Creditor Opt-Out Election in accordance with the instructions on the Ballot.

On the other hand, as consideration for not making the Creditor Opt-Out Election, the Holders of Allowed Unsecured Claims shall be entitled to received the Distributions contemplated to be made to Holders of Claims in Classes 7(a), 7(b), 7(c), 7(d), 7(e), 8 and 10 under the Plan.  A full description of the treatment of Claims and Interests under the Plan is set forth in Section V.A below.

> **PLEASE NOTE THAT IF YOU FAIL TO VOTE AND THE PLAN IS CONFIRMED, YOU WILL BE *DEEMED TO HAVE GRANTED* THE RELEASES IN FAVOR OF THE RELEASED PARTIES PROVIDED FOR IN SECTION 9.4 OF THE PLAN, AND IN EXCHANGE YOU WILL RECEIVE THE CONSIDERATION CONTEMPLATED TO BE PROVIDED TO HOLDERS OF CLAIMS IN CLASSES 7(a), 7(b), 7(c), 7(d), 7(e), 8 AND 10 UNDER THE PLAN.**

4.      Withdrawal of Votes on the Plan

The solicitation of acceptances of the Plan will expire on the Ballot Deadline.  A properly submitted Ballot may be withdrawn by delivering a written notice of withdrawal to the Ballot Agent at its address set forth on the Ballot at any time prior to the Ballot Deadline. Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court, pursuant to Bankruptcy Rule 3018(a).

To be valid, a notice of withdrawal must:

- specify the name of the Holder who submitted the votes on the Plan to be withdrawn;

- contain the description of the Claim; and

- be signed by the Holder in the same manner as on the Ballot.

The Debtors expressly reserve the right to contest the timeliness or validity of any withdrawals of votes on the Plan.

In addition to withdrawal as specified above, any Holder who has previously submitted a properly completed Ballot may revoke and change its vote by submitting to the Ballot Agent prior to the Ballot Deadline a subsequent properly completed Ballot.  If more than one timely, properly completed Ballot is received, only the Ballot that bears the latest date will be counted.

**D.     Other General Information**

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES EQUAL OR GREATER VALUE TO CREDITORS THAN OTHER AVAILABLE ALTERNATIVES. A LIQUIDATION ANALYSIS CONTAINING A COMPARISON OF RECOVERIES UNDER THE PLAN VERSUS A CONVERSION OF THE CASES AND LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE IS ANNEXED HERETO AS <u>EXHIBIT B</u>.  THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS ENTITLED TO VOTE ON THE PLAN AND RECOMMEND THAT EACH CREDITOR VOTE TO ACCEPT THE PLAN.  THIS DISCLOSURE STATEMENT CONTAINS GOOD FAITH ESTIMATES AND ASSUMPTIONS WHICH ARE BASED ON FACTS CURRENTLY KNOWN TO THE APPLICABLE DEBTOR AND WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.

EACH CREDITOR SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY AND CONSULT WITH ITS LEGAL AND/OR BUSINESS ADVISORS AS IT DEEMS APPROPRIATE BEFORE VOTING ON THE PLAN.  THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU.  THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.   THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM ENTITLED TO VOTE THEREON, BUT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW.  THE DESCRIPTION OF THE PLAN SET FORTH HEREIN IS ONLY A SUMMARY, AND HOLDERS OF CLAIMS, INTERESTS, AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN THEMSELVES FOR A FULL UNDERSTANDING OF THE PLAN.   IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN CONTROL.

General information regarding the Debtors, their businesses and material events leading to their commencement of the Cases and the proposal of the Plan is set forth in Article IV. Except where otherwise noted, this information is provided by the Debtors and their management.

THE STATEMENTS AS TO THE APPLICABLE DEBTOR'S FINANCIAL CONDITION CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF APRIL 29, 2011 (UNLESS ANOTHER TIME IS SPECIFIED), AND THERE IS NO REPRESENTATION OR IMPLICATION THAT THE INFORMATION CONTAINED HEREIN WILL NOT HAVE CHANGED AS OF ANY TIME SUBSEQUENT TO THAT DATE, NOR WILL YOU RECEIVE ANY NOTICE OF SUCH CHANGES.

Certain risk factors and other considerations are described in Article VIII below. Alternatives to confirmation and consummation of the Plan are described in Article IX below.

THIS DISCLOSURE STATEMENT INCLUDES CERTAIN STATEMENTS, ESTIMATES AND PROJECTIONS PROVIDED BY THE APPLICABLE DEBTOR AS TO CERTAIN FUTURE MATTERS THAT REFLECT VARIOUS ASSUMPTIONS, WHICH ASSUMPTIONS MAY OR MAY NOT PROVE TO BE CORRECT. THE DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO PROVIDE ADDITIONAL INFORMATION OR TO CORRECT OR UPDATE ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT OR THE EXHIBITS HERETO.

IV. **GENERAL INFORMATION ON THE DEBTORS AND EVENTS LEADING TO THE COMMENCEMENT OF THE CASES**

A. **The Debtors' Business and Corporate Structure**

From its founding in 2002, Raser has had two principal business segments: (i) the exploration, development, construction and operation of geothermal electric plants, referred to as the "Power Systems" segment, and (ii) developing technologies that improve the efficiency of electric motors, generators and power electronic drives used in electric and hybrid electric vehicle propulsion systems, referred to as its "Transportation and Industrial" segment. As discussed in more detail below, in November 2010, Raser sold all of the assets comprising the Transportation and Industrial business segment to a company now called Via ~~Motors~~**Automotive, Inc. ("Via Automotive")**, owned by a private investor group. The consideration Raser received for the sale included cash, Via's assumption of segment related liabilities and the issuance to Raser of approximately $1/3^{rd}$ of Via **Automotive**'s equity. Upon completion of the sale, certain former directors, officers and segment employees of the Debtors joined Via Motors.

Raser became a public company in October 2003, and until recently traded on the New York Stock Exchange ("NYSE") under the symbol "RZ". In November 2010, Raser's Common Stock was delisted by the NYSE and it is now quoted on the Over-the-Counter Bulletin Board under the symbol "RZTI". Each of the Debtors is a direct or indirect wholly-owned subsidiary of Raser.

1. Power Systems Segment

Raser's Power Systems business segment focuses on developing and constructing geothermal power plants. Geothermal energy is derived from the natural heat of the earth and can be used to generate electricity through a transfer medium such as water. Geothermal power plants provide a reliable, continuous power supply in contrast to wind and solar sources that can only produce energy when an abundance of wind or sun is available.

Since its inception, Raser, through its subsidiaries, has accumulated a portfolio of geothermal interests consisting of over 270,000 acres in four western states -- Utah, Nevada, New Mexico and Oregon -- and geothermal rights to over 100,000 acres in Indonesia. Typically, Raser acquires an interest in a property with potential geothermal resources through a limited purpose project entity indirectly owned by Raser. The project entity enters into a long-term geothermal lease with the owner of the property that grants Raser the right to explore and

develop the geothermal resources on the property. In certain situations, Raser project entities also have acquired a fee interest in the real property in areas where wells have been drilled on, or in the vicinity of, the geothermal leasehold interests.

After Raser acquires an interest in a prospect property, it generally further evaluates the property and, if warranted, will drill exploratory wells to analyze the potential for developing and utilizing the geothermal resources at the site. Assuming the initial analysis demonstrates that the resources at the site are sufficient to support an economically feasible power plant, the Debtors undertake construction of the plant facilities, including drilling production and injection wells, installing specialized turbines, transmission lines and pipelines. Only following that significant investment of capital can Raser place the plant into service to produce and sell electricity. As of the date hereof, Raser has one operating geothermal power plant, seven other geothermal power plant projects in the United States in various stages of development, and an additional ten prospect areas that are being studied for possible development.

Raser's only operating power plant project is referred to as the Thermo No. 1 plant, which is located in Southwest Utah. Raser invested approximately $120 million in development and construction costs to put the Thermo No. 1 into service. Currently, Thermo No. 1 is providing approximately 6 megawatts (MW) of electricity to the City of Anaheim, California pursuant to a long-term Power Purchase Agreement (the "Anaheim PPA").

In addition to the Thermo No. 1 plant, Raser is actively developing the Lightning Dock plant in New Mexico. To date, Raser has invested approximately $15 million into the exploration, development and construction of the Lightning Dock project. While Raser is sanguine about the potential production capacity at Lightning Dock, lack of capital and financial difficulties facing the owner of the real property upon which Raser accesses its geothermal leases, including a foreclosure commenced against the owner of the real property, has hindered Raser's ability to finalize the drilling and construction phases to realize the potential at Lightning Dock.

2.      Transportation and Industrial Segment

Raser's Transportation & Industrial segment focused on developing and commercializing Raser's electromagnetic machine and power electronic drive technologies, which are used to increase the torque, power and efficiency in electric motors, generators and machines. The technology Raser developed is particularly well suited for plug-in hybrid electric vehicle propulsion system in larger vehicles where electric motors historically were unable to provide sufficient power to be commercially feasible.

In 2009, Raser integrated its technology into a Hummer demonstration vehicle under a collaborative arrangement with General Motors. The Hummer demonstration vehicle was designed to achieve 100 mpg equivalent to demonstrate the benefits of Raser's plug-in electric drive system. Although General Motors decided to discontinue the Hummer brand, Raser believed that its technology was capable of being used in other types of SUVs and light truck

applications and had negotiated development agreements with several makers of trucks and other heavy equipment.

By November 2010, Raser did not have sufficient funds to continue the basic activities of the ~~Transporation~~**Transportation** and Industrial segment, and certainly did not have adequate capital to complete the research and development of the electric drive systems technology and to fund the commercialization of the technology to market. Additionally, Raser's heavy debt load and capital structure made it practically impossible to source adequate capital for those specific purposes. Accordingly, in November 2010, Raser entered into an agreement with a private investor group, for the purpose of forming and capitalizing a new and independent electric vehicle company, Via Automotive~~, Inc. ("Via Automotive")~~. Under the terms of the transaction, the newly-formed Via Automotive purchased substantially all of the assets related to the Transportation and Industrial segment, including the intellectual property underlying the electric drive systems technology, in exchange for $2.5 million in cash, the assumption of certain liabilities related to the Transportation and Industrial Segment that totaled approximately $700,000, and the issuance to Raser of approximately 39% of the common shares of Via Automotive (now known as Via Motors). In addition, the agreement required that the investor group contribute an additional $2 million in equity capital to Via Automotive and raise an additional $10 million of equity capital, which would not be dilutive of Raser's equity interest. As a result of that transaction, as of the Petition Date, Raser has exited its Transportation and Industrial Segment business segment and holds a 31% minority interest in Via Motors, which reflects an 8% reduction after permitted dilution for issuances to Via's management and Board of Directors.

## B. The Debtors' Capital Structure

The Debtors acquired the significant capital needed for their prepetition exploration, development and construction activities through a variety of sources, including project-level financing transactions, the issuance of convertible notes, unsecured lines of credit and the sale of equity securities. As of the Petition Date, the Debtors' capital structure consists of secured and unsecured debt generally falling within the following eight categories: (i) secured project-financing involving Debtor Thermo No. 1 BE-01, LLC ("Thermo No. 1"), certain other of the Debtors, and Prudential Insurance Company of America, Zurich American Insurance Company and Deutsche Bank Trust Company Americas (collectively, the "Thermo Lenders"); (ii) an unsecured note owed by Raser and certain subsidiary Debtors to Merrill Lynch, Pierce, Fenner & Smith ("Merrill **Lynch**"); (iii) certain 8% convertible senior notes due 2013; (iv) a secured note issued by Raser to Evergreen Clean Energy, LLC ("Evergreen LLC"); (v) an unsecured line of credit from Bombay Investments ("Bombay") and Evergreen Clean Energy Fund LLC ("Evergreen Fund"); (vi) secured financing provided by Evergreen-FE Lightning Dock, LLC ("Evergreen-FE") related to the Debtor's Lightning Dock plant in New Mexico; (vii) a secured bridge loan provided by Linden Capital ~~LP~~**L.P.** (the "Bridge Facility"); and (viii) various unsecured trade debt.

(i) The Thermo 1 Secured Debt

In connection with the development and construction of the Thermo No. 1 plant, in August 2008, certain of the Debtors, including Thermo No. 1, entered into a Credit Agreement, a Deed of Trust, Leasehold Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Production Agreement, an Account and Security Agreement and certain other related security and other agreements (collectively, as amended from time to time, the "Thermo Financing Agreements") with Merrill **Lynch**, as lender, and Deutsche Bank Trust Company Americas, as administrative and collateral agent. Pursuant to the Thermo Financing Agreements, among other things, Thermo No. 1 issued to Merrill **Lynch** that certain Promissory Note dated as of August 31, 2008 (the "Thermo Note"), in the original principal amount of $31,175,092.00.

The Debtors' obligations under the Thermo Note are secured by liens and security interests on the assets of Thermo No. 1, including the proceeds generated from the Anaheim PPA, the equity of Thermo No. 1, which is owned by Debtors Intermountain Renewable Energy, LLC and Columbia Renewable Power, LLC, and certain geothermal leases and other assets owned by the Debtors (collectively, the "Thermo Collateral"). In or about October 2008, Merrill **Lynch** assigned the Thermo Note to the Thermo Lenders, who remain the current holders of the Thermo Note. The outstanding balance due under the Thermo Note on the Petition Date is $10,326,878.25, and those obligations continue to be secured by liens on and security interests in the Thermo Collateral.

To perfect their security interests in the cash proceeds generated by the Anaheim PPA, each monthly payment made to Thermo No. 1 is paid into a lock-box account under the control of the Thermo Lenders in accordance with an Account and Security Agreement. The Debtors submit periodic draw requests to the Thermo Lenders to fund the operating costs associated with the operation of the Thermo No. 1 plant, including certain employee or other costs allocated to Debtor Thermo No. 1 by Raser or other Debtors. After the payment is received in the lock-box account from Anaheim, the Thermo Lenders cause payments to be made directly to the Thermo No. 1 trade creditors and then release any excess funds over certain reserves required to be maintained under the Thermo Financing Agreements to Thermo No. 1.[2] As a result of certain design and mechanical deficiencies that are discussed in more detail below, since being put into service in 2009 the Thermo No. 1 plant has operated on an effectively break-even basis generating only nominal, if any profits from operations.

(ii)     Unsecured Merrill **Lynch** Debt

In addition to the secured debt financing provided pursuant to the Thermo Financing Agreements, Merrill **Lynch** also acquired the Class A membership interests in Debtor Thermo No. 1 for the purpose of providing tax equity capital for the Thermo No. 1 plant. Under the terms of the Thermo Financing Agreements, the Thermo No. 1 plant was to have been completed on or before December 4, 2009. In December 2009, the Thermo Financing Agreements were amended to extend the completion date to February 2010 and to modify the provisions in the

---

[2]   In April 2011, the Thermo Lenders agreed to reduce the required reserve amounts from $250,000 to $50,000 to provide the Debtors with much needed liquidity to fund payroll and other obligations.

Thermo Financing Agreements related to the use of tax credits by Thermo No. 1 and Merrill **Lynch**.

Those amendments were made in order to position Thermo No. 1 to apply for a grant under Section 1603 of the American Recovery and Reinvestment Act of 2009 in lieu of taking production tax credits that it previously was entitled to take. To facilitate the grant, Thermo No. 1, Raser and certain of the other Debtors entered into, among other things, a Membership Interest Redemption Agreement dated December 4, 2009 (the "Redemption Agreement"), pursuant to which Thermo No. 1 redeemed the Class A equity interests held by Merrill **Lynch** and issued to Merrill **Lynch** a promissory note in the original principal amount of $24.5 million (the "Merrill **Lynch** Note").

In February 2010, the Redemption Agreement was amended and restated (the "Amended Redemption Agreement") and the Merrill **Lynch** Note was exchanged by Merrill **Lynch** for a Promissory Note dated June 30, 2010 (the "New Merrill **Lynch** Note"), made by Raser and Debtors Raser Power Systems, LLC, RT Patent Company, Inc., Western Renewable Power, LLC, Intermountain Renewable Power, LLC and Columbia Renewable Power, LLC in the original principal amount of $24.5 million. Under the terms of the Amended Redemption Agreement, the New Merrill **Lynch** Note was to be secured by "springing" liens on and security interests in certain assets of the Debtors, including certain leases and parcels of real property, leases for ancillary parcels of real estate and certain interconnection and related agreements. Those liens were to attach only after the Debtors' obligations under the Thermo Note were satisfied and the liens of the Thermo Lenders in those assets were released.

As noted above, as of the Petition Date, the Thermo Note has an outstanding balance in excess of $10 million, and the Thermo Lenders' liens and security interests have not been released. Accordingly, no security interests or liens have been granted to Merrill **Lynch** under the terms of the Amended Redemption Agreement to secure the Debtors' obligations under the Merrill **Lynch** Note, nor has Merrill **Lynch** taken any action to perfect any such liens or security interests. Accordingly, the debt owed to Merrill **Lynch** is entirely unsecured and totals, as of the Petition Date, approximately $22.6 million.

(iii)     Raser Convertible Unsecured Notes

On March 26, 2008, Raser issued $55 million in aggregate principal amount of its 8.00% Convertible Senior Unsecured Notes due 2013 (the "Convertible Notes"), which are convertible, at the holder's option, to shares of common stock of Raser. Under the terms of the indenture governing the Convertible Notes, interest is to be paid semi-annually at a rate of 8.00% per annum. The total amount due on the Convertible Notes as of the Petition Date is approximately $57,200,000.

A semi-annual interest payment in the amount of approximately $2.2 million was due to be paid by Raser on April 1, 2011, subject to a 30-day cure period in the event Raser failed to timely make the payment.

(iv)    Evergreen LLC Secured Debt

Debtors Raser and Raser Power Systems, LLC ("Raser Power Systems") entered into a Letter Agreement dated October 27, 2010, with Evergreen LLC.  Under the terms of that Letter Agreement, the Debtors agreed to not solicit any additional potential purchasers for the Thermo No. 1 plant until November 30, 2010 and to pay a break-up fee to Evergreen LLC under certain circumstances.  In exchange, Evergreen LLC agreed to advance up to $2.5 million to Raser in the form of one or more term loans in accordance with a Secured Promissory Note issued by Raser (the "Evergreen Secured Note").  The Evergreen Secured Note matures on the earlier to occur of (i) the sale of the Thermo No. 1 plant, or (ii) June 30, 2011 and obligations thereunder bear interest at the rate of 12.00% per annum prior to maturity, and 18.00% per annum following maturity.  As collateral for the Evergreen Secured Note, Raser Power Systems executed a Deed of Trust and Security Agreement and a Security Agreement covering the  leasehold interests in its Alvord prospect, which consists of geothermal leasehold interests located in Harney County, Oregon.

To date, Evergreen LLC has made only one loan to Raser under the Evergreen Secured Note in the amount of $1.15 million, the proceeds of which were used by Raser to make its semi-annual interest payment on the Convertible Notes.  As of the Petition Date, Raser owes approximately $1.2 million to Evergreen LLC under the Evergreen Secured Note.

(v)    Unsecured Evergreen Line of Credit

Raser entered into that certain Unsecured Line of Credit Agreement and Promissory Note dated as of January 27, 2009, by and among Raser and Radion Energy, LLC, Ocean Fund, LLC, Primary Colors, LLC and R. Thomas Bailey (the "Evergreen Line of Credit").  Pursuant to the Evergreen Line of Credit, the lenders agreed to make non-revolving loans to Raser for general corporate purposes up to the  maximum commitment of $15.0 million.  The obligations under the Evergreen Line of Credit accrue interest at the rate of 10.00% per annum and are scheduled to mature on June 30, 2011.

Evergreen Fund and Bombay are the current holders of the Promissory Note, as successor lenders under the terms of the Evergreen Line of Credit.  In October 2010, Raser, Evergreen Fund and Bombay entered into an amendment to the Line of Credit documents pursuant to which, among other things, approximately $2.5 million of the outstanding obligations owed by Raser were converted to common equity in Raser.  Accordingly, as of the Petition Date, Evergreen Fund is owed approximately $2.4 million and Bombay is owed approximately  $0.4 million under the Evergreen Line of Credit.

(vi)    Evergreen-FE Secured Note

On October 1, 2010, Debtor Los Lobos Renewable Power, LLC, Debtor Raser Power Systems LLC and Debtor Lightning Dock Geothermal HI-01, LLC (the "Lightning Dock Project Entity") entered into that certain Letter Agreement (the "Evergreen-FE Letter Agreement") with Evergreen-FE, pursuant to which Evergreen-FE agreed to provide certain loans for the purpose of financing the continued development of the Debtors' Lightning Dock project while the

Debtors and Evergreen-FE negotiated definitive documents pursuant to which Evergreen-FE would purchase 51% of the membership interests of the Lightning Dock Project Entity for a purchase price of approximately $15.3 million. The Evergreen-FE Letter Agreement provided that all amounts loaned to the Lightning Dock Project Entity would be applied to the purchase in the event Evergreen-FE determined to consummate the acquisition. As of the Petition Date, the Debtors and Evergreen-FE have not reached an agreement on the definitive terms of the proposed sale of a controlling stake in the Lightning Dock Project Entity.

In connection with the Evergreen-FE Letter Agreement, the Lightning Dock Project Entity issued a Secured Promissory Note (the "Evergreen-FE Note") to Evergreen-FE, which has a schedule to evidence the various loans being made pursuant to the Evergreen-FE Letter Agreement. The Lightning Dock Project Entity's obligations under the Evergree-FE Note are secured by security interests in certain equipment owned by the Lightning Dock Project Entity. The Evergreen-FE Note has a maturity date of the earlier of (i) June 30, 2011 or (ii) 30 days after the delivery of a notice that Evergreen-FE will not proceed with its investment in the Lightning Dock project and accrues at the rate of .25% per month prior to the maturity date and the rate of 0.83% per month thereafter. As of the Petition Date, the Evergreen-FE Note has an outstanding balance of approximately $3.6 million.

(vii)    Secured Bridge Facility

On April 18, 2011, Debtors Raser and Thermo No. 1 entered into that certain Bridge Loan Agreement (the "Bridge Facility") with Linden Capital ~~Advisors LP~~**L.P.** (the "Bridge Lender"), and certain related security agreements, pursuant to which, among other things, the Bridge Lender made a term loan to the Debtors in the amount of $750,000. The Bridge Facility matures on July 31, 2011 and the outstanding obligations thereunder accrue interest at the rate of LIBOR + 12.25% per annum. The proceeds of the Bridge Facility were used by the Debtors to fund working capital shortfalls, including payroll and other necessary operating expenses, and the costs associated with preparing for these cases.

The Debtors' obligations to the Bridge Lender are secured by (i) first-priority blanket liens and security interests on certain assets of certain of the Debtors and Thermo No. 1 (a) that are not subject to existing liens, and (b) for which no third-party consents or waivers are required to provide or perfect such liens or security interests, and (ii) junior liens and security interests on all assets of certain of the Debtors that are subject to existing liens or security interests, including the Thermo Collateral, and for which no third-party consents or waivers are required to provide such liens or security interests.

(viii)    Unsecured Trade Debt

In the ordinary course of their business, the Debtors incur approximately $600,000 per month of unsecured trade debt, generally related to ongoing operations at the project level entities. Prior to the Petition Date, the Debtors' trade creditors generally provided credit terms that averaged between 15 and 30 days. As a result of the liquidity crisis that the Debtors have been experiencing, the Debtors have managed the payment of their trade creditors to ensure that

those vendors providing essential services were paid. The Debtors estimate that as of the Petition Date they owe approximately $3.5 million to various trade creditors.

## C. Events Leading to Chapter 11 filing

(i) Economic and other business challenges facing the Debtors.

As discussed above, the Debtors' business strategy requires significant initial capital investment to conduct the exploration, research, development and construction of their geothermal assets. Since its inception, Raser has invested more than $200 million in acquiring rights to geothermal resources, research, drilling and developing certain of those resources, and constructing geothermal power projects.

Unfortunately, the Debtors' only fully-operational power plant, Thermo No. 1, has failed to reach its full output potential. Currently, the Thermo No. 1 plant generates approximately 8 MW of gross electrical power. After deducting the "parasitic" load required to power the plant, the net power generated that is available for sale is approximately 6 MW. Both the gross output and the net output of the plant are well below the amounts that the plant was designed to produce due to a number of potential factors, salient among them inefficiencies occurring as a result of the failure of certain equipment to perform to contractual specifications, and the costs to operate and maintain said equipment.

Given the historically tight credit markets of recent years, the highly leveraged nature of the Debtors' capital structure, the overall economic downturn and the failure of the Thermo No. 1 plant to reach expected output levels, the Debtors have faced increasing liquidity issues. In the year preceding the Petition Date, the Debtors have sought capital infusions in the form of both equity and debt, but have been unsuccessful in raising the liquidity necessary to maintain their operations or address the continuing capital required to complete the Lightning Dock project or address the mechanical and design deficiencies at the Thermo No. 1 project.

As it became clear that the Debtors would be unable to secure the necessary liquidity to maintain their operations, they sought to reduce their cash burn through strategic layoffs, transitioned from their corporate headquarters into more modest office space, and conducted several private sales of geothermal leasehold interests to generate cash. Further, the Debtors worked with Evergreen-FE in an effort to consummate the equity investment in the Lightning Dock project contemplated in the Evergreen-FE Letter Agreement. That equity investment did not come to fruition.

In addition, the Debtors retained Bodington & Co. ("Bodington"), an investment bank that specializes in energy project transactions, to seek potential acquirers for the Thermo No. 1 project in Southwest Utah. Bodington marketed the Thermo No. 1 project to more than 60 strategic buyers and financial investors. As a result of those efforts, 21 parties executed confidentiality agreements with the Debtors and conducted due diligence, and five made qualified and/or conditional proposals to acquire the Thermo No. 1 project, although none were considered adequate by the Debtors.

While Bodington was marketing Thermo No. 1, the Debtors also engaged Canaccord Genuity to seek additional capital or potential merger candidates for the Debtors that would permit them to restructure their balance sheet and provide them with sufficient capital to retain and address certain mechanical and design deficiencies at the Thermo No. 1 project, continue development of the Debtors' Lightning Dock project in New Mexico, and exploit the other geothermal resources in their portfolio. The Debtors envisioned this process would overlap with the Bodington process, but sought to ensure every potential opportunity was pursued to facilitate the financial restructuring. Canaccord Genuity approached more than 20 potential strategic and financial investors, nine of which executed confidentiality agreements and engaged in some form of diligence. As the process continued, a number of parties informally indicated an interest, but each expression of interest contained conditions that either made the proposed transaction infeasible or impractical.

Despite the significant efforts of the Debtors and their advisors for almost a year prior to the Petition Date, the Debtors were unable to obtain a firm offer that would be sufficient to satisfy the secured claims related to the Debtors' assets or that would provide any real recovery to the Debtors' other stakeholders.

    (ii)    Negotiation and Execution of the Plan Support Agreement

As the Debtors' financial situation became more tenuous, they engaged in discussions with several of their significant creditor constituencies in the hopes of garnering sufficient concessions or other financial support to permit the Debtors to restructure their business and execute on their business plans. Specifically, the Debtors engaged in discussions with Linden ~~Advisors, LP~~**Capital L.P.** ("Linden") and Tenor Capital Management Company, LP (with certain of its subsidiaries or affiliates, "Tenor"; together with Linden, the "Sponsors"), which in the aggregate hold approximately half of the face amount of the Convertible Notes, and the Thermo Lenders regarding a proposed recapitalization of the Debtors' business.

As a result of those discussions, prior to the Petition Date, the Debtors successfully negotiated a Plan Support and Restructuring Agreement (the "Plan Support Agreement") with the Thermo Lenders and the Sponsors.

The Plan Support Agreement embodied, among other things, the terms for a complete restructuring of the Debtors' balance sheet, the terms of debtor-in-possession financing facility (the "DIP Facility"), and the recapitalization of the Debtors' business through the Plan. The Plan terms embodied in the Plan Support Agreement contemplated that the Sponsors would act as the "stalking horse" bidder with respect to an auction for the equity of reorganized Raser. Specifically, the Plan Support Agreement included the following terms and transactions:[3]

- The Sponsors agreed to provide a DIP Facility to the Debtors in the aggregate amount of $8.75 that was to be used, among other things, to fund the costs

---

[3]  The terms of the Plan Support Agreement discussed herein are qualified in their entirety by the actual terms of the Plan Support Agreement. A true and correct copy of the Plan Support Agreement was attached to the *Declaration of Nicholas Goodman in support of Chapter 11 Petitions and Related Motions* (the "Goodman Declaration"), which was filed on the Petition Date [Docket No. 5].

associated with the chapter 11 proceedings, cover the Debtors' working capital needs, make certain payments to creditors upon confirmation of the plan, and fund the Thermo Lenders Payment (as defined below);

- Following final approval of the DIP Facility, the Plan Support Agreement provided for the indefeasible payment of $6.0 million to the Thermo Lenders (the "<u>Thermo Lenders Payment</u>") to reduce the Debtors' obligations under the Thermo Financing Agreements;

- Following the Thermo Lenders Payment, the Thermo Lenders consented to the priming of their liens on the Thermo Collateral by the liens granted to the Sponsors under the DIP Facility;

- The Plan Support Agreement contemplated that the Debtors would conduct an auction for 100% of the equity of reorganized Raser (the "<u>Reorganized Raser Equity</u>") following Court approval of certain auction procedures, including the approval of the Sponsors' "stalking horse" bid;

- The Sponsors' "stalking horse" bid provided that upon confirmation of the Plan, the Sponsors would purchase the Reorganized Raser Equity on the Effective Date in exchange for the following consideration (the "<u>Purchase Price</u>"): (i) a crediting of the outstanding balance of the DIP Facility, including all fees and interest paid in kind pursuant to the terms thereof, (ii) a crediting of the outstanding balance of the Bridge Facility, (iii) a waiver of the remaining claims of the Thermo Lenders under the Thermo Financing Documents, and (iv) Cash in the amount of $2.5 million~~, subject to a reduction in an amount equal to any unused Commitment under the DIP Facility~~;

- In addition to the Purchase Price, the Plan Support Agreement provided that upon the effective date of the Plan and provided that the Sponsors are the "successful bidder" at the auction for the Reorganized Raser Equity, the Sponsors would make available to the Debtors a $3.0 million working capital facility; and

- Upon the effective date of the Plan, and provided that the Sponsors were the "successful bidder" at the auction for the Reorganized Raser Equity, the Thermo Lenders would receive releases from the Sponsors and the Debtors' estates in exchange for the waiver of any remaining claims they may hold against the Thermo Project Entity.

As of the Petition Date, the Debtors believed that the transactions contemplated by the Plan Support Agreement reflected the best alternative available to maximize the recovery to the Debtors' various creditor constituencies. First, the Debtors had a desperate need to access the financing contemplated by the DIP Facility.

Moreover, the Debtors were convinced that the ultimate value of the Debtors' business following the restructuring and the substantial capital commitment of the Sponsors would provide a significant and meaningful recovery to their creditors and almost certainly represented

a better alternative to the liquidation of their assets. As a result of the consummation of the transactions contemplated by the Plan Support Agreement, the Debtors would have a clean capital structure with virtually no debt, would have sufficient capital to address the design and mechanical issues at the Thermo No. 1 plant, and would be in a position to execute their business plan and develop their significant portfolio of geothermal assets.

As discussed below, the Debtors and the Sponsors agreed after the Petition Date to amend certain terms of the Plan Support Agreement, including by increasing the amount of the DIP Facility and by removing the auction process contemplated therein.

## D.   Significant Post-Petition Date Filings and Events

(i)      Payment of Certain Prepetition Obligations

On the Petition Date, the Debtors filed a number of "first day" motions, which were designed to ensure the Debtors' ability to continue to operate with minimal disruption following the filing of these cases. Specifically, the Debtors requested authority to pay certain pre-Petition Date obligations, primarily related to outstanding amounts owed to their employees in the ordinary course of business.

On May 3, 2011, the Bankruptcy Court conducted a hearing to consider the first day motions and entered orders, among other things, authorizing the Debtors to make payments related to outstanding wage, vacation, severance and related withholding tax obligation.

(ii)     Retention of Professionals

a.      Hunton & Williams LLP

To assist them in carrying out their duties as debtors-in-possession, and to represent their interests otherwise in the cases, the Debtors filed with the Bankruptcy Court an application seeking entry of an order authorizing the Debtors to retain Hunton & Williams LLP as their counsel effective as of the Petition Date. On June 15, 2011, the Court entered an order approving the application on a final basis.

b.      Bayard, P.A.

To assist them in carrying out their duties as debtors-in-possession, and to represent their interests otherwise in the Cases, the Debtors filed with the Bankruptcy Court an application seeking entry of an order authorizing the Debtors to retain Bayard, P.A. as their co-counsel effective as of the Petition Date. On June 15, 2011, the Bankruptcy Court entered an order approving the application on a final basis.

c.      Sichenzia Ross Friedman Ference LLP

To assist them with general corporate matters in the Cases, the Debtors filed with the Bankruptcy Court an application seeking entry of an order authorizing the Debtors to retain Sichenzia Ross Friedman Ference LLP as their general corporate counsel effective as of the

Petition Date. On [INSERT], the Bankruptcy Court entered an order approving the application on a final basis.

      d. ~~Canaccord Genuity~~

~~On [INSERT], the Debtors filed with the Bankruptcy Court an application seeking entry of an order authorizing the Debtors to retain Canaccord Genuity to provide certain financial advisory services to the Debtors effective as of the Petition Date. On [INSERT], the Bankruptcy Court entered an order approving the application on a final basis.~~

      (iii)      Official Committee of Unsecured Creditors

On May 12, 2011, the United States Trustee appointed an official committee of unsecured creditors (the "Committee") in these Cases. The members of the Committee are The Bank of New York Mellon, Bombay Investments and Quantec Geoscience Limited.

The Committee filed with the Bankruptcy Court an application seeking to retain Foley & Lardner LLP and Womble Carlyle Sandridge & Rice, PLLC as bankruptcy counsel in these cases. On June 15, 2011, the Bankruptcy Court entered orders approving the applications on a final basis.

      (iv)      Approval of Amended DIP Facility and Amendments to Plan Support Agreement

As discussed above, prior to the Petition Date, the Debtors and the Sponsors negotiated the terms of the Plan Support Agreement. On the Petition Date, the Debtors filed motions asking the Court to approve the DIP Facility and approve procedures related to the auction contemplated under that agreement. A number of objections to the DIP Facility and proposed auction procedures were filed by, among others, the Committee, **Kraig Higginson,** Evergreen-FE and Merrill Lynch.

To address certain of the issues raised in those objections, the Debtors and the Sponsors agreed to amend the DIP Facility to increase the commitment available to the Debtors from $8.75 million to $12.5 million, to reduce the commitment fee from 10% to 7%, to reduce the interest rate from 15% to 12% and to extend the maturity date. The Debtors and the Sponsors also agreed to withdraw the motion to approve the auction procedures and, rather than conducting an auction, to proceed straight to the proposal of the Plan and the sale of the Reorganized Equity to the Sponsors.

**In addition to those changes, the Sponsors and Mr. Higginson also negotiated the terms of an agreement that apparently resolved Mr. Higginson's objection to the DIP Facility. The Debtors, however, are not party to that agreement, are not privy to the specific terms of the agreement, and are not bound by such terms.**

Following a contested hearing, the Court on June 2, 2011, entered its *Final Order (I) Approving Debtor-In-Possession Financing Pursuant to 11 U.S.C. §§ 105(a), 362, and 364 and Fed. Bankr. P. 2002, 4001 and 9014 and Local Bankruptcy Rule 4001-2; (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 of the Bankruptcy Code; (III)*

*Granting Adequate Protection and Superpriority Administrative Claims; and (IV) Granting Related Relief* [D.I. 165] **(the "Final DIP Order")**, approving the amended DIP Facility and authorizing the other relief requested.

**On June 15, 2011, Evergree-FE perfected an appeal of the Final DIP Order to the United States District Court for the District of Delaware. That appeal remains pending as of the date hereof.**

(v)     Notice of Default Under Anaheim PPA

On May 30, 2011, the Debtors received a copy of a notice from the City of Anaheim Public Utilities Department alleging that Thermo No.1 is a "Defaulting Party," as such term is defined in the Anaheim PPA, and alleging that a number of defaults had occurred under that agreement. As discussed above, pursuant to the Anaheim PPA, the City of Anaheim purchases all of the electricity current produced at the Thermo No. 1 geothermal project and the income from the sale of that electricity represents the Debtors' sole source of income. The Debtors dispute many of the allegations in the notice provided by Anaheim and have responded to that notice.

**(vi)     Lightning Dock Surface Access Litigation**

**On July 11, 2011, the Lighting Dock Project Entity filed a complaint in the Bankruptcy Court (the "Surface Access Litigation") against Rosette, Inc. ("Rosette"), Southern Sky Investments, Inc. ("Southern Sky"), Dale Burgett, Betty D. Beagles and Paula J. Thomas, commencing Adversary Proceeding No. 11-52545 (KJC). In the Surface Access Litigation, the Lightning Dock Project Entity seeks to confirm and enforce its federal and contractual rights to access the surface area adjacent to its mineral rights and to ensure that Southern Sky's pending and stayed foreclosure action does not negatively affect those rights. Specially, in the Surface Access Litigation, the Lightning Dock Project Entity requests that the Bankruptcy Court enter a judgment (i) for declaratory relief -- declaring that its rights under 43 U.S.C. § 299 and the Surface Access and Use Agreement, dated June 10, 2008, between the Lightning Dock Project Entity and Rosette (the "Surface Access Agreement") are senior to Southern Sky's rights under that certain mortgage issued by Rosette to Southern Sky (the "Mortgage"); (ii) in the alternative, for equitable subordination -- equitably subordinating the liens of Southern Sky in the Mortgage to the interests of the Lightning Dock Project Entity in the "surface estate" under 43 U.S.C. § 299 and the Surface Access Agreement; (iii) in the alternative, for merger of title -- declaring that Rosette, Southern Sky, Dale Burgett, Betty D. Beagles and Paula J. Thomas are alter egos of one another and to merge the Mortgage and the fee simple interest in the surface estate into a unified title and deem the Mortgage satisfied; and (iv) in the alternative, for specific performance -- issuing an order of specific performance directing Southern Sky to execute an agreement subordinating the Mortgage to the rights of Lightning Dock in the Surface Access Agreement.**

**(vii)     PWPS Claims**

23

**Certain of the Debtors intend to assert the PWPS Claims in litigation to be commenced against UTC Power, Inc. ("UTCP") and Pratt & Whitney Power Systems, Inc. ("PWPS"). Specifically, certain of the Debtors intend to assert claims for damages arising out of the sale by PWPS and UTCP of their "PureCycle" power generation system for use in the Thermo 1 Project Entity. The PureCycle power generation system and related services were purchased from UTCP for use at the Thermo 1 Project Entity to convert heat from geothermal resources into electricity. In purchasing this system, certain of the Debtors relied on various representations by UTCP concerning such matters as the efficiency, capital costs, functionality and reliability of the system. When the Debtors attempted to get the PureCycle system to work at the Thermo 1 Project Entity, the Debtors discovered that many of these representations had been false and that the PureCycle system was not capable of performing as UTCP had represented. The Debtors believe that the PWPS Claims against UTCP and PWPS relating to the sale of the PureCycle power generation system total somewhere between $10 million to $100 million.**

## V. THE PLAN

THE FOLLOWING SUMMARY PROVIDES ONLY A GENERAL OVERVIEW OF THE PLAN, WHICH IS QUALIFIED IN ITS ENTIRETY BY, AND SHOULD BE READ IN CONJUNCTION WITH, THE PLAN AND THE MORE DETAILED DISCUSSION APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT.

**A.      Classification and Treatment of Claims and Interests**

The Plan designates fifteen Classes of Claims, including five sub-classes, two Classes of Interests and leaves certain Claims unclassified. The following sections describe more fully the classification and treatment of Claims and Interests under the Plan.

  1.  <u>Unclassified Claims – Administrative Claims and Priority Tax Claims</u>

    (a)  Administrative Claims

Administrative Claims are those Claims asserted against the applicable Debtor, as the case may be, that constitute a cost or expense of administration of the Cases allowed under Code § 503(b), including any actual and necessary costs and expenses of preserving any of the Assets of the applicable Debtor, any actual and necessary costs and expenses of operating the Debtor's business, any allowance of compensation and reimbursement of expenses of professionals to the extent allowed by the Court, claims of certain vendors for goods delivered during the 20-days prior to the Petition Date and certain other amounts as set forth in the Plan. The Bankruptcy Code does not require Administrative Claims to be classified under a plan. It does, however, require that Allowed Administrative Claims be paid in full in cash in order for a plan to be confirmed, unless a Holder of such a Claim consents to different treatment. See the discussion of certain risks attendant to the payment of Administrative Claims in the Article VIII below.

The Plan establishes bar dates for Administrative Claims arising prior to the Confirmation Date. The Claims Bar Date for applications or requests for payment of

Administrative Claims arising prior to the Confirmation Date—other than Cure Claims and Administrative Claims for goods or non-professional services provided to the Debtors during the Cases in the ordinary course of business—shall be the first Business Day that is twenty (20) days after the Effective Date.

Pursuant to the Plan, the Holder of each ~~Allowed~~ Administrative Claim ~~shall receive cash from the applicable Estate~~**that is an Allowed Claim, except for Professional Fee Claims, shall receive, in full and final satisfaction of such Holder's Allowed Claim, Cash** in an amount equal to the unpaid portion of such Allowed Claim, or some other, less favorable treatment as is agreed upon by the Debtors **or the Reorganized Debtors, as applicable,** and the Holder of such Allowed Administrative Claim; provided, however, that ~~Allowed~~ Administrative Claims for goods or non-professional services provided to the Debtors during the Cases in the ordinary course of the Debtors' business shall be paid or performed in accordance with the terms and conditions of the particular transactions and any agreements relating thereto. ~~To the extent an Allowed Administrative Claim may related to more than one Estate, the Debtors, in consultation with the Committee, or the Liquidation Trustee shall make commercially reasonable efforts to allocate such Allowed Administrative Claim to the appropriate Estates.  The Claims Bar Date for Professional Fee Claims shall be the first Business Day that is forty-five (45)~~

**The Reorganized Debtors shall pay Professionals who are entitled to reimbursement or allowance of fees and expenses from the Estates, in Cash, in the amount awarded to such Professionals by Final Order of the Bankruptcy Court, as soon as practicable after the later of the Effective Date and the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of such fees and expenses.  Any final application for allowance of a Professional Fee Claim must be filed with the Bankruptcy Court and served on counsel for the Debtors, the Committee and the Reorganized Debtors and the U.S. Trustee so that it is received no later than forty-five** days after the Effective Date ~~of the Plan.~~ **or such Professional Fee Claim shall be forever barred.  Allowed Professional Fee Claims must be paid in full or reserved for in Cash pending allowance by the Bankruptcy Court prior to any payment to Holders of Allowed Unsecured Claims.**

(b)     Priority Tax Claims

Priority Tax Claims are Claims asserted by governmental units entitled to priority under Bankruptcy Code § 507(a)(8).  The Bankruptcy Code does not require Priority Tax Claims to be classified under a plan, but requires that such claims receive the treatment described below unless the Holder of such Claim consents to different treatment.  Any Holder of ~~an Allowed~~**a** Priority Tax Claim **that is an Allowed Claim** shall receive ~~(i) the amount of the Holder's Allowed Priority Tax Claim in one cash payment on or promptly after the Distribution Date or, where applicable, when the tax ultimately becomes Allowed or otherwise due, or (ii~~**, at the discretion of the Reorganized Debtors and in full and final satisfaction of such Holder's Allowed Claim, (a) cash in an amount equal to the unpaid portion of such Allowed Claim, (b**) payment of such Allowed Claim over a period not to exceed five (5) years with interest ~~,~~ **, or (c) some other, less favorable treatment as is agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax Claim.**

**Notwithstanding the foregoing, the Holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any Claim or demand for any such penalty (a) will be subject to treatment as an Unsecured Claim or a Convenience Claim, if and to the extent an Allowed Claim, and (b) the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such amounts from the Reorganized Debtor or the Assets except as an Unsecured Claim or a Convenience Claim, if and to the extent an Allowed Claim.**

A Priority Tax Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes an Allowed Priority Tax Claim. To the extent that some or all of an Allowed Secured Claim for taxes does not qualify as a Priority Tax Claim, but is a valid Allowed Secured Claim, it will be classified as a Class 3 Other Secured Claim.

    2.       <u>Class 1 – Priority Non-Tax Claims</u>

Class 1 consists of all Allowed Priority Non-Tax Claims. Common examples of such Claims include wage claims earned within 180 days of the Petition Date entitled to priority under section 507 of the Bankruptcy Code. Pursuant to authority granted by the Bankruptcy Court, the Debtors have paid, or will have paid, substantially all of these Claims on a current basis and, therefore, anticipate that few, if any, Class 1 Claims will exist on the Effective Date of the Plan. To the extent that there are any such Claims, the Plan provides that such Claims will be paid in full on or shortly after the Effective Date. Accordingly, Class 1 Claims are unimpaired and are not entitled to vote on the Plan pursuant to Bankruptcy Code section 1126(f).

    3.       <u>Class 2 – Secured Claims of Thermo Lenders</u>

~~.~~Class 2 consists of all Allowed Secured Claims and that are secured by Liens on any Assets of the Thermo 1 Project Entity, which Liens were granted pursuant to (a) the Thermo 1 Financing Documents, and/or (b) any other related documents or agreements. ~~On the Effective Date, in~~**In** full and final **settlement,** satisfaction ~~and~~**,** discharge **and release** of all secured claims of the Thermo Lenders arising under the Thermo 1 Financing Documents, the Thermo Lenders shall receive the ~~consideration provided for under the terms of the Thermo Lenders Settlement set forth in the Plan Support Agreement, including without limitation the~~ releases **and indemnification** provided for in Section 9.5 of the Plan**, and the Thermo Lenders shall irrevocably and absolutely release and waive any and all remaining Claims against the Debtors and all Liens against Assets**. Class 2 Claims are impaired under the Plan and are entitled to vote.

    4.       <u>Class 3 – Raser Power Secured Claims</u>

Class 3 consists of all Allowed Secured Claims that are secured by Liens on any Assets of Debtor Raser Power Systems, LLC, which Liens were granted pursuant to (a) the Evergreen Financing Documents, and/or (b) any other related documents or agreements. At the sole option of the Reorganized Debtors, the Holder of the Allowed Class 3 Claim shall receive ~~in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed Class 3~~

~~Secured Claim,~~**on the Effective Date or as soon thereafter as reasonably practicable** (a) a new promissory note **made by Reorganized Debtor Raser Power Systems, LLC,** secured by ~~the same property of the Estate that constitutes~~**a Lien on the Assets that constitute** collateral **security** for such Class 3 Secured Claim and **requiring payments** having ~~a~~**an aggregate** present value equal to the value of such collateral **security**, (b) **turnover of** the property of the ~~Estates~~**Estate** that constitutes collateral **security** for such Allowed Class 3 Secured Claim, or (c) such other, less favorable treatment as is agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Allowed Class 3 Claim.  Class 3 Claims are impaired under the Plan and are entitled to vote.

     5.      <u>Class 4 – Bridge Facility Secured Claims</u>

Class 4 consists of all Allowed Bridge Facility Secured Claims.  On the Effective Date, the Holders of the Allowed Class 4 Claims shall credit all outstanding obligations owed by the Debtors under the Bridge Facility as part of the Purchase Price.  Class 4 Claims are impaired under the Plan and are entitled to vote.

     6.      <u>Class 4 – Lightning Dock Secured Claims</u>

Class 5 consists of all Allowed Secured Claims and that are secured by Liens on any Assets of the Lightning Dock Project Entity, which Liens were granted pursuant to (a) the Lightning Dock Financing Documents, and/or (b) any other related documents or agreements.  On the Effective Date, the Holder of the Allowed Class 5 Claims shall receive~~, at the sole option of the Reorganized Debtors, (a) a new promissory note secured by the same property~~ **(a) turnover** of the ~~Estate that constitutes collateral for such Class 5 Secured Claim and having a present value equal to the value of such collateral, (b) the property of the Estates that constitutes collateral~~**Assets that constitute collateral security** for such Allowed Class 5 Secured Claim ~~on the later of the Effective Date, or as soon thereafter as practicable, or (c~~**or (b)** such other, less favorable treatment as is agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Allowed Class 5 Claim.  Class 5 Claims are impaired under the Plan and are entitled to vote.

     7.      <u>Class 6 – Other Secured Claims</u>

Class 6 consists of Other Secured Claims, which Claims include any right of setoff or recoupment.  The Debtors do not believe that any Other Secured Claims will exist on the Effective Date of the Plan.  To the extent that there are any such Claims, the Plan provides that ~~at the sole option of the Liquidation Trustee, (i) Allowed Class 3 Claims will be unaltered and, subject to the requirements of Section 1124(2) of the Bankruptcy Code, on the Effective Date, the legal equitable and contractual rights of the Holder of Allowed Class 3 Claims shall be reinstated in full, or (ii) the Holder of the Allowed Class 3 Claim shall receive in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed Secured Claim, at the sole option of the Liquidation Trustee, (a) Cash in~~**each Holder of an Allowed Class 6 Claim shall receive, at the sole option of the Reorganized Debtors, on the Effective Date or as soon thereafter as reasonably practicable (a) Cash in amount equal to** the amount of the Allowed **Class 6** Secured Claim ~~on the later of the Effective Date and the date such Claim~~

~~becomes an Allowed Claim, or as soon thereafter as practicable, (b) the property~~**, (b) turnover** of the ~~Estates which constitutes~~**Assets that constitute** collateral **security** for such Allowed **Class 6** Secured Claim ~~on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as practicable~~, or (c) such other, less favorable treatment as is agreed upon by the Debtors or the ~~Liquidation Trustee~~**Reorganized Debtors**, as applicable, and the Holder of such Allowed Class 3**6** Claim.  ~~Accordingly,~~Class 6 ~~Claims are unimpaired~~**is an impaired Class** and ~~are not~~ entitled to vote on the Plan ~~pursuant to Bankruptcy Code section 1126(f)~~.

8.     Class 7 – General Unsecured Claims

The Debtors' Estates are not being substantively consolidated under the Plan.  Accordingly the Plan treats the Assets and creditors of each Debtor separately.  The Holders of General Unsecured Claims in Class 7 are separated into five (5) subgroups, identified as Classes 7(a), 7(b), 7(c), 7(d) and 7(e) to account for the non-consolidation of the Debtor companies.

(a)     Class 7(a) – General Unsecured Claims Against Raser

Class 7(a) consists of all Allowed General Unsecured Claims against Raser (i) that are not Convenience Class Claims, (ii) with respect to which the Holder of such Claim has not made either the Creditor Opt-Out Election or the Cash Election, and (iii) that are not ML Unsecured Claims.  The Plan provides that each Holder of an Allowed Claim in Class 7(a) shall ~~have its claim cancelled and discharged and in exchange therefore shall~~ receive on the Effective Date (a) its Ratable Portion of (i) the membership interests in the Creditor ~~LLC~~**Trust**, and (ii) the Class B membership interests in the Litigation LLC, in each case taking into account the Allowed Claims in Classes 7(b), 7(c) and 7(e) when determining such Ratable Portion, or (b) such other, less favorable treatment as is agreed upon by the Reorganized Debtors and such Holder.  Class 7(a) is an impaired Class and is entitled to vote on the Plan.

(b)     Class 7(b) – General Unsecured Against the Thermo 1 Project Entity

Class 7(b) consists of all Allowed General Unsecured Claims against the Thermo 1 Project Entity (i) that are not Convenience Class Claims, and (ii) with respect to which the Holder of such Claim has not made either the Creditor Opt-Out Election or the Cash Election.  The Plan provides that each Holder of an Allowed Claim in Class 7(b) shall ~~have its claim cancelled and discharged and in exchange therefore shall~~ receive on the Effective Date (a) its Ratable Portion of (i) the membership interests in the Creditor ~~LLC~~**Trust**, and (ii) the Class B membership interests in the Litigation LLC, in each case taking into account the Allowed Claims in Classes 7(a), 7(c) and 7(e) when determining such Ratable Portion, or (b) such other, less favorable treatment as is agreed upon by the Reorganized Debtors and such Holder.  Class 7(b) is an impaired Class and is entitled to vote on the Plan.

(c)     Class 7(c) – General Unsecured Against Lightning Dock Project Entity

Class 7(c) consists of all Allowed General Unsecured Claims against the Lightning Dock Project Entity (i) that are not Convenience Class Claims, and (ii) with respect to which the

Holder of such Claim has not made either the Creditor Opt-Out Election or the Cash Election. The Plan provides that each Holder of an Allowed Claim in Class 7(c) shall ~~have its claim cancelled and discharged and in exchange therefore shall~~ receive on the Effective Date (a) its Ratable Portion of (i)the membership interests in the Creditor ~~LLC~~**Trust**, and (ii) the Class B membership interests in the Litigation LLC, in each case taking into account the Allowed Claims in Classes 7(a), 7(b) and 7(e) when determining such Ratable Portion, or (b) such other, less favorable treatment as is agreed upon by the Reorganized Debtors and such Holder. Class 7(c) is an impaired Class and is entitled to vote on the Plan.

(d)     Class 7(d) – ML Unsecured Against ML Debtors

Class 7(d) consists of all Allowed ML Unsecured Claims against the ML Debtors with respect to which the Holder of such Claim has not made the Creditor Opt-Out Election. Each Holder of an Allowed Claim in Class 7(d) shall ~~have its claim cancelled and discharged and in exchange therefore shall~~ receive ~~(i)~~ on the Effective Date~~,~~ **(i)** the Reorganized Raser Note, and (ii) ~~an amount of Cash equal to fifty percent (50%) of the difference of (x) the Net Raser Proceeds less (y) $15 million~~**a release and waiver of any and all Causes of Action, including without limitation Avoidance Actions, against Merrill Lynch**. Class 7(d) is an impaired Class and is entitled to vote on the Plan.

(e)     Class 7(e) – General Unsecured Against Subsidiary Debtors

Class 7(e) consists of all Allowed General Unsecured Claims against the Subsidiary Debtors (i) that are not Convenience Class Claims, (ii) with respect to which the Holder of such Claim has not made either the Creditor Opt-Out Election or the Cash Election, and (iii) that are not ML Unsecured Claims. The Plan provides that each Holder of an Allowed Claim in Class 7(e) shall ~~have its claim cancelled and discharged and in exchange therefore shall~~ receive on the Effective Date (a) its Ratable Portion of (i) the membership interests in the Creditor ~~LLC~~**Trust**, and (ii) the Class B membership interests in the Litigation LLC, in each case taking into account the Allowed Claims in Classes 7(a), 7(b) and 7(c) when determining such Ratable Portion, or (b) such other, less favorable treatment as is agreed upon by the Reorganized Debtors and such Holder. Class 7(e) is an impaired Class and is entitled to vote on the Plan.

9.     Class 8 – Convenience Class Claims

Class 8 consists of all Allowed Convenience Claims against the Debtors with respect to which the Holder of such Claim has not made the Creditor Opt-Out Election. ~~On the Distribution Date, or as soon as reasonably practical thereafter~~ **To the extent necessary for purposes of Section 1129(a)(10) with respect to one or more of the Debtors, Convenience Class Claims against such Debtor or Debtors shall be considered to be a separate subclass or subclasses within Class 8, and each such subclass shall be deemed to be a separate Class for purposes of the Plan. On the Effective Date**, each Holder of an Allowed Claim in Class ~~6~~**8** shall receive ~~(x) a~~ **a)** ~~Cash payment equal to 10% of the Allowed amount of such Holder's Claims, or (y~~**a)** ~~a~~ **its Ratable Portion of the Convenience Class Fund, or (b**) such other, less favorable

treatment as is agreed upon by the Debtors **or the Reorganized Debtors, as applicable,** and the Holder of such Allowed Claim.  Class 8 is an impaired Class and is entitled to vote on the Plan.

10.    <u>Class 9 – Opt-Out Unsecured Claims</u>

Class 9 consists of all Opt-Out Unsecured Claims.  The Plan provides that on the Effective Date, Claims in Class 9 shall receive no ~~property~~**Assets** or ~~distribution~~**Distribution** under the Plan.  Class 9 is an impaired Class and conclusively deemed to have voted to reject the Plan pursuant to Bankruptcy Code section 1126(g).

11.    <u>Class 10 – Cash Election Unsecured Claims</u>

Class 10 consists of Allowed Unsecured Claims for which the Holder has made the Cash Election.  On the Effective Date, each Holder of an Allowed Claim in Class 10 shall receive (a) a Cash Distribution equal to one percent (1%) of the face amount of such Allowed Class 10 Claim, or (b) such other, less favorable treatment as is agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Allowed Claim.  Class 10 is an impaired Class and is entitled to vote on the Plan.

12.    <u>Class 11 – Subordinated Securities Law Claims</u>

Class 11 consists of all Subordinated Securities Law Claims against the Debtors.  The Plan provides that Holders of Allowed Class 11 Claims shall receive no property or distribution under the Plan. Class 11 is an impaired Class and conclusively deemed to have voted to reject the Plan pursuant to Bankruptcy Code section 1126(g).

13.    <u>Class 12 – Interests in Raser</u>

Class 12 consists of all Interests against Raser.  The Plan provides that on the Effective Date, Interests in Class 12 shall be cancelled and the Holders of such Interests shall receive no ~~property~~**Assets** or ~~distribution~~**Distribution** under the Plan. Class 12 is an impaired Class and conclusively deemed to have voted to reject the Plan pursuant to Bankruptcy Code section 1126(g).

14.    <u>Class 13 – Interests in Subsidiary Debtors</u>

Class 13 consists of all Interests against the Subsidiary Debtors.  The Plan provides that on the Effective Date, Interests in Class 13 shall be cancelled and the Holders of such Interests shall receive no ~~property~~**Assets** or ~~distribution~~**Distribution** under the Plan. Class 13 is an impaired Class and conclusively deemed to have voted to reject the Plan pursuant to Bankruptcy Code section 1126(g).

**B.    Disputed Claims and Interests**

No distribution shall be made with respect to any Disputed Claim, even if a portion of the Claim is not disputed, until the entire Claim is resolved by a Final Order.  At such time as a Disputed Claim becomes an Allowed Claim, the Holder of such Allowed Claim shall receive the

cash and/or other distributions to which such Holder is then entitled to under the Plan, but in no event prior to the later of (i) the Distribution Date, (ii) the date that an order regarding such Claim becomes a Final Order or (iii) in accordance therewith when assets become available for distribution to the Holder of such Claim under the Plan.

## C.   Means for Implementation of the Plan

The Plan is premised upon the consummation of transactions contemplated by the Plan Support Agreement, as well as other agreements and settlements that are the result of extensive negotiations between the Debtors, the Sponsors, the Committee and other Creditors of the Debtors.  The principal transactions is described below.

## 1.   __Privatization__

__On the Effective Date, the Reorganized Debtors shall take such steps as are necessary or advisable to reflect the cancellation of its publicly traded securities and its status as a privately owned company and to cease all public-company reporting.__

## 2.   ~~1.~~ Sale of the Reorganized Raser Equity

On the Effective Date, the Reorganized Debtors shall issue to the Sponsors in exchange for the Purchase Price ~~the~~ (a) __the Reorganized__ Raser Equity, ~~and (b)~~ ~~(i)~~ the Contingent Payment Certificates ~~, and (ii) the Sponsors Note~~ __and (c) in the event that the Lightning Dock Project Entity is removed from the Plan as contemplated by Section 6.4 of the Plan, the Lightning Dock Assigned Contracts__.  The equity of the Reorganized Subsidiary Debtors shall be issued to Reorganized Raser or __any other entity identified by the Reorganized Debtors; provided, however, that the Reorganized Lightning Dock Equity shall not be issued to Reorganized Raser or__ another entity identified by the Reorganized Debtors __in the event that the Lightning Dock Project Entity is removed from the Plan as contemplated by Section 6.4 of the Plan__.

## 3.   ~~2.~~ Entry Into Post-Confirmation Financing Documents

~~On~~ __Within ninety (90) days following__ the Effective Date ~~or as soon thereafter as is reasonably practical~~, the Reorganized Debtors and the Sponsors shall execute and enter into the Post-Confirmation Financing Documents.

## ~~3.   Sponsor Relief From Stay for Certain Subsidiary Debtors~~

## 4.   __Assignment of Certain Executory Contracts and Leases and Sale of Appurtenant Property to Sponsors__

In the event that ~~(i)~~ the Plan is not confirmed with respect to ~~any Subsidiary Debtor as a result of the failure by the Holders of Allowed Claims against the estate of such Subsidiary Debtor to vote in favor of the Plan and (ii) the DIP Facility has not otherwise been satisfied, such Subsidiary Debtor shall be deemed to have been removed from the terms of the Plan and__ __the Lightning Dock Project Entity for any reason, (a) the Lightning Dock Project Entity shall be removed from the Plan, (b)__ the Plan shall become effective with respect to each of the

remaining Debtors. ~~Further,~~ **in accordance with its terms, (c) the Plan shall constitute a motion by the Lightning Dock Project Entity to (i) assume and assign the Lightning Dock Assigned Contracts , including without limitation any related permits, to the Sponsors pursuant to section 365 of the Bankruptcy Code and (ii) sell any appurtenant property, other than Assets that constitute collateral under the Lightning Dock Financing Documents, to the Sponsors pursuant to section 363(f) of the Bankruptcy Code, and (d)** the Confirmation Order shall provide that ~~the Sponsors shall be granted immediate relief from stay with respect to the estate of any Subsidiary Debtor that is removed from the Plan to permit the Sponsors to exercise their rights~~**(i) as substitute consideration to the Sponsors in lieu of the Interests in the Reorganized Lightning Dock Equity, the Lightning Dock Project Entity shall be and is authorized and directed to assume and assign the Lightning Dock Assigned Contracts , including without limitation any related permits, and sell any appurtenant property, other than Assets that constitute collateral under the Lightning Dock Financing Documents, to the Sponsors or their designee in full and final satisfaction of the Lightning Dock Project Entity's obligations under the DIP Financing Documents, and (ii) the Lightning Dock Project Entity's obligations to the Sponsors** under the terms of the DIP ~~Financing Documents with respect to the Assets of such Subsidiary Debtor. Any recoveries from the exercise of such rights shall be applied to reduce the obligations of the Debtors under the DIP Financing Documents.~~**Facility and the Bridge Facility shall remain in full force and effect until such time as the Confirmation Order has become a Final Order and the assumption and assignment of the Lightning Dock Assigned Contracts to the Sponsors has closed.**

~~4.~~   ~~Consummation of the Thermo Lenders Settlement~~

~~On the Effective Date, the Reorganized Debtors, the Sponsors and the Thermo Lenders shall consummate the transactions contemplated by the Thermo Lenders Settlement.~~

5.   Formation of Litigation LLC

On the Effective Date, **(i)** the ~~Reorganized Debtors shall form a~~ Litigation LLC **shall be established** in accordance with Delaware law ~~and~~**pursuant to the terms of the Litigation LLC Operating Agreement annexed to the Plan as Exhibit 6.5 (ii)** all of the Debtors' right, title and interests in the ~~claims, rights, counter claims and all other rights the Debtors have against Pratt & Whitney Power Systems and UTC Power Corporation ("UTC") arising from or in any way related to (A) that certain Sourcing and Development Agreement, dated as of April 6, 2007, between UTC and Raser, (B) that certain Purchase Contract, dated August 31, 2008, between UTC and the Thermo 1 Project Entity, (C) that certain Step In and Standstill Agreement, dated as of August 31, 2008, between the Thermo 1 Project Entity, Raser and UTC, (D) that certain Service Agreement, dated August 31, 2008, between UTC and the Thermo 1 Project Entity, (E) that certain Reimbursement Agreement, dated as of August 31, 2008, between Raser and UTC, and (F) all related agreements, in each case as such agreements may have been amended from time to time (such claims, rights and causes of action, the "PWPS Claims")~~**PWPS Claims** shall be transferred to the Litigation LLC and shall vest in the Litigation LLC, free and clear of all Claims and Interests of any Person~~. The~~**, (iii) the** Reorganized Debtors ~~also~~ shall contribute $500,000 ~~of cash~~ to the Litigation LLC~~. The~~**, and (iv) the** Litigation LLC ~~then~~ shall issue **(A)** its

Class A **membership interests** to the Reorganized Debtors**,** and ~~the~~**(B) its** Class B **membership interests to Creditors** in accordance with the Plan.

Subject to the terms of the Litigation LLC Operating Agreement ~~annexed as an exhibit to the Plan~~, the holder(s) of the Class A membership interests in the Litigation LLC shall be (i) entitled to exercise sole and absolute control over the prosecution and/or settlement of the PWPS Claims, (ii) obligated to fund through capital contributions all costs and expenses associated with the prosecution and/or settlement of the PWPS Claims, and (iii) entitled to distributions equal to seventy-percent (70%) of an amount equal the difference of (A) the gross proceeds recovered from the prosecution and/or settlement of the PWPS Claims, <u>less</u> (B) all capital contributions made by the Reorganized Debtors, including the initial $500,000 contribution made upon the formation of the Litigation LLC.

~~The holder(s)~~**Subject to the terms of the Litigation LLC Operating Agreement, the holders** of the Class B membership interests in the Litigation LLC shall be entitled to distributions equal to thirty-percent (30%) of an amount equal to ~~(i~~**the difference of (A)**) the gross proceeds recovered from the prosecution and/or settlement of the PWPS Claims, <u>less</u> ~~(ii~~**B**) all capital contributions made by the Reorganized Debtors, including the initial $500,000 contribution made upon the formation of the Litigation LLC~~, used to fund the costs and expenses associated with the prosecution and/or settlement of the PWPS Claims~~.

Subject to the terms of the Litigation LLC Operating Agreement, the Litigation LLC shall not make any distributions to the holders of Class A or Class B membership interests, whether from the proceeds of the prosecution and/or settlement of the PWPS Claims or otherwise, until such time as the Litigation LLC has returned to the Reorganized Debtors all capital contributions made to the Litigation LLC.

6.      Formation of Creditor ~~LLC~~**Trust**

*Formation of the Creditor Trust.*  **On or prior to the Effective Date, the Creditor Trust shall be formed.  The Creditor Trustee shall sign the Creditor Trust Agreement and accept the Assets to be transferred to the Creditor Trust pursuant to such agreement and this Plan on behalf of the beneficiaries thereof, and the Creditor Trust will then be deemed created and effective without any further action of the Debtors or the employees, officers, directors, members, partners or shareholders of the Debtors.  The Creditor Trust shall be established for the purpose of liquidating its assets and making post-Effective Date distributions under the Plan, with no objective to continue or engage in the conduct of a trade or business.  The beneficiaries of the Creditor Trust shall be bound by the Creditor Trust Agreement.  Interests in the Creditor Trust shall be uncertificated and shall be transferable subject, as applicable, to Bankruptcy Rule 3001(e) and any other provision of applicable law.  The Creditor Trust shall have a term of five (5) years from the Effective Date, without prejudice to the rights of the Creditor Trustee to extend such term as applicable law shall allow.**

*Creditor Trust Agreement.*  **The Creditor Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including but not**

**limited to, any and all provisions necessary to govern the rights, powers, obligations and appointment and removal of the Creditor Trustee and to ensure the treatment of the Creditor Trust as a liquidating trust for federal income tax purposes. In the event a provision of this Plan or Confirmation Order conflicts with a provision of the Creditor Trust Agreement, the provisions of the Creditor Trust Agreement shall control.**

*__Selection of Creditor Trustee__*__. The Creditor Trustee shall be selected by the Committee prior to the Confirmation Date and shall be reasonably acceptable to the Debtors and the Committee. The Creditor Trustee shall commence serving as the Creditor Trustee on the Effective Date; provided however, that the party appointed as Creditor Trustee shall be permitted to act in accordance with the terms of the Creditor Trust Agreement from the Confirmation Date through the Effective Date and shall be entitled to seek compensation in accordance with the terms of the Creditor Trust Agreement and this Plan.__

*__Plan Advisory Committee__*__.__

- **On the Effective Date, the Plan Advisory Committee shall be appointed and shall adopt bylaws to govern the actions of the Plan Advisory Committee.**

- On the Effective Date, the Creditor LLC shall be established in accordance with Delaware law pursuant to the Creditor LLC Operating Agreement annexed to the Plan, and a manager**The Plan Advisory Committee shall consist of three members** selected by the Committee shall be appointed pursuant to that agreement. The Debtors shall transfer to the Creditor LLC (i) the D&O Claims, and (ii) the Avoidance Claims. In addition, the Reorganized Debtors shall loan the sum of $200,000 to the Creditor LLC pursuant to**from Holders of Allowed Unsecured Claims in Classes 7(a), 7(b), 7(c) or 7(e) who are willing to serve. The initial members of the Plan Advisory Committee shall be identified in the Plan Supplement. The composition of the Plan Advisory Committee after the Effective Date shall be governed by the Creditor Trust Agreement.**

- **The fiduciary duties, as well as the privileges, immunities and protections, that applied to the Committee prior to the Effective Date shall apply to the Plan Advisory Committee after the Effective Date. The duties and powers of the Plan Advisory Committee shall terminate upon the termination of the Creditor Trust.**

- **The Plan Advisory Committee's role shall be to advise and consult with the Creditor Trustee as more particularly set forth in the Creditor Trust Agreement. The Plan Advisory Committee shall have the rights and duties set forth in the Creditor Trust Agreement.**

- **The members of the Plan Advisory Committee shall serve without compensation or reimbursement of expenses.**

*Estate Representative.* **The Creditor Trustee shall be deemed the Estates' representative in accordance with the Bankruptcy Code, including but not limited to section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in this Plan and the Creditor Trust Agreement, including, without limitation, the powers of a trustee under sections 704, 108, and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules (including without limitation, commencing, prosecuting or settling Causes of Action transferred to the Creditor Trust, enforcing contracts, and asserting claims, defenses, offsets and privileges), to the extent not inconsistent with the status of the Creditor Trust as a liquidating trust within the meaning of Treasure Regulations 301.7701-4(d) for federal income tax purposes.**

*Actions against the Creditor Trustee.* **Absent the express permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding shall be commenced against the Creditor Trustee in its official capacity, with respect to its status, duties, powers, acts or omissions as Creditor Trustee in any forum other than the Bankruptcy Court.**

*Bond.* **The Creditor Trustee shall at all times maintain a bond, in accordance with** the terms of the Creditor ~~LLC Promissory Note. The Creditor LLC Operating Agreement shall provide that no distributions may be made to members of the Creditor LLC until such time as the Creditor LLC has satisfied the obligations arising under the Creditor LLC Promissory Note~~**Trust Agreement, acceptable to the U.S. Trustee or as approved by the Bankruptcy Court.**

*Term and Compensation of the Creditor Trustee.*

- **The Creditor Trustee shall be compensated in accordance with the terms of the Creditor Trust Agreement. The Creditor Trustee may be removed or replaced in accordance with the procedures set forth in the Creditor Trust Agreement.**

- **In the event of the death or in competency (in the case of a Creditor Trustee that is a natural person), dissolution (in the case of a Creditor Trustee that is a corporation or other entity), bankruptcy , insolvency or removal of the Creditor Trustee, a successor trustee may be appointed in accordance with the Creditor Trust Agreement.**

*Responsibilities of the Creditor Trustee.* **The rights, duties and powers of the Creditor Trustee shall include the following, but in all cases shall be subject to and consistent with the terms of this Plan:**

- **The Creditor Trustee shall succeed to all such powers as would have been applicable to the Debtors with respect to the Assets of the Debtors transferred to the Creditor Trust, and the Creditor Trustee**

shall be authorized to take all actions as the Creditor Trustee determines is in the best interests of the beneficiaries of the Creditor Trust.

- The Creditor Trustee, in its reasonable business judgment, and in an expeditious but orderly manner, shall liquidate and convert to cash the Creditor Trust Assets and shall make all distributions in accordance with this Plan. The liquidation of the Creditor Trust Assets may be accomplished either through the sale of the Creditor Trust Assets (in whole or in combination), including the sale of Causes of Action, or through prosecution or settlement of any Causes of Action, or otherwise.

- The Creditor Trustee shall be expressly authorized to do the following:

    (i) institute, prosecute, collect, compromise and settle any Causes of Actions transferred to the Creditor Trust in accordance herewith and without further approval or application to the Bankruptcy Court, except as otherwise provided the Plan, including prosecuting and/or settling Causes of Actions in any court of appropriate jurisdiction and participate as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding and litigate or settle such Causes of Action on behalf of the Debtors or the Estates, and/or to pursue such Causes of Actions to settlement or judgment;

    (ii) open and maintain bank accounts in the name of the Creditor Trust, draw checks and drafts thereon by the sole signature of the Creditor Trustee and terminate such accounts as the Creditor Trustee deems appropriate;

    (iii) make Distributions and take other actions consistent with this Plan and the implementation hereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate reserves, in the sound discretion of the Creditor Trustee;

    (iv) collect and liquidate all assets of the Creditor Trust and to administer the winding-up of the Creditor Trust;

    (v) file, prosecute, or object to any Claims in Classes 7(a), 7(b), 7(c) or 7(e) (whether Disputed or otherwise), and to compromise or settle any such Claims prior to or after objection without supervision or approval of the Court, free of

any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the guidelines and requirements of the U. S. Trustee, other than those restrictions expressly imposed by this Plan, and/or to seek Court approval for settlement of such Claims made after objection;

(vi)    retain or engage professionals, employees and consultants to the Creditor Trustee and to pay the fees and charges incurred by the Creditor Trustee and the Creditor Trustee's professionals, employees and consultants relating to the implementation of this Plan without application to the Bankruptcy Court; provided, however, that if the Creditor Trustee and the Plan Advisory Committee do not agree on such fees and expenses, such parties can apply to the Bankruptcy Court for approval of such fees and expenses;

(vii)    take all other actions not inconsistent with the provisions of this Plan that the Creditor Trustee deems reasonably necessary or desirable with respect to administering this Plan;

(viii)    invest Cash or moneys received by the Creditor Trust or otherwise held by the Creditor Trust; provided, however, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected the Plan, or under applicable IRS guidelines, rulings, or other controlling authorities;

(ix)    execute any documents, pleadings and take any other actions related to, or in connection with, the liquidation of the Assets transferred to the Creditor Trust pursuant to the Plan and the exercise of the Creditor Trustee's powers granted the Plan;

(x)    enter into any agreement or execute any document required by or consistent with this Plan and perform all of the obligations thereunder; or

(xi)    purchase and maintain all insurance policies and pay all insurance premiums and costs the Creditor Trustee deems necessary or advisable.

*Valuation of Assets.*  As soon as practicable after the Effective Date, the Creditor Trustee shall make a good faith determination of the fair market value of the Creditor Trust Assets.  This valuation shall be used consistently by all parties (including, without

**limitation, the Debtors, the Creditor Trustee and the holders of beneficial interests in the Creditor Trust) for all federal and state income tax purposes.**

*Federal Income Tax Treatment of the Creditor Trust.* **For federal income tax purposes, it is intended that the Creditor Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations and that such trust be owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution from the Debtors' Estates of an undivided interest in each of the assets of the Creditor Trust and then contributed such interests to the Creditor Trust.**

*Creditor Trust Assets Treated as Owned by Holders of Allowed Claims.* **For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Creditor Trust, and the Holders of Allowed Claims in Classes 7(a), 7(b), 7(c) and 7(e)) shall treat the transfer of Assets to the Creditor Trust for the benefit of the Holders of Allowed Claims, as (i) a transfer of the assets of the Debtors' Estates directly to the Holders of Allowed Claims, followed by (ii) the transfer by such Holders to the Creditor Trust of the assets of the Creditor Trust in exchange for beneficial interests in the Creditor Trust. Accordingly, the Holders of such Allowed Claims shall be treated for federal income tax purposes as the grantors and owners of their respective share of the assets of the Creditor Trust.**

*Tax Reporting.*

- **The Creditor Trustee shall file returns for the Creditor Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Section 6.7(m)(i) of the Plan. The Creditor Trustee also shall annually send to each holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their federal income tax returns. The Creditor Trust's taxable income, gain, loss, deduction or credit will be allocated (subject to Section 6.17 of the Plan, relating to Disputed Claims) to the Holders of Allowed Claims in accordance with their relative beneficial interests in the Creditor Trust.**

- **Notwithstanding anything else in the Plan, subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, the Creditor Trust shall (i) treat any Disputed Claim Reserve, consisting of separate and independent shares to be established with respect to each Disputed Claim, in accordance with the trust provisions of the Tax Code (sections 641 et. seq.), (ii) treat as taxable income or loss of the Disputed Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Creditor Trust that would have been allocated to the holders of Disputed Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable**

year with respect to which such Claims are unresolved), (iii) treat as a distribution from the Disputed Claims Reserve any increased amounts distributed by the Creditor Trust as a result of any Disputed Claims resolved earlier in the taxable year, to the extent such distributions relate to taxable income or loss of the Disputed Claims Reserve determined in accordance with the provisions hereof, and (iv) to the extent permitted by applicable law, shall report consistent with the foregoing for state and local income tax purposes. All Holders of beneficial interests in the Creditor Trust shall report, for tax purposes, consistent with the foregoing.

- The Creditor Trustee shall be responsible for payments, out of the Creditor Trust assets, of any taxes imposed on the Creditor Trust or its assets, including the Disputed Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Creditor Trustee as a result of the resolutions of such Disputed Claims.

*Dissolution*. The Creditor Trustee shall be discharged and the Creditor Trust shall be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the assets of the Creditor Trust have been liquidated, (iii) all Distributions required to be made by the Creditor Trustee under the Plan and the Creditor Trust Agreement have been made, and (iv) all appropriate tax filings have been completed, but in no event shall the Creditor Trust be dissolved later than five years from the Effective Date unless the Bankruptcy Court, upon motion within the six month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension (to the extent allowed by applicable law) is necessary to facilitate or complete the recovery and liquidation of the assets of the Creditor Trust. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained within six (6) months prior to the expiration of each extended term; provided, however, that the aggregate of all such extensions shall not exceed three (3) years, unless the Creditor Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Creditor Trust as a liquidating trust within the meaning of Treasury Regulations 301.7701-4(d) for federal income tax purposes.

*Resignation, Death or Removal of Creditor Trustee*. The Creditor Trustee may resign at any time upon 30 days' notice to the Bankruptcy Court, counsel to the Creditor Trustee, and the Plan Advisory Committee. Any party in interest, including the Plan Advisory Committee, may move for the removal of the Creditor Trustee for cause upon providing notice to counsel to the Creditor Trustee and the Plan Advisory Committee; provided,

**however, that if the Creditor Trustee or any other party in interest shall object to such removal within 20 days of such notice, such removal shall not be effective until approved by the Bankruptcy Court. No successor Creditor Trustee hereunder shall in any event have any liability or responsibility for the acts or omissions of any of his or her predecessors. Every successor Creditor Trustee appointed pursuant hereto shall execute, acknowledge and deliver to the Bankruptcy Court an instrument in writing accepting such appointment hereunder, and thereupon such successor Creditor Trustee, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of his or her predecessor. Notwithstanding any other provision in this Plan, upon the resignation or removal of a Creditor Trustee, a Creditor Trustee shall continue to serve in such capacity until such time as a successor Creditor Trustee is identified and accepts the appointment on substantially the terms as the resigning Creditor Trustee and notice is provided to the Court of such successor Creditor Trustee pursuant to this Section; provided, however, upon the death or incapacity of the Creditor Trustee, the Bankruptcy Court may approve the appointment of a new Creditor Trustee in accordance with the terms of the Creditor Trust Agreement**.

7.   <u>Assumption of Management Agreements</u>.

On the Effective Date, the Reorganized Debtors shall assume the management agreements with certain key managers of the Debtors, as such agreements may be amended to address issues associated with the conversion of Raser from a public to a private company.

**8.   <u>Vesting of Assets.</u>**

**As of the Effective Date, all Assets of each of the Debtors shall vest in the Reorganized Debtors free and clear of all Claims, Liens, and Interests, and all setoff and/or recoupment rights, except as otherwise specifically provided in the Plan or in the Confirmation Order.**

**9.**   8. <u>Preservation of Causes of Action</u>

Except as otherwise provided in the Plan or in any contact, instrument, release or agreement entered into in connection with the Plan, in accordance with the provisions of the Bankruptcy Code, including but not limited to section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall be vested with, retain, and may exclusively enforce and prosecute any claims or Causes of Action that the Debtors or the Estates may have against any Person or entity. Without further order of the Bankruptcy Court, the Reorganized Debtors shall be substituted as the party in interest in all adversary proceedings pending on the Effective Date. Notwithstanding anything to the contrary in the Plan, no ~~distribution~~**Distribution** shall be made to the Holder of any Claim, including by way of setoff or recoupment by such claimant, if the Debtors or the Reorganized Debtors, as applicable, have taken action to recover, or given notice to the applicable party of intent to take such action, on a Cause of Action against the Holder of such Claim (or the direct or indirect transferor of such Holder), until such Cause of Action is resolved.

# **10.** ~~9.~~ Injunction

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE DOCUMENTS EXECUTED PURSUANT TO THE PLAN, OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES WHO HAVE HELD, CURRENTLY HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS OR THE ESTATES THAT AROSE PRIOR TO THE EFFECTIVE DATE (INCLUDING BUT NOT LIMITED TO STATES AND OTHER GOVERNMENTAL UNITS, AND ANY STATE OFFICIAL, EMPLOYEE, OR OTHER ENTITY ACTING IN AN INDIVIDUAL OR OFFICIAL CAPACITY ON BEHALF OF ANY STATE OF OTHER GOVERNMENTAL UNIT) ARE PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING AGAINST ANY ~~PROTECTED~~**RELEASED** PARTY OR ANY PROPERTY OF ANY ~~PROTECTED~~**RELEASED** PARTY; (II) ENFORCING, ATTACHING, EXECUTING, COLLECTING, OR RECOVERING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST ANY ~~PROTECTED~~**RELEASED** PARTY; (III) CREATING, PERFECTING, OR ENFORCING, DIRECTLY OR INDIRECTLY, ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST ANY ~~PROTECTED~~**RELEASED** PARTY OR ANY PROPERTY OF ANY ~~PROTECTED~~**RELEASED** PARTY; (IV) ASSERTING OR EFFECTING, DIRECTLY OR INDIRECTLY, ANY SETOFF OR RIGHT OF SUBROGATION OF ANY KIND AGAINST OBLIGATIONS DUE TO ANY ~~PROTECTED~~**RELEASED** PARTY OR ANY PROPERTY OF ANY ~~PROTECTED~~**RELEASED** PARTY; OR (V) ANY ACT, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, COMPLY WITH, OR IS INCONSISTENT WITH ANY PROVISIONS OF THE PLAN. ANY PERSON OR ENTITY INJURED BY ANY WILLFUL VIOLATION OF SUCH INJUNCTION SHALL RECOVER ACTUAL DAMAGES, INCLUDING COSTS AND ATTORNEYS' FEES, AND, IN APPROPRIATE CIRCUMSTANCES, MAY RECOVER PUNITIVE DAMAGES FROM THE WILLFUL VIOLATOR. NOTHING CONTAINED ~~HEREIN~~**THE PLAN** SHALL PROHIBIT THE HOLDER OF A DISPUTED CLAIM FROM LITIGATING ITS RIGHT TO SEEK TO HAVE SUCH DISPUTED CLAIM DECLARED AN ALLOWED CLAIM AND PAID IN ACCORDANCE WITH THE PLAN.

## **11.** ~~10.~~ Term of Stay

UNLESS OTHERWISE PROVIDED IN ACCORDANCE WITH THE PLAN OR AN APPLICABLE ORDER OF THE BANKRUPTCY COURT, ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CASES PURSUANT TO SECTIONS 105 OR 362 OF THE BANKRUPTCY CODE SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE ENTRY OF THE FINAL DECREE. IN ACCORDANCE THEREWITH, AND WITHOUT LIMITING THE FOREGOING, UNTIL THE ENTRY OF THE FINAL DECREE, ALL PERSONS OR ENTITIES ARE STAYED FROM (I) THE COMMENCEMENT OR CONTINUATION OF A JUDICIAL, ADMINISTRATIVE OR OTHER ACTION OR PROCEEDING, INCLUDING THE EMPLOYMENT OF SERVICE OF PROCESS, AGAINST THE DEBTORS THAT WAS OR COULD HAVE BEEN COMMENCED PRIOR TO THE PETITION DATE, OR TO RECOVER A CLAIM AGAINST THE DEBTORS THAT AROSE PRIOR TO THE PETITION DATE, (II) THE ENFORCEMENT, AGAINST THE DEBTORS OR AGAINST PROPERTY OF THE ESTATES, OF A JUDGMENT OBTAINED BEFORE THE PETITION DATE, (III) ANY ACT TO OBTAIN POSSESSION OF PROPERTY OF THE ESTATES OR OF PROPERTY FROM THE ESTATES OR TO EXERCISE CONTROL OVER PROPERTY OF THE ESTATES, (IV) ANY ACT TO CREATE, PERFECT, OR ENFORCE ANY LIEN AGAINST PROPERTY OF THE ESTATES, AND (V) ANY ACT TO COLLECT, ASSESS, OR RECOVER A CLAIM AGAINST THE DEBTORS THAT AROSE BEFORE THE PETITION DATE.

## **12.** ~~11.~~ Release and Exculpation of Released Parties

THE PLAN PROVIDES THAT ~~EFFECTIVE~~EFFECTIVE AS OF THE EFFECTIVE DATE, EACH RELEASED PARTY ~~SHALL   BE~~IS HEREBY EXCULPATED AND RELEASED FROM ANY CLAIM (AS DEFINED IN SECTION 2.1(P) HEREOF), CAUSE OF ACTION OR LIABILITY TO ANY PERSON OR ENTITY OR TO ANY HOLDER OF A CLAIM OR INTEREST, FOR ANY ACT OR OMISSION IN CONNECTION WITH OR ARISING OUT OF OR RELATING TO THE DEBTORS THAT OCCURRED OR AROSE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING WITHOUT LIMITATION ANY ACT OR OMISSION RELATED TO THE FORMULATION, CONFIRMATION, CONSUMMATION, AND/OR ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, ~~EXCEPT   IF~~UNLESS SUCH ACT OR OMISSION IS

DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT~~, AND ,__~~IN ALL RESPECTS, EACH ~~OF SUCH PERSONS~~RELEASED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES AND SHALL BE FULLY PROTECTED IN ACTING OR IN REFRAINING FROM ACTION IN ACCORDANCE WITH SUCH ADVICE. WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, THE RELEASES AND EXCULPATIONS IN FAVOR OF ANY CURRENT OR FORMER OFFICER OR DIRECTOR OF THE DEBTORS SHALL BECOME EFFECTIVE IF, AND ONLY IF, SUCH OFFICER OR DIRECTOR HAS EXECUTED ~~AN AGREEMENT IN FORM AND SUBSTANCE ACCEPTABLE TO THE DEBTORS, PURSUANT TO WHICH SUCH OFFICER OR DIRECTOR AGREES TO USE BEST EFFORTS TO ASSIST THE REORGANIZED DEBTORS, THE LITIGATION LLC AND THE CREDITOR LLC IN THE PURSUIT OF CAUSES OF ACTION~~A COOPERATION AGREEMENT IN SUBSTANTIALLY THE FORM ANNEXED AS EXHIBIT 9.4 TO THE PLAN.

## 13. ~~12. Releases~~ ~~and,~~ Indemnification **and Injunctions** Related to Thermo Lenders Settlement

Each of the Debtors, the Estates, the Reorganized Debtors and the Sponsors and the successors and assigns of any of them, and any other person that claims or might claim through, on behalf of, or for the benefit of any of the foregoing, shall be deemed to have irrevocably and unconditionally, fully, finally and forever waived, released, acquitted and discharged the Thermo Lenders from any and all claims (as defined in the Bankruptcy Code), counterclaims, demands, debts, actions, causes of action, suits, losses, damages or liabilities of any nature whatsoever, whether known or unknown, that arise from or in any way relate to the Thermo 1 Financing Documents.

~~In addition to the foregoing releases, the~~**The** Reorganized Debtors shall indemnify the Thermo Lenders for a period of three (3) years after the Effective Date against any claim, demand or liability arising from any action, failure or omission to act, and arising from any claim against the Thermo Lenders being released pursuant to **Section 9.5(a) of** the Plan.

**All persons and entities are permanently enjoined from initiating any action against the Thermo Lenders related to any matters for which the Thermo Lenders are released under the Plan or for which there is indemnification of said parties under the Plan.**

**14.** ~~13.~~ United States Trustee Fees

Each of the Debtors' Estates will pay quarterly fees to the Office of the United States Trustee until their respective cases are closed under Section 350 of the Bankruptcy Code and provide relevant reports to show the amount of such fee that is due.

**D.   Executory Contracts and Unexpired Leases**

The following shall be the treatment of Executory Contracts:

1.    ~~Rejection~~**Assumption** of Certain Executory Contracts

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into in connection with the Plan, on the Effective Date, pursuant to Bankruptcy Code § 365, the Debtors will assume each of the Executory Contracts listed on Exhibit 7.1 to the Plan; provided, however, that the Debtors reserve the right, at any time prior to the Effective Date, to amend Exhibit 7.1 to (a) delete any Executory Contract listed ~~therein~~**in the Plan**, thus providing for its rejection pursuant to Section 7.2 of the Plan or (b) add any Executory Contract thereto, thus providing for its assumption pursuant to Section 7.1 of the Plan.  The Debtors will provide notice of any amendments to Exhibit 7.1 to the non-Debtors parties to the Executory Contracts affected thereby and to those parties entitled to notice pursuant to Bankruptcy Rule 2002.  Each contract and lease listed on Exhibit 7.1 will be assumed only to the extent that such contract or lease constitutes an Executory Contract.  Listing a contract or lease on Exhibit 7.1 will not constitute an admission by the Debtors or the Reorganized Debtors that the contract or lease is an Executory Contract or that the Debtors or Reorganized Debtors have any liability thereunder.

2.    Executory Contracts Rejected if Not Assumed

On the Effective Date, except for an Executory Contract that was previously assumed, assumed and assigned or rejected by an order of the Bankruptcy Court or that is assumed pursuant to Section 7.1 of the Plan, each Executory Contract of every kind and nature entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms prior to the Effective Date will be rejected pursuant to section 365 of the Bankruptcy Code, except:  (i) any Executory Contract that is the subject of a separate motion to assume or reject filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the entry of the Confirmation Order, provided, however, that upon denial or withdrawal of any such motion, such executory contract or unexpired lease shall automatically be deemed rejected as of the Effective Date; and (ii) any agreement, obligation, security interest, transaction or similar undertaking that the Debtors believe is not an Executory Contract that is later determined by the Bankruptcy Court to be an Executory Contract that is subject to assumption or rejection under section 365 of the Bankruptcy Code, which agreements shall be subject to assumption or rejection within 30 days of any such determination.  Any order entered after the Confirmation Date by the Bankruptcy Court, after notice and hearing, authorizing the rejection of an Executory Contract shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief were granted and such order were entered prior to the

Confirmation Date. The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejection of the Executory Contracts as provided for by Section 7.2 of the Plan, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

        3.        <u>Cure Claims Related to the Assumption of Executory Contracts</u>

To the extent that any Cure Claim constitutes a monetary default, such Cure Claim will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the Debtors' option: (a) by payment of the Cure Claim as an Allowed Administrative Claim or (b) on such other terms as are agreed to by the parties to the Executory Contract. If a dispute arises regarding (x) the amount of any Cure Claim, (y) the ability of the Debtors, the ~~Liquidation Trustee~~**Reorganized Debtors** or assignee to provide adequate assurance of future performance under the contract or lease, or (z) any other matter pertaining to the assumption of such Executory Contract, the payment of the Cure Claim set forth in the preceding sentence will be made following the entry of a Final Order resolving the dispute and approving the assumption.

        4.        <u>Bar to Rejection Damages</u>

If the rejection of any Executory Contract under the Plan gives rise to a Claim by the non-Debtor party or parties to such Executory Contract, such Claim, to the extent that it is timely filed and is an Allowed Claim, shall be classified in ~~Class~~**Classes** 7(a), 7(b), 7(c), 7(d) ~~or~~, 7(e) **or 8,** as appropriate; <u>provided</u>, <u>however</u>, that the Unsecured Claim arising from such rejection shall be forever barred and shall not be enforceable against the Debtors, the ~~Liquidation Trust~~**Reorganized Debtors**, their successors or properties, unless a proof of such Claim is filed and served on the ~~Liquidation Trust~~**Debtors or the Reorganized Debtors, as applicable,** within ~~twenty~~**thirty** (~~20~~**30**) days after the date of notice of the entry of the order of the Court rejecting the Executory Contract, which may include, if applicable, the Confirmation Order. To the extent Rejection Claims initially are Disputed Claims, but subsequently become Allowed Claims, the ~~Liquidation Trust~~**Reorganized Debtors** shall pay such Rejection Claims in accordance with the Plan, but nothing ~~herein~~**the Plan** shall constitute a determination that any such rejection gives rise to or results in a Claim or constitutes a waiver of any objections to such Claim by the Debtors, the ~~Liquidation Trust~~**Reorganized Debtors** or any party in interest**.**

        **5.**        **<u>Cancellation of Documents or Instruments Evidencing Claims and Interests</u>**

**<u>Except as otherwise provided in the Plan, on the Effective Date, the promissory notes, share certificates (including treasury stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, commitments, or any other agreements of any character to acquire such Interests shall be deemed canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors under the notes, share certificates, and other agreements and instruments governing such Claims and Interests shall be discharged. The Holders of or parties to such canceled notes, share certificates, and other agreements and instruments shall have no rights arising from or</u>**

**relating to such notes, share certificates, and other agreements and instruments, or the cancellation thereof, except the rights provided pursuant to the Plan**.

**E.      Retention of Jurisdiction**

      1.     <u>General Scope of Retention of Jurisdiction</u>

Following the Effective Date, the Bankruptcy Court shall retain jurisdiction over these Cases to the extent legally permissible, including without limitation such jurisdiction as is necessary to ensure that the purposes and intent of the Plan are carried out.

      2.     <u>Claims and Actions</u>

The Bankruptcy Court shall retain jurisdiction (a) to classify, resolve objections to, and determine or estimate pursuant to Bankruptcy Code § 502(c) all Claims against, and Interests in, the Debtors and (b) to adjudicate and enforce all claims and causes of action owned by the Debtors or the ~~Litigation LLC~~**Reorganized Debtors on the Effective Date**.

      3.     <u>Specific Jurisdiction</u>

Without in any way limiting the scope of the Bankruptcy Court's retention of jurisdiction over these Cases as otherwise set forth in the Plan, the Bankruptcy Court shall retain jurisdiction for the following specific purposes:

      (a)     To determine all questions and disputes regarding title to the respective Assets of the Debtors, all causes of action, controversies, disputes or conflicts, whether or not subject to any pending action as of the Effective Date, between the Debtors and any other party, including without limitation any **Causes of Action and any** right to recover Assets pursuant to the provisions of the Bankruptcy Code;

      (b)     To modify the Plan after the Effective Date pursuant to the Bankruptcy Code, the Bankruptcy Rules, and applicable law;

      (c)     To enforce and interpret the terms and conditions of the Plan or the Confirmation Order;

      ~~(d)~~     ~~To enforce and interpret the terms and conditions of the Plan Support Agreement;~~

      **(d)**     ~~(e)~~ To enter such orders, including, but not limited to, such future injunctions as are necessary to enforce the respective title, rights and powers of the ~~Liquidation Trustee~~**Reorganized Debtors**, and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Bankruptcy Court may deem necessary;

**(e)** ~~(f)~~ To enter a final decree closing the Cases;

**(f)** ~~(g)~~ To correct any defect, cure any omission or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to implement the purposes and intent of the Plan;

**(g)** ~~(h)~~ To determine any and all objections to the allowance or classification of Claims;

**(h)** ~~(i)~~ To adjudicate all claims or controversies to a security or ownership interest in any of the Debtors' Assets or in any proceeds thereof;

**(i)** ~~(j)~~ To determine any and all applications for allowances of compensation and reimbursement of expenses and the reasonableness of any fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code;

**(j)** ~~(k)~~ To determine any applications or motions pending on the Effective Date for the rejection, assumption or assumption and assignment of any Executory Contract and to hear and determine, and, if need be, to liquidate any and all Claims arising therefrom;

**(k)** ~~(l)~~ To determine any and all motions, applications, adversary proceedings and contested matters that may be pending on the Effective Date or filed thereafter;

**(l)** ~~(m)~~ To remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court~~,~~ to the extent authorized by the Plan or the Bankruptcy Court;

**(m)** ~~(n)~~ To determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan;

**(n)** ~~(o)~~ To consider and act on the compromise and settlement of any Claim against or cause of action by or against the Debtors arising under or in connection with the Plan;

**(o)** ~~(p)~~ To issue such orders in aid of execution of the Plan as may be authorized by **section 1142 of the** Bankruptcy Code ~~§ 1142~~;

**(p)** ~~(q)~~ To determine such other matters or proceedings as may be provided for under Title 28 or any other title of the United States Code, the Bankruptcy Code, the Bankruptcy Rules, other applicable law, the Plan or in any order or orders of the Bankruptcy Court, including, but not limited to, the Confirmation Order or any order which may arise in connection with the Plan or the Confirmation Order;

    **(q)** ~~(r)~~ To make such orders as are necessary or appropriate to carry out the provisions of the Plan;

    **(r)** ~~(s)~~ To adjudicate all claims of any nature by any person which may be adverse or otherwise affect the value of the property of the Estates dealt with by the Plan;

    **(s)** ~~(t)~~ To determine any other matters not inconsistent with the Bankruptcy Code; and

    **(t)** ~~(u)~~ To make such orders and/or take such action as is necessary to enjoin ~~the~~**any** interference with the implementation or the consummation of the Plan.

4.    Failure of Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, declines to exercise, or is otherwise without jurisdiction over any matter arising out of the Cases, including the matters set forth in Article VIII of the Plan, the provisions of the Plan shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

5.    Revocation and Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan at any time before entry of a Confirmation Order.  If the Debtors, or one of the individual Debtors, as the case may be, revoke or withdraw the Plan prior to the Confirmation Date, or if the confirmation or the Effective Date does not occur with respect to one or more of the Debtors, then the Plan shall be deemed to be null and void as to that Estate.  In such event, nothing contained herein, in the Plan or in any document relating to the Plan shall be deemed to constitute an admission of validity, waiver or release of any Claims by or against the Debtors or any Person or to prejudice in any manner the rights of the Debtors or any Person in any proceeding involving the Debtors.

6.    Section 1145 Exemption.

Pursuant to Bankruptcy Code § 1145, neither section 5 of the Securities Act of 1933 nor any State or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, shall apply with respect to a security being offered, sold or transferred under the Plan in exchange for a Claim against the Debtors.

7.    Section 1146(a) Exemption

Pursuant to Bankruptcy Code § 1146(a), the issuance, transfer or exchange of any security under the Plan or the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, or the re-vesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated by the

Plan shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee.

# VI. CONFIRMATION AND CONSUMMATION PROCEDURE

## A. Disclosure and Solicitation

This Disclosure Statement is presented to the Holders of Claims and Interests that are entitled to vote on the Plan to satisfy the requirements Sections 1125 and 1126 of the Bankruptcy Code. Section 1125 of the Bankruptcy Code requires that full disclosure be made to all Holders of Claims and Interests in impaired Classes which receive or retain property pursuant to a plan at the time, or before, solicitation of acceptances of such plan is commenced.

## B. Acceptance of the Plan

As discussed in Article III of this Disclosure Statement, the Bankruptcy Code defines acceptance of a plan by a Class of creditors or interest-holders as acceptance by holders of more than two-thirds in dollar amount and more than one-half in number of the Claims of that Class that have timely voted on a plan. A vote may be disregarded if the Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

A vote to accept or reject the Plan can only occur by proper submission of a duly executed Ballot. Failure of a holder to vote does not constitute a vote to reject the Plan by that holder. Each Holder of a Claim or Interest should seek such independent legal and/or business advice as it deems appropriate regarding whether to vote to accept or reject the Plan.

## C. Classification

The Debtors are required under Section 1122 of the Bankruptcy Code to classify the Claims and Interests into Classes that contain Claims and Interests that are substantially similar to the other Claims or Interests in such Class. The Plan can be confirmed so long as there is at least one consenting Class of impaired Claims under the Plan (not including the votes of insiders), and so long as the other requirements for confirmation are met.

## D. Confirmation

The Bankruptcy Code requires the Court, after notice, to hold a Confirmation Hearing. At the Confirmation Hearing, the Court will confirm the Plan only if all the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for Confirmation of a plan are that the Plan be (i) accepted by all impaired Classes of Claims and Interests or, if rejected by an impaired Class, that the Plan "not discriminate unfairly" and be "fair and equitable" as to such impaired Class; (ii) feasible; and (iii) in the "best interests" of rejecting Holders of Claims and Interest impaired under the Plan.

1.   Acceptance

Classes 2, 3, 4, 5, **6,** 7(a), 7(b), 7(c), 7(d), 7(e), 8 and 10 are impaired under the Plan and entitled to vote and, therefore, must accept the Plan in order for it to be Confirmed.  Because Classes 9, 11, 12 and 13 are impaired under the Plan and deemed to have rejected the Plan under Section 1126(g) of the Bankruptcy Code, the Court must determine that the Plan is "fair and equitable" with respect to those rejecting Classes.  The "fair and equitable" test is described below under the heading *Confirmation Without Acceptance by All Impaired Classes*.

2.   Feasibility

The Plan is premised on the consummation of the transactions contemplated by the Plan Support Agreement, the creation of the Litigation LLC and the Creditor ~~LLC~~**Trust**, the liquidation of certain claims and causes of action, and the consummation of the other transactions contemplated under the Plan.  Upon the occurrence ~~of~~**or** the closing of those transactions, the Debtors believe that sufficient proceeds will exist to implement the terms of the Plan and make all of the distributions provided for ~~therein~~**in the Plan**.

3.   Best Interests Test

With respect to each impaired Class, confirmation of the Plan requires that each Holder of an Allowed Claim or Allowed Interest in such Class either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  Under the Debtors' Liquidation Analysis attached as <u>Exhibit B</u> hereto, the Debtors estimate that in a Chapter 7 liquidation case, Holders of Secured Claims in Classes 2, 3, ~~4 and 5~~**4, 5 and 6 likely would receive a lesser recovery from the Debtors' Estates,** and Unsecured Claims in Classes 1, 7(a), 7(b), 7(c), 7(d), 7(e), 8 and 10 likely would receive ~~a significantly smaller recovery from the Debtors' Estates, if any~~**no** recovery at all.  Accordingly, the treatment provided to such Classes under the Plan is substantially better than such Classes would receive in a Chapter 7 liquidation.  See Article IX, *Alternatives to Confirmation and Consummation of the Plan*, and the Debtors' Liquidation Analysis attached as <u>Exhibit B</u> hereto for a further discussion of why the Debtors believe that the Plan is in the best interests of Holders of Claims and Interests.

4.   Confirmation Without Acceptance By All Impaired Classes

The Bankruptcy Code provides that, so long as at least one Class of Claims that is impaired under the Plan accepts the Plan (without respect to the votes cast by insiders), the Debtors may seek confirmation of the Plan over the objections of any non-consenting Class, provided that the Debtors demonstrate that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Classes.  These "cramdown" provisions for confirmation of the Plan, despite the non-acceptance of one or more impaired Classes of Claims or Interests, are set forth in Bankruptcy Code § 1129(b).

The Bankruptcy Code establishes different "fair and equitable" tests for Holders of Secured Claims, Unsecured Claims and Interests. The respective tests are as follows:

(a)     Secured Creditors

Either (i) each impaired Holder of Secured Claim of the rejecting Class (a) retains its liens in the collateral securing such Claim or in the proceeds thereof to the extent of the allowed amount of the Secured Claim and (b) receives deferred cash payments in at least the allowed amount of such Secured Claim with a present value at the Effective Date at least equal to such creditor's interest in its collateral or in the proceeds thereof; or (ii) the Plan provides each impaired Holder of a Secured Claim with the "indubitable equivalent" of its Secured Claim.

(b)     Unsecured Creditors

Either (i) each impaired Holder of an Unsecured Claim of the rejecting Class receives or retains under the Plan property of a value equal to the amount of its Allowed Claim; or (ii) the Holders of Claims and Interests that are junior to the Claims of the dissenting Class do not receive or retain any property under the Plan.

(c)     Interest Holders

Either (i) each Interest Holder of the rejecting Class receives or retains under the Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption prices, if any, of the Interest it holds or (b) the value of such Interest or; (ii) the Holders of Interests that are junior to such Interest do not receive or retain any property under the Plan.

The Debtors believe that the Plan meets the applicable tests described above, even in the event that it is rejected by the Holders of one or more Classes of Claims and Interests.

## VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES

**THE FOLLOWING IS NOT INTENDED TO BE A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN FOR HOLDERS OF CLAIMS AND INTERESTS ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN INDIVIDUAL TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER.**

The following is a general summary of certain significant U.S. federal income tax consequences of the Plan to the Holders of certain Claims and Interests. This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury Department regulations promulgated thereunder ("Treasury Regulations"), judicial decisions and

current administrative rulings and practice as in effect on the date hereof. These authorities are all subject to change at any time by legislative, judicial or administrative action, and such change may be applied retroactively in a manner that could adversely affect Holders of Claims or Interests and the Debtors.

Due to a lack of definitive judicial or administrative authority or interpretation, the complexity of the application of the Tax Code and Treasury Regulations to the implementation of the Plan, the possibility of changes in the law, the differences in the nature of various Claims and Interests and the potential for disputes as to legal and factual matters, the tax consequences discussed herein are subject to substantial uncertainties.

### A.    Tax Consequences for the Debtors

Subject to certain exceptions, a debtor generally recognizes cancellation of indebtedness ("COD") income upon satisfaction of outstanding indebtedness equal to the excess of  (i) the adjusted issue price of the indebtedness satisfied less (ii) the sum of the issue price of any new indebtedness issued, the amount of cash paid, and the fair market value of any other consideration (including stock of the debtor) given in satisfaction of the indebtedness.

A debtor may not be required to include COD income in gross income if the discharge of the debt occurs in a case under Title 11. However, under the Tax Code the debtor generally must, after the determination of the tax imposed for the year of discharge, reduce its tax attributes (including net operating loss ("NOL") carryovers, tax credits, capital loss carryovers, and/or the tax basis of its assets) by the amount of COD income excluded from gross income by this exception.

The Debtors anticipate that they will recognize COD income as a result of the transactions contemplated by the Plan. Because the COD income will be realized in a Title 11 case, however, the Debtors may not be required to include the COD income in taxable income for 2011. Accordingly, the Debtors believe that any COD income may simply reduce the tax attributes related to their prior operations and assets.

In addition, the Debtors do not believe that the transactions contemplated by the Plan will permit them to retain the benefit of the NOL carryovers related to their prior operations. However, the Debtors intend to explore alternatives, including alternative structures for certain of the transactions contemplated by the Plan, that may permit the Reorganized Debtors to preserve the value of some or all of their accumulated NOL carryovers.

### B.    Tax Consequences for Holders of Claims and Interests

The Debtors anticipate that the Litigation LLC will be taxed as a partnership for federal income tax purposes. If classified as a partnership, the Litigation LLC itself will not be subject to federal income tax. Rather, each member of the Litigation LLC will be required to include, on its own income tax return, its share of the income or loss of the Litigation LLC, whether or not such member has received or will receive a distribution of cash or property from the Litigation LLC.

The Debtors or the Reorganized Debtors, as applicable, will withhold Distributions provided under the Plan and required by law to be withheld, and will comply with all applicable reporting requirements of the Tax Code. Under the Tax Code, interest, dividends and other "reportable payments" may under certain circumstances be subject to "backup withholding". Backup withholding generally applies if the Holder (i) fails to furnish his social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends, or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct TIN and the Holder is not subject to backup withholding. Your Ballot contains a place to indicate your TIN.

Creditors and Holders of Interests should consult their respective individual tax advisors for more specific advice on the tax implications of the Plan on their specific situation.

## VIII. CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS

### A. Risk of Breach or Non-Closing of the Transactions Contemplated by the Plan Support Agreement and the Plan

The Plan is largely premised upon the consummation of the transactions contemplated by the Plan Support Agreement, as they may have been amended from time to time. If certain events occur or the Debtors fail to confirm the Plan within the time provided, the Sponsors may have the right to terminate that agreement. If the Plan Support Agreement is terminated or if the Sponsors fail to perform under the terms of the Plan Support Agreement, the Debtors likely would not have the means to effectuate the distributions contemplated by the Plan. To the extent the Sponsors fail to perform under the Plan Support Agreement, the Debtors reserve their rights to pursue any and all causes of action arising as a result of such failure of performance before the Bankruptcy Court.

### B. Risk of Loss From Operations

The Plan is premised upon certain estimates of, among other things, the results of the Debtors' operations both prior to and after the Effective Date, the Debtors' ability to monetize certain assets in a timely manner and at certain levels, and the cash available to the Debtors on the Effective Date. Because the Debtors' business is primarily in a developmental stage and still requires large amounts of capital investment, there is a risk that the Debtors' estimates of available cash will be wrong by a material amount. In that event and because of the Debtors' limited ability to generate income, the Debtors may be unable to satisfy all obligations required to be paid under the Plan.

### C. Risk of Successfully Creating Value for Creditors Through the Liquidation LLC and the Creditor ~~LLC~~Trust

Based on the Debtors' present forecasts, the estimated range of potential distributions to General Unsecured Creditors varies from a nominal sum to up to [ ]% of the Allowed amount of Unsecured Claims. The potential to have more than a nominal distribution to unsecured creditors, if any distribution at all, also will depend on, among other things, the success of the

Litigation LLC and Creditor ~~LLC~~**Trust** in pursuing various claims and causes of action being transferred to those entities, and controlling the costs associated with those efforts. The Debtors cannot state with any certainty the value that will be available for the creditors as a result of those actions.

**D. Forward Looking Statements in this Disclosure Statement May Prove to be Inaccurate**

Many of the statements included in this Disclosure Statement and related exhibits and schedules contain forward-looking statements and information relating to the Debtors. These forward-looking statements are generally identified by the use of terminology such as "may," "will," "could," "should," "potential," "continue," "expect," "intend," "plan," "estimate," "project," "forecast," "anticipate," "believe," or similar phrases or the negatives of such terms. These statements are based on the beliefs of management as well as assumptions made using information currently available to management. Such statements are subject to risks, uncertainties and assumptions, as well as other matters not yet known or not currently considered material by management. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those anticipated, estimated or projected. Given these risks and uncertainties, you are cautioned not to place undue reliance on such forward-looking statements. Forward-looking statements do not guarantee future performance. You should recognize these statements for what they are and not rely on them as facts. None of the Debtors undertakes any obligation to update or revise any of these forward-looking statements to reflect new events or circumstances after the date of this Disclosure Statement.

**IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

If the Plan is not confirmed or consummated, the alternatives include, in addition to dismissal of the Cases, (i) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code or (ii) an alternative Chapter 11 plan.

**A. Liquidation Under Chapter 7**

If no plan can be confirmed or the Court determines other cause exists for conversion, the bankruptcy cases may be converted to cases under chapter 7 of the Bankruptcy Code. In chapter 7, a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to creditors in accordance with priorities established by the Bankruptcy Code.

The Debtors believe that liquidation under chapter 7 likely would result in no distributions to Creditors with Unsecured Claims (in contrast to the expected distributions under the Plan) due to the lack of viable alternatives for the Debtors. Absent the consideration being provided under the Plan Support Agreement and the other transactions contemplated by the Plan, there is little or no likelihood that there would be sufficient assets available to satisfy the Secured Claims against the Debtors' Assets. Moreover, conversion to chapter 7 and the appointment of a chapter 7 trustee would result in substantial additional Administrative Claims related to the

attorneys and other professionals necessary to assist such trustee and their need to extensively study these bankruptcy cases in order to fulfill their fiduciary duties, as well as the delays attendant to the chapter 7 trustee's need analyze issues and research the background of the Debtors, their assets and liabilities and the recovery analysis. Indeed, the Debtors' Liquidation Analysis concludes that under a chapter 7 liquidation, it is unlikely that any distributions would be made to creditors holding Unsecured Claims against the Debtors. A copy of the Liquidation Analysis is Annexed hereto as <u>Exhibit B</u>.

**B.      Alternative Plan(s) of Reorganization**

If the Debtors' exclusive period to file a plan of reorganization and solicit acceptances of a plan of reorganization expires pursuant to § 1121 of the Bankruptcy Code, other parties could propose their own plans of reorganization for the Debtors. The Debtors believe that the transactions and settlements reflected in the Plan and this Disclosure Statement will result in quicker and higher recoveries for all constituencies than any alternative scenario.

The Debtors believe that confirmation and implementation of the Plan are preferable to any realistic alternatives available to the Debtors and recommend that all Creditors vote in favor of the Plan.

# X. CONCLUSION AND RECOMMENDATION

The Debtors believe that acceptance of the Plan is in the best interest of Creditors and recommend that you vote to accept the Plan.

> **RASER TECHNOLOGIES, INC., RASER TECHNOLOGIES OPERATING COMPANY, INC, RASER POWER SYSTEMS, LLC, RT PATENT COMPANY, INC., PACIFIC RENEWABLE POWER, LLC, WESTERN RENEWABLE POWER, LLC, INTERMOUNTAIN RENEWABLE POWER, LLC, LOS LOBOS RENEWABLE POWER, LLC, COLUMBIA RENEWABLE POWER, LLC, TRUCKEE GEOTHERMAL NO. 1 SV-01, LLC, TRUCKEE GEOTHERMAL NO. 2, SV-04, LLC, TRAIL CANYON GEOTHERMAL NO. 1 SV 02, LLC, DEVIL'S CANYON GEOTHERMAL NO. 1 SV-03, LLC, THERMO NO. 1 BE-01, LLC, THERMO NO. 2 BE-02, LLC, THERMO NO. 3 BE-03, LLC, CRICKET GEOTHERMAL NO. 1 MI-01, LLC, HARMONY GEOTHERMAL NO. 1 IR-01, LLC, LIGHTNING DOCK GEOTHERMAL HI-01, LLC, KLAMATH GEOTHERMAL NO. 1 KL-01, LLC, and BORAX GEOTHERMAL NO. 1 HA-01, LLC.**
>
> y:    /s/ *Nicholas Goodman*
> Name: Nicholas Goodman

## EXHIBIT A
## TO DISCLOSURE STATEMENT

**Joint Plan of Reorganization of**
**Raser Technologies, Inc. and its Affiliates**

# EXHIBIT B
# TO DISCLOSURE STATEMENT


## Liquidation Analysis

Document comparison done by Workshare DeltaView on Friday, July 22, 2011 5:13:05 PM

| Input: | |
|---|---|
| Document 1 | interwovenSite://EMF_US/HW_US/35106538/7 |
| Document 2 | interwovenSite://EMF_US/HW_US/35106538/10 |
| Rendering set | H&W |

| Legend: |
|---|
| **Insertion** |
| ~~Deletion~~ |
| ~~Moved from~~ |
| Moved to |
| Style change |
| Format change |
| ~~Moved deletion~~ |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 283 |
| Deletions | 208 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 491 |